STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| Amanda Seutter and Brittany Yelle, Individually and on behalf of a class of similarly situated individuals, | Case Type: Civil Other<br>Court File No.: 27-CV-24-7741<br>Hon. Thomas J. Conley |
| Plaintiff, | |
| v. | **NOTICE OF REMOVAL**<br>**TO FEDERAL COURT** |
| MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC, | |
| Defendants. | |

TO:    Court Administrator
       Hennepin County District Court
       300 South Sixth Street
       Minneapolis, MN 55487

PLEASE TAKE NOTICE that, under title 28, United States Code Sections 1332(d), 1441, 1446, and 1453, on June 6, 2024, Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC filed a Notice of Removal with respect to the above-captioned case in the United States District Court District of Minnesota. A true and correct copy of that filing is attached as **Exhibit A**.

Dated: June 6, 2024                        SOULE & STULL LLC
                                           By: /s/George W. Soule
                                               George W. Soule (#0103664)
                                               7201 Metro Boulevard, Suite 200
                                               Edina, MN 55439
                                               Tel: 612.353.6403
                                               Fax: 612.573.6484
                                               Email: gsoule@soulestull.com

                                               and

Jennifer L. Mesko (*pro hac vice* forthcoming)
Ethan W. Weber (*pro hac vice* forthcoming)
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Tel: 216.592.5000
Fax: 216.592.5009
Email: jennifer.mesko@tuckerellis.com
       ethan.weber@tuckerellis.com

*Attorneys for Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC*

2

# Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| AMANDA SEUTTER, *et al.*, | ) |
| | ) Case No. 0:24-cv-2179 |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) (Removed From the Fourth Judicial |
| MEAD JOHNSON NUTRITION COMPANY, | ) District of Hennepin County, Minnesota; |
| *et al.*, | ) Case No. 27-CV-24-7741) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' NOTICE OF REMOVAL

Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC remove this case from the Fourth Judicial District of Hennepin County, Minnesota, under title 28, United States Code Sections 1332, 1441, 1446, and 1453. The grounds for removal are as follows:

### BACKGROUND

1.      On May 3, 2024, Plaintiffs Amanda Seutter and Brittany Yelle filed a Complaint in the Fourth Judicial District Court for Hennepin County, Minnesota against Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC (together, "Mead Johnson"). (**Exhibit 1**.)

2.      This putative class action involves several Mead Johnson infant formula products, including: Enfamil® A.R.™, Enfamil® Gentlease®, Enfamil® Enspire™ Gentlease®, Enfamil® NeuroPro™, Enfamil® NeuroPro™ Sensitive, Enfamil® Nutramigen®, and Enfamil® ProSobee® (the "Products"). *See* Compl. ¶ 1 n.1.

3.      Plaintiffs allege the Products contain "Heavy Metals," including arsenic, cadmium, and lead, but Mead Johnson does not disclose that on its packaging. *See, e.g.*, Compl. ¶¶ 43–44 (**Ex. 1**).

4.      As a result, Plaintiffs allege Mead Johnson violated Minnesota's Unlawful Trade Practices Act, Uniform Deceptive Trade Practices Act, False Statement in Advertising Act, Prevention of Consumer Fraud Act, and breached other statutory and common law duties. *See id.* ¶¶ 179–294.

5.      Plaintiffs also seek to maintain this lawsuit as a class action on behalf of "[a]ll persons who are residents of Minnesota who, from May 1, 2018, to the present, purchased the Infant Formulas in Minnesota for household use, and not for resale." *Id.* ¶ 173.

## GROUNDS FOR REMOVAL

**I.      This Court has original jurisdiction under the Class Action Fairness Act of 2005.**

6.      "A primary purpose in enacting CAFA was to open the federal courts to corporate defendants out of a concern that the national economy risked damage from a proliferation of meritless class action suits." *Bell v. Hershey Co.*, 557 F.3d 953, 957 (8th Cir. 2009).

7.      "CAFA's provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014) (cleaned up).

8.      "CAFA expands federal diversity jurisdiction to include class actions in which more than $5 million is in controversy if any member of a class of plaintiffs is a citizen of a State different from any defendant." *Pirozzi v. Massage Envy Franchising, LLC*, 938 F.3d 981, 983 (8th Cir. 2019) (quotation omitted).

9.      All three CAFA requirements are satisfied because there (1) is minimal diversity, (2) are more than 100 putative class members, and (3) is more than $5 million at issue in the aggregate. *See* 28 U.S.C. § 1332(d). There are also no exceptions to CAFA jurisdiction. *See* 28 U.S.C. § 1332(d)(4).

**A.     The parties are minimally diverse.**

10.     Plaintiff Seutter is a citizen of Minnesota, resides in Elk River, Minnesota, and allegedly purchased some Enfamil® Gentlease® in Minnesota. Compl. ¶¶ 31–32 (**Ex. 1**).

11.     Plaintiff Yelle is a citizen of Minnesota, resides in Plymouth, Minnesota, and allegedly purchased Enfamil® Neupro™ and Enfamil® Gentlease® in Minnesota. *Id.* ¶¶ 35–36.

12.     Defendant Mead Johnson Nutrition Company ("Mead Johnson Nutrition") is a Delaware corporation with its principal place of business in Evansville, Indiana. *See id.*, ¶ 39.

13.     Defendant Mead Johnson & Company, LLC ("Mead Johnson & Company") is a limited liability company headquartered in Evansville, Indiana and organized under Delaware law. *See* Mead Johnson & Company, LLC Ind. Sec. of State Bus. Entity Report (Dec. 2023) (**Exhibit 2**).

14.     Thus, the parties are minimally diverse because Plaintiffs are citizens of a State different from both Mead Johnson Nutrition and Mead Johnson & Company. 28 U.S.C. § 1332(d)(2)(A); 28 U.S.C. § 1332(d)(10); *see Gillespie v. Benton Invs. & Assocs., LLC*, Case No. 4:12CV00288 BSM, 2012 WL 13020749, at *1–2 (E.D. Ark. Nov. 2, 2012) (noting "CAFA changes the traditional rule" for determining citizenship of "'unincorporated association[s]'").

**B.     The putative class plausibly exceeds 100 members.**

15.     Based on Plaintiffs' proposed class definition, Compl. ¶ 173, there are plausibly more than 100 putative class members, 28 U.S.C. § 1332(d)(5)(B).

16.     Mead Johnson, in response to Plaintiffs' Complaint, reviewed sales data for the Products in the State of Minnesota from June 2019 until April 2024. Declaration of Daniel Jenski, ¶¶ 3–6 (**Exhibit 3**).

17.    There were more than 100,000 units of the Products sold in Minnesota between June 2019 and April 2024. Jenski Decl. ¶ 6.

18.    Based on Plaintiffs' putative class definition and Mead Johnson's sales data, there are likely more than 100 putative class members. Compl. ¶ 173; Jenski Decl. ¶ 6; *see* 28 U.S.C. § 1332(d)(5)(B).

**C.    The amount in controversy plausibly exceeds $5,000,000.**

19.    The amount in controversy plausibly exceeds $5,000,000, exclusive of costs and interest. 28 U.S.C. § 1332(d); *see Bell*, 557 F.3d at 959 ("Under the preponderance standard, the jurisdictional fact is not whether the damages are greater than the requisite amount, but whether a fact finder might legally conclude that they are." (cleaned up)).

20.    Plaintiffs allege they and the putative class "would not have purchased" the Products or paid a "premium price" for them but for Mead Johnson's allegedly misleading and deceptive conduct. *E.g.*, Compl. ¶¶ 188, 206, 220, 233, 246, 266, 286 (**Ex. 1**). That is, either Plaintiffs seek a full refund for every unit purchased or some "price premium" theory of damages.

21.    Based on the total volume of Products sold in Minnesota between June 2019 and April 2024, Mead Johnson's total aggregate sales for the Products exceeded $5,000.000. *See* Jenski Decl. ¶ 5 (**Ex. 3**).

22.    The amount-in-controversy requirement is met. 28 U.S.C. § 1332(d)(2).

**D.    No exception to CAFA jurisdiction applies.**

23.    There are two exceptions to CAFA jurisdiction, but neither apply. 28 U.S.C. § 1332(d)(4).

24.    The "local controversy" exception does not apply because: (1) neither Mead Johnson Nutrition nor Mead Johnson & Company are "citizen[s] of" Minnesota, 28 U.S.C.

§ 1332(d)(4)(A)(i)(II)(cc), and (2) during the three years before this lawsuit was filed, at least one other class action asserting the same or similar factual allegations was filed against Mead Johnson, 28 U.S.C. § 1332(d)(4)(A)(ii). *See Lopez v. Mead Johnson Nutrition Co.*, No. 1:24-cv-00691 (N.D. Ill.) (**Exhibit 4**).

25.     The "home state" exception does not apply either because neither Mead Johnson Nutrition nor Mead Johnson & Company, the "primary defendants," are "citizens of" Minnesota. 28 U.S.C. § 1332(d)(4)(B); 28 U.S.C. § 1332(d)(10).

## II.     The procedural requirements for removal are satisfied.

26.     Promptly after filing this Notice of Removal, Mead Johnson will notify counsel for Plaintiffs and the Hennepin County District Court that this case was removed. *See* 28 U.S.C. § 1446(a); 28 U.S.C. § 1453(b).

27.     This District and Division is the proper venue for removal because it encompasses Hennepin County, Minnesota, where this action was originally filed. *See* 28 U.S.C. § 1441(a); 28 U.S.C. § 1453(b).

28.     Mead Johnson Nutrition and Mead Johnson & Company waived service and, through counsel, received a copy the Complaint on May 7, 2024. *See* Waiver of Service (**Exhibit 5**). This removal is therefore timely. *See* 28 U.S.C. § 1446(b); 28 U.S.C. § 1453(b).

29.     Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of all process, pleadings, and orders is attached as **Exhibit 6**.

## CONCLUSION

30.     Removal of this action to the United States District Court for the District of Minesota, Division 4 is proper under the Class Action Fairness Act of 2005. *See* 28 U.S.C. § 1332(d). This Court has original jurisdiction because (1) minimal diversity exists, (2) there are

more than 100 putative class members, and (3) there is more than $5,000,000 at issue in the aggregate.


Dated: June 6, 2024                         SOULE & STULL LLC
                                            By: */s/George W. Soule*
                                                George W. Soule (#0103664)
                                                7201 Metro Boulevard, Suite 200
                                                Edina, MN 55439
                                                Tel: 612.353.6403
                                                Fax: 612.573.6484
                                                Email: gsoule@soulestull.com

                                                and

                                                Jennifer L. Mesko (*pro hac vice* forthcoming)
                                                Ethan W. Weber (*pro hac vice* forthcoming)
                                                Tucker Ellis LLP
                                                950 Main Avenue, Suite 1100
                                                Cleveland, OH 44113-7213
                                                Tel: 216.592.5000
                                                Fax: 216.592.5009
                                                Email: jennifer.mesko@tuckerellis.com
                                                        ethan.weber@tuckerellis.com

                                                *Attorneys for Defendants Mead Johnson Nutrition*
                                                *Company and Mead Johnson & Company, LLC*

Exhibit 1

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT
                                                  Case Type:  Civil Other

| | |
|---|---|
| Amanda Seutter and Brittany Yelle**,** individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC,<br><br>Defendants. | Court File No. _____<br><br><br><br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

1.      Plaintiffs Amanda Seutter and Brittany Yelle ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Class Action Complaint against Defendant Mead Johnson Nutrition Company and Defendant Mead Johnson & Company, LLC (collectively, "Defendant" or "Mead Johnson"), for its knowing, reckless, and/or intentional practice of failing to disclose the presence or material risk of Heavy Metals in its Enfamil® infant formulas ("Products" or "Infant Formulas").[1] The Infant Formulas are sold in Minnesota and throughout the United States and do not conform to their packaging.

---

[1] As used herein, "Heavy Metals" includes arsenic, cadmium, and lead. "Products" or "Infant Formula(s)" as to the Heavy Metals allegations refer to the following Mead Johnson powdered infant formula products: Enfamil A.R., Enfamil Gentlease, Enfamil Enspire Gentlease, Enfamil NeuroPro, Enfamil NeuroPro Sensitive, Enfamil Nutramigen, and Enfamil ProSobee. Discovery may reveal additional products that contain Heavy Metals and/or the presence of additional heavy metals.  Plaintiffs reserve their right to amend and include any such additional products or heavy metals in this action.

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Class (as defined herein), including requiring full disclosure of the risk or presence of Heavy Metals on the Products' packaging, and restoring monies to the members of the proposed Class. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel as to themselves, and as to all other matters, upon information and belief. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

2.      Mead Johnson is one of the primary manufacturers of infant formula in the United States and previously held 39.6% of the market share for powdered infant formula.[2] As a trusted manufacturer and vendor of products consumed exclusively by babies and young children, it carries a duty of the highest importance to implement and maintain quality control when manufacturing its products. When a company selling vital products, such as Defendant who sells infant formula, it must not knowingly fail to ensure the safety of its products and must not allow dangerous toxins or contaminants, such as Heavy Metals, to be consumed by its unsuspecting consumers. Rather, these companies have a duty to disclose material risks of contamination— allowing consumers to make informed decisions about the risks they are willing to take (especially with the health of their infants) and assess the true value of the product they are considering for purchase. Defendant failed to do so in this case.

3.      Defendant's Products contain dangerous toxins: Heavy Metals. As detailed below, individuals, especially infants, who consume Heavy Metals risk developing serious adverse health

---

[2] *Market Share of the Leading Vendors of Baby Formula (Powder) in the United States in 2016, Based on Dollar Sales*, available at https://www.statista.com/statistics/443975/market-share-of-the-leading-us-baby-formula-powder-companies/ (last accessed April 29, 2024).

effects – a risk which most consumers strongly prefer to avoid in food they feed children (who are more vulnerable to those risks than others). Yet, Defendant chose to sell itself to new parents as a trusted company, without disclosing that its formula contained or had a material risk of containing Heavy Metals (collectively, the "Omissions"), which would be material to any parent purchasing formula for their infant.

4.    Infants rely on breastmilk and/or infant formula for their nutrition and growth. The U.S. Dietary Guidelines for Americans and the American Academy of Pediatrics recommends breastfeeding babies exclusively for about six months from birth and continuing afterwards along with introduction of solid foods until they are 12 months old and beyond.[3] However, according to the Centers for Disease Control and Prevention ("CDC"), only 46.3% of babies under three months old are exclusively breastfed, and the percentage of babies exclusively breastfed through six months drops to 25.8%.[4] For babies younger than six months, the CDC recommends that breast milk or infant formula are the only things they eat for their nutrition, and while supplementing with some solid food, breastmilk or infant formula is recommended up to when they are 24 months old.[5] Therefore, a significant number of babies rely on infant formulas for their growth and nutrition in the first year of their lives and beyond.

5.    Reasonable parents, like Plaintiffs, trust and depend on manufacturers, like Defendant, to sell infant formula that is healthy, nutritious, and free from the presence or material

---

[3] CDC, *Infant and Toddler Nutrition: Recommendation and Benefits*, available at https://www.cdc.gov/nutrition/infantandtoddlernutrition/breastfeeding/recommendations-benefits.html (last accessed January 21, 2024).

[4] CDC, *Facts: Key Breastfeeding Indicators*, available at https://www.cdc.gov/breastfeeding/data/facts.html (last accessed March 18, 2024).

[5] CDC, *When, What, and How to Introduce Solid Foods*, available at https://www.cdc.gov/nutrition/InfantandToddlerNutrition/foods-and-drinks/when-to-introduce-solid-foods.html (last accessed March 18, 2024).

risk of harmful toxins, contaminants, and chemicals. They certainly expect the formula they feed their infants to be free of the risk or presence of Heavy Metals, substances known to have significant and unsafe developmental and health consequences as detailed herein.

6.      Consumers lack the knowledge and opportunity to determine whether Defendant's Products do in fact contain (or have a material risk of containing) Heavy Metals or to ascertain the true nature of the ingredients and quality of the Products. Reasonable consumers therefore must and do rely on Defendant to properly and fully disclose what its Products contain. This is especially true for the risk or presence of Heavy Metals that are being fed to hours-, days- or months-old babies. Such information would be material to any reasonable parent's purchasing decisions.

7.      Defendant's packaging is designed to induce reasonable consumers to believe in the high quality and safety of its infant formula while omitting any information about the inclusion (or material risk of inclusion) of Heavy Metals.

8.      For example, the packaging emphasizes that the Infant Formulas are healthy and made with nutritious ingredients that help support proper development and growth:[6]

 

---

[6]    https://www.enfamil.com/products/enfamil-neuropro-infant-formula/powder-tub-20-7-oz-tub/ (last accessed March 18, 2024).

9.    The packaging on the Infant Formulas also stresses that there are no detrimental, harmful, and genetically engineered ingredients:[7]

 

10.    On these packages and others, Defendant states the Infant Formulas contain nutritious ingredients such as Docosahexaenoic Acid ("DHA"), prebiotics such as human milk oligosaccharides ("HMO"), probiotics, and desirable (naturally occurring) minerals such as selenium.

 

 

---

[7]    https://www.enfamil.com/products/enfamil-neuropro-gentlease-formula/powder-tub-19-5-oz-tub/ (last accessed March 18, 2024).

11.     Based on the messaging and impression communicated by the packaging and the material nondisclosures, no reasonable consumer could expect or understand that the Infant Formulas contained or risked containing Heavy Metals. This is especially true as the development and physical risks created by ingestion of Heavy Metals by infants are well-recognized.

12.     Likewise, this same packaging promising healthy, high quality and safe products would not lead reasonable consumers to expect or understand that the Infant Formulas were manufactured by a company that allowed improper quality control procedures.

13.     Defendant's website provides further context to demonstrate that the Products' packaging is deceptive by promising a healthy product that poses no risks to any infants. Specifically, Defendant promises on its website that: (1) Defendant "[s]upport[s] the brain in everything" it does with products that "are excellent for routine, everyday feeding;"[8] (2) "[t]he health and safety of infants and children is [Defendant's] top priority," and it is "committed to providing a high quality and safe products [sic] for [its] littlest consumers;"[9] (3) Defendant's "products undergo extensive quality and safety checks throughout the manufacturing process—from raw materials to finished product" and that "samples from every batch [it] produce[s] are tested to ensure the product meets [its] stringent quality standards;"[10] and (4) "[p]arents can be assured that our infant formulas are safe and nutritious feeding options for their infants."[11] These representations are each in direct contradiction to the Omissions.

---

[8] https://www.enfamil.com/why-enfamil/enfamil-formula-family/ (last accessed March 18, 2024).

[9] https://www.enfamil.com/why-enfamil/quality-assurance/ (last accessed March 18, 2024).

[10] *Id*.

[11] *Id*.

14.     On information and belief, Defendant was knowingly, recklessly, and/or intentionally selling Infant Formulas that contained or risked containing detectable levels of arsenic, cadmium, and/or lead.

15.     Independent testing also confirmed the presence of Heavy Metals in two of Defendant's Infant Formulas:[12]

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee Soy Infant Formula | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

16.     Arsenic, cadmium, and lead are all known to pose health risks to humans, and particularly to infants.[13]

17.     Exposure to Heavy Metals has significant and dangerous health consequences. A 2021 report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform highlighted the material risk of including Heavy Metals in baby food, spurred by the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development."[14]

---

[12] Healthy Babies Bright Futures' Report: *What's in My Baby's Food?*, at 20, available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed March 18, 2024) ("HBBF Report")..

[13] *See generally, id.*

[14] U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury," February 4, 2021, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed March 18, 2024)

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

18.     Despite the known health risks, Defendant knowingly chose to not disclose to consumers that the Infant Formulas contain (or have a material risk of containing) Heavy Metals. Nowhere on the Infant Formulas' packaging is it disclosed that they contain (or have a material risk of containing) Heavy Metals.

19.     The Infant Formulas' packaging does not include any type of disclaimer or disclosure regarding the presence of Heavy Metals that would inform consumers of their presence or risk. Likewise, nothing on the packaging states that ingestion of Heavy Metals can be unsafe or accumulate over time resulting in developmental issues, poisoning, injury, and/or disease.

20.     Instead, to induce reasonable consumers to believe in the quality and safety of its Products and to justify a price that reflects a premium, Defendant chose to focus on promoting its Infant Formulas on its packaging as high quality and made with nutritious ingredients.

21.     Defendant's marketing strategy reflects the concerns raised by the World Health Organization ("WHO") and UNICEF in their report acknowledging the troubling marketing efforts by infant formula milk manufacturers.[15] This report raises deep concerns over the lasting and pervasive negative effects from the false and misleading information received by parents such as

---

("Congressional Committee Report"); *see also* U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods," September 29, 2021, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/ECP%20Second%20Baby%20Food%20Report%209.29.21%20FINAL.pdf (last accessed March 18, 2024) ("Second Congressional Committee Report").

[15] WHO, *How the Marketing of Formula Milk Influences our Decisions on Infant Feeding*, February 22, 2022, available at https://www.who.int/teams/maternal-newborn-child-adolescent-health-and-ageing/formula-milk-industry (last accessed March 18, 2024).

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

Plaintiffs and the Class members through such aggressive marketing efforts by infant formula manufacturers such as Defendant.[16]

22.     Based on Defendant's packaging and related omissions, no reasonable consumer had any reason to know or expect that the Infant Formulas contained Heavy Metals. Furthermore, reasonable parents, like Plaintiffs and the Class members, who were feeding the Infant Formulas to their babies (multiple times a day) would consider the mere presence (or risk) of Heavy Metals a material fact when considering whether to purchase the Infant Formulas.

23.     Defendant knows its customers trust the quality of its Products that are manufactured for the most vulnerable population – infants – and expect the Infant Formulas to be properly and safely manufactured and free from the risk and actual presence of Heavy Metals. Defendant also knows its consumers seek out and wish to purchase infant formulas that possess nutritious ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas they believe possess these qualities. Defendant also knows no reasonable consumer would knowingly provide his or her children with infant formula that contained Heavy Metals.

24.     Defendant knew that parents would find the Omissions material when deciding whether to purchase the Infant Formulas and that it was in a special position of public trust to those consumers.

---

[16] National Public Radio, *Infant Formula Promoted in 'Aggressive' and 'Misleading' Ways, Says New Global Report*, March 1, 2022, available at https://www.npr.org/sections/goatsandsoda/2022/03/01/1082775961/infant-formula-promoted-in-aggressive-and-misleading-ways-says-new-global-report (last accessed March 18, 2024).

25.     The material Omissions are deceptive, misleading, unfair, and/or false because the Infant Formulas were manufactured in a such a way that they contained (or risked containing) undisclosed Heavy Metals.

26.     The Omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for Infant Formulas that did not disclose material information as to the Products' true quality and value. Defendant continues to wrongfully induce consumers to purchase its Infant Formulas without full disclosure of the Omissions.

27.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein), who, from the applicable limitations period up to and including the present, purchased for household use and not resale any of Defendant's Infant Formulas.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action as it is based on Minnesota Statute sections 8.31, 336.2-314, 325D.09 to 325D.16, 325D.43 to 325D.48, 325F.67, 325F.68 to 325F.70, and Minnesota common law.

29.     This Court has personal jurisdiction over Defendant as it conducts a substantial part of its operations with regular and continuous business activity in Minnesota, on information and belief, through its marketing and retail of the Products. This Court has personal jurisdiction over the Plaintiffs as they both were, and still are, residents of Minnesota during the occurrence of the acts and transactions giving rise to this action and they purchased the Infant Formulas in this State.

30.     Venue is proper in Hennepin County because Plaintiff Yelle suffered injury as a result of Defendant's acts in this County, and many of the acts and transactions giving rise to this action occurred in this County.

## PARTIES

31.    Plaintiff Amanda Seutter ("Plaintiff Seutter") is, and at times relevant hereto was, a resident of Elk River, Minnesota and currently resides in Hennepin County in the State of Minnesota. She purchased the Infant Formula, including Enfamil® Gentlease, for household use.

32.    Plaintiff Seutter purchased the Infant Formula for her child from Target in Otsego, Minnesota and Amazon.com, from approximately October 2022 until January 2024.

33.    Plaintiff Seutter believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Seutter saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formulas contained (or had a material risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Seutter would be willing to purchase Enfamil® products in the future if she could be certain that they do not contain (or have a material risk of containing) Heavy Metals.

34.    As a result of Defendant's intentionally, recklessly, and/or knowingly deceptive conduct as alleged herein, Plaintiff Seutter was injured when she paid the purchase price or a price premium for the Infant Formula that did not deliver what was promised by Defendant.  Plaintiff Seutter paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formulas were free of Heavy Metals, and posed no potential harm to the physical and mental growth of her infant – long term or short term. Plaintiff Seutter would not have paid this money had she known the truth about the Omissions.  Further, should Plaintiff Seutter encounter the Infant Formulas in the future, she could not rely on the truthfulness of the packaging, absent corrective

changes to the packaging and advertising of the Infant Formulas. Damages can be calculated through expert testimony at trial.

35.     Plaintiff Brittany Yelle ("Plaintiff Yelle") is, and at times relevant hereto was, a resident of Plymouth, Minnesota and currently resides in Hennepin County in the State of Minnesota. She purchased the Infant Formula, including Enfamil® Neuropro and Enfamil® Gentlease for household use.

36.     Plaintiff Yelle purchased the Infant Formula for her child from Target locations in Medina and Minnetonka, Minnesota, from approximately December 2023 through April 2024.

37.     Plaintiff Yelle believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Yelle saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Yelle would be willing to purchase Defendant's Products in the future if she could be certain that they were safely manufactured and do not contain (or have a material risk of containing) Heavy Metals.

38.     As a result of Defendant's intentionally, recklessly, and/or knowingly deceptive conduct as alleged herein, Plaintiff Yelle was injured when she paid the purchase price or a price premium for the Infant Formula that did not deliver what was promised by Defendant. Plaintiff Yelle paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formulas were manufactured with proper quality control procedures, were free of Heavy Metals, and posed no potential harm to the physical and mental growth of her infant – long term

or short term. Plaintiff Yelle would not have paid this money had she known the truth about the Omissions. Further, should Plaintiff Yelle encounter the Infant Formulas in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Infant Formulas. Damages can be calculated through expert testimony at trial.

39.     Defendant Mead Johnson Nutrition Company is a Delaware corporation with its principal place of business located at 2400 West Lloyd Expressway, Evansville, Indiana. In June 2017, Mead Johnson Nutrition Company was acquired by Reckitt Benckiser Group PLC, whose U.S. headquarters is located at 399 Interpace Parkway, Parsippany, New Jersey. Mead Johnson & Company, LLC, is a Delaware corporation with its headquarters at 2400 West Lloyd Expressway in Evansville, Indiana.

40.     Defendant, one of the largest producers of infant formula products in the world, has formulated, developed, manufactured, packaged, labeled, distributed, marketed, advertised, and sold the Infant Formulas under the Enfamil® name throughout the United States, including in this State. Defendant has done so continuously from May 1, 2018, to the present (the "Relevant Period").

41.     Defendant knowingly created, allowed, oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging and related marketing for the Infant Formulas that did not disclose the presence (or risk) of Heavy Metals in the Infant Formulas. Defendant is also responsible for sourcing ingredients, manufacturing the Products, and conducting all relevant quality assurance protocols, including testing of both the Products and their ingredients.

42.     Plaintiffs relied upon the Infant Formulas' packaging and the material Omissions, which was disseminated by Defendant and its agents in this State through the material Omissions

from the packaging. The Omissions were nondisclosed material content that a reasonable consumer would consider important in purchasing the Infant Formulas.

43. The Infant Formulas, at a minimum, include:

(a) Enfamil® A.R.;



(b) Enfamil® Gentlease;



14

(c)     Enfamil® Enspire Gentlease;



(d)     Enfamil® NeuroPro;



(e)    Enfamil® NeuroPro Sensitive;



(f)    Enfamil® Nutramigen; and



(g)    Enfamil® ProSobee.



## FACTUAL ALLEGATIONS

**I.    DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE HEALTH RISKS PRESENTED TO INFANTS AND BABIES FROM HEAVY METALS AND THE LIKELIHOOD THEY WERE PRESENT IN ITS PRODUCTS**

44.    While there are no U.S. federal regulations regarding Heavy Metals in infant formulas, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "No level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[17]

45.    Arsenic, cadmium, and lead—the Heavy Metals found in the Infant Formulas—are neurotoxins, or poisons, which affect the nervous system. Exposure to these Heavy Metals

---

[17] New York Times, *Some Baby Food May Contain Toxic Metals, U.S. Reports*, available at https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html (last accessed March 18, 2024) ("Some Baby Food May Contain Toxic Metals").

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

"diminish[es] quality of life, reduce[s] academic achievement, and disturb[s] behavior, with profound consequences for the welfare and productivity of entire societies."[18]

46.     The Heavy Metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder ('ADHD')."[19] Even when trace amounts are found in food, these Heavy Metals can alter the developing brain and erode a child's intelligence quotient ("IQ").[20]

47.     Heavy Metals can remain in one's body for years and, thus, can accumulate in the body, such as in the kidneys and other internal organs, increasing the risk to a person over time.[21]

48.     Due to their smaller physical size and still-developing brain and organs, infants and toddlers are particularly susceptible to the toxic effects of Heavy Metals because "[t]hey also absorb more of the heavy metals that get into their bodies than adults do."[22]

49.     Of additional concern to developing infants are the health risks related to simultaneous exposure to multiple Heavy Metals as "co-exposures can have interactive adverse effects."[23] Heavy Metals disturb the body's metabolism and cause "significant changes in various

---

[18] HBBF Report, *supra*, at 13.

[19] *Id.* at 6.

[20] Congressional Committee Report, *supra*, at 1.

[21] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know* (Aug. 16, 2018, updated Sept. 29, 2021), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed April 12, 2024) ("Consumer Reports: Heavy Metals in Baby Food").

[22] *Id.*

[23] Morello-Frosch R., Cushing L.J., Jesdale B.M., Schwartz J.M., Guo W., Guo T., Wang M., Harwani S., Petropoulou S.E., Duong W., Park J.S., Petreas M., Gajek R., Alvaran J., She J., Dobraca D., Das R., Woodruff T.J. *Environmental Chemicals in an Urban Population of Pregnant Women and Their Newborns from San Francisco*. Environ Sci Technol. 2016 Nov 15;50(22):12464-12472. doi: 10.1021/acs.est.6b03492. Epub 2016 Oct 26. PMID: 27700069;

biological processes such as cell adhesion, intra- and inter-cellular signaling, protein folding, maturation, apoptosis, ionic transportation, enzyme regulation, and release of neurotransmitters."[24]

50.    Exposure to Heavy Metals, even in small amounts, can lead to life-long effects. According to Victor Villarreal, Ph.D., Assistant Professor in the Department of Educational Psychology at the University of Texas at San Antonio who has studied the effects of heavy metals on childhood development, "[t]he effects of early exposure to heavy metals can have long-lasting impacts that may be impossible to reverse."[25]

51.    Because Heavy Metals can bioaccumulate in the body, even regular consumption of small amounts can increase the material risk of various health issues, including the material risk of bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[26]

52.    As Dr. James E. Rogers, the director of food safety research and testing at Consumer Reports has said "[t]**here is no safe level of heavy metals**, so the goal should be to have no measurable levels of any heavy metal in baby and toddler foods."[27] This rings particularly true when considering that generally, babies who are 12 months or younger heavily rely on infant

---

PMCID: PMC6681912. Available at https://stacks.cdc.gov/view/cdc/80511 (last accessed March 18, 2024).

[24] Jaishankar, M., Tseten, T., Anbalagan, N., Mathew, B. B., & Beeregowda, K. N. (2014). *Toxicity, Mechanism and Health Effects of Some Heavy Metals*. Interdisciplinary toxicology, 7(2), 60–72. Available at https://doi.org/10.2478/intox-2014-0009 (last accessed March 18, 2024).

[25] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[26] *Id*.

[27] Consumer Reports, *Congressional Report Finds More Problems With Heavy Metals in Baby Food*, updated Oct. 2021, available at https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/#:~:text=%E2%80%9CThere%20is%20no%20safe%20level,research%20and%20testing%20at%20CR (last accessed March 18, 2024) (emphasis added).

formula as a key source of nutrients and that unless breastmilk is an option, formula is the only food babies younger than five months can eat for their development and growth.

53.     Research continues to confirm that exposures to food containing arsenic, cadmium, and lead cause "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[28]

54.     The FDA and the WHO have declared Heavy Metals "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[29]

*Arsenic*

55.     The Infant Formulas contain (or have a material risk of containing) arsenic, which can cause cognitive deficits in children who are exposed early in life, and even neurological problems in adults who were exposed as infants.[30] "[E]ven low levels of arsenic exposure can impact a baby's neurodevelopment."[31] "Studies have shown that consuming products with arsenic over time can lead to impaired brain development, growth problems, breathing problems, and a compromised immune system."[32]

56.     Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage children's central

---

[28] HBBF Report, *supra*, at 1.

[29] Congressional Committee Report, *supra*, at 2.

[30] HBBF Report, *supra*, at 13.

[31] Senators' Letter to the FDA, *supra* (citing Dartmouth Toxic Metals Superfund Research Program (2021), Arsenic and Children, available at https://sites.dartmouth.edu/arsenicandyou/arsenic-and-children/) (last accessed March 18, 2024)).

[32] *Id.*

nervous systems and cognitive development.[33] Exposure to arsenic can also cause diabetes, atherosclerosis, and cardiovascular disease.[34]

57.     Arsenic can cause cancer in humans, as well as diabetes and atherosclerosis, and potentially cardiovascular disease when ingested chronically.[35] Chronic exposure to arsenic has also been associated with dermatological lesions and malignancies.[36]

58.     Moreover, "[t]here is no evidence that the harm caused by arsenic is reversible."[37]

59.     Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and FDA have set limits concerning the allowable limit of arsenic at 10 ppb for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA as a maximum contaminant level). The FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic.[38]

---

[33] Congressional Committee Report, *supra*, at 10.

[34] States J.C., Singh A.V., Knudsen T.B., Rouchka E.C., Ngalame N.O., Arteel G.E., et al. (2012) *Prenatal Arsenic Exposure Alters Gene Expression in the Adult Liver to a Proinflammatory State Contributing to Accelerated Atherosclerosis*. PLOS ONE 7(6): e38713. Available at https://doi.org/10.1371/journal.pone.0038713 (last accessed March 18, 2024).

[35] *Id*.

[36] Genuis SJ, Schwalfenberg G, Siy A-KJ, Rodushkin I (2012) *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*. PLOS ONE 7(11): e49676. Available at https://doi.org/10.1371/journal.pone.0049676 (last accessed March 18, 2024) ("Toxic Element Contamination of Natural Health Products").

[37] HBBF Report, *supra*, at 3.

[38] Toxic Heavy Metals in Popular Baby Foods, *supra*; *see also* 21 C.F.R. §165.110(b)(4)(iii)(A).

60.     Although the FDA has not set the action level for arsenic in infant formulas specifically, "the FDA prioritizes monitoring and regulating products that are more likely to be consumed by very young children."[39]

61.     Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed arsenic levels at 7.9 ppb, an amount that is especially concerning considering the amount of infant formula consumed by developing children.

***Cadmium***

62.     The Infant Formulas also contain (or have a material risk of containing) cadmium, which has been shown to cause anemia, liver disease, and nerve or brain damage in animals that eat or drink it.

63.     Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage. Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children[.]"[40]

64.     Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[41] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens, and the EPA has likewise determined

---

[39] NutritionInsight.com, *FDA Studies Reveal Drop in Infant Rice Cereal's Arsenic Levels* (March 9, 2020), available at https://www.nutritioninsight.com/news/fda-studies-reveal-drop-in-infant-rice-cereals-arsenic-levels.html (last accessed March 18, 2024).

[40] HBBF Report, *supra*, at 14.

[41] *Id.*

that cadmium is a probable human carcinogen.[42] Compounding such concerns is the fact that

cadmium has a prolonged half-life as it "sequesters in [human] tissue."[43]

65.    The EPA has set a maximum contaminant level for cadmium in drinking water of

5 ppb (*see* 40 C.F.R. §141.62); the FDA has set a maximum level in bottled water to 5 ppb; and

the WHO set a maximum cadmium level in drinking water to 3 ppb.[44]

66.    Despite this, laboratory tests indicate that Defendant sold Products containing

undisclosed cadmium levels as high as 6.8 ppb.

***Lead***

67.    The Infant Formulas contain (or have a material risk of containing) lead, which is

"reasonably anticipated to be [a] human carcinogen []."[45]

68.    Lead exposure can seriously harm the brain and nervous system in infants and

children and is associated with a range of negative health outcomes such as behavioral problems,

decreased cognitive performance, delayed puberty, and reduced postnatal growth.

69.    Exposure to lead in foods builds up over time. Build-up can and has been

scientifically demonstrated to lead to the development of chronic poisoning, cancer,

developmental, and reproductive disorders, as well as serious injuries to the nervous system, and

other organs and body systems.

---

[42] CDC, Agency for Toxic Substances and Disease Registry, *Public Health Statement for Cadmium*, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed March 18, 2024).

[43] Toxic Element Contamination of Natural Health Products, *supra*.

[44] Congressional Committee Report, *supra*, at 29.

[45] American Cancer Society, *Known and Probable Carcinogens*, last revised August 14, 2019, available at https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html (last accessed March 18, 2024).

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

70.     Even very low exposure levels to lead can "cause lower academic achievement, attention deficits and behavior problems. No safe level of exposure has been identified."[46] The FDA, CDC, American Academy of Pediatrics ("AAP"), and the WHO have all stated that there is no safe level of lead.[47]

71.     Lead is extremely toxic, and its effects cannot be reversed or remediated.[48]

72.     One study found that "children age 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food."[49]  Additionally, studies have established a link between lead exposure and ADHD.[50]

73.     Although there is no federal standard for lead in baby food, health experts, including the AAP, the Environmental Defense Fund, and Consumer Reports, have agreed that lead in baby foods should not exceed 1 ppb.[51]

---

[46] HBBF Report, *supra*, at 13.

[47] FDA, *Lead in Food and Foodwares*, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares#:~:text=Although%20no%20safe%20level%20for,blood%20(%C2%B5g%20%2FdL) (last accessed March 18, 2024); CDC, *Health Effects of Lead Exposure*, available at https://www.cdc.gov/nceh/lead/prevention/health-effects.htm (last accessed March 18, 2024); AAP, Lead Exposure in Children, available at https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-children/#:~:text=How%20Much%20Lead%20is%20Safe,Prevention%20recommends%20evaluation%20and%20intervention (last accessed March 18, 2024); WHO, *Lead Poisoning*, available at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health#:~:text=The%20neurological%20and%20behavioural%20effects,and%20learning%20problems%20(1) (last accessed March 18, 2024); *see also* USA Today, *FDA: Recalled Applesauce Pouches Had Elevated Lead Levels and Another Possible Contaminant* (Jan. 5, 2024), available at https://www.usatoday.com/story/money/food/2024/01/05/applesauce-pouch-recall-contamination-spreads/72121869007/ (last accessed March 18, 2024).

[48] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[49] HBBF Report, *supra*, at 7.

[50] Congressional Committee Report, *supra*, at 12.

[51] Toxic Heavy Metals in Popular Baby Foods, *supra*.

24

74.    Despite this, laboratory tests indicate Defendant sold products containing undisclosed lead levels as high as 6.5 ppb.[52]

75.    The Heavy Metals – arsenic, cadmium, and lead – are significant detriments to children.

76.    The FDA has acknowledged that "exposure to [these heavy] metals are [sic] likely to have the most significant impact on public health."[53]

77.    Importantly, however, and relevant to this lawsuit, the FDA's action levels do not require disclosure of the presence of Heavy Metals on the packaging of products that are placed in the market. Action levels only set limits for determining when products cannot be placed into the market.

78.    The presence of Heavy Metals and/or other undesirable toxins or contaminants in baby foods have been confirmed by investigations and reports by the U.S. Congress, Healthy Babies Bright Futures,[54] Consumer Reports,[55] and Politico,[56] and studies by the FDA,[57] University of Miami, the Clean Label Project, and Ellipse Analytics.[58]

---

[52] HBBF Report, *supra,* at 20, 34.

[53] FDA, *Environmental Contaminants in Food*, available at https://www.fda.gov/food/chemical-contaminants-pesticides/environmental-contaminants-food (last accessed March 18, 2024) ("Environmental Contaminants in Food").

[54] HBBF Report at 12, 20, *supra*.

[55] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[56] Politico, *The FDA's Food Failure* (Apr. 8, 2022), available at https://www.politico.com/interactives/2022/fda-fails-regulate-food-health-safety-hazards/ (last accessed March 18, 2024).

[57] FDA, *FDA Total Diet Study Report, Fiscal Years 2018-2020 Elements Data (July 2022)*, available at https://www.fda.gov/media/159751/download?attachment (last accessed March 18, 2024) ("FDA Total Diet Study").

[58] Gardener, et al., *Lead and Cadmium Contamination In A Large Sample of United States Infant Formulas and Baby Foods*, 651 SCI. TOTAL ENVIRON. 1, 822-827 (2019), available at:

79.     Both the Congressional Committee Report, published on February 4, 2021, which acknowledged that Heavy Metals "can endanger infant neurological development,"[59] followed by a second report published on September 29, 2021, revealed alarming levels of Heavy Metals in baby foods.[60] The Congressional Committee Report acknowledged that Heavy Metals—including arsenic, cadmium, and lead—were present in "significant levels" in numerous commercial baby food products.[61]

80.     As such, the knowledge of the risks associated with exposure to Heavy Metals is not a new phenomenon. Defendant knew or should have known the risks associated with the presence of Heavy Metals in foods consumed by infants,[62] and that, over time, these toxins can accumulate and remain in infants' bodies, to their detriment.

81.     Despite the material risk and/or presence of these harmful chemicals, Defendant fails to disclose the presence (or risk) of Heavy Metals in its Products.

---

https://www.sciencedirect.com/science/article/abs/pii/S0048969718334442?via%3Dihub      (last accessed March 18, 2024) ("Lead and Cadmium Contamination in Infant Formulas and Baby Foods").

[59] Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), available at https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/ (last accessed March 18, 2024) ("Toxic Heavy Metals in Popular Baby Foods").

[60] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[61] Congressional Committee Report, *supra*.

[62] *See*, *e.g.*, *FDA Compliance Program Guidance Manual: Toxic Elements in Food and Foodware, and Radionuclides in Food- Import and Domestic*, available at http://wayback.archive-it.org/7993/20170404233343/https://www.fda.gov/downloads/Food/ComplianceEnforcement/UCM073204.pdf (last accessed March 18, 2024); *see also* 21 CFR §172, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?CFRPart=172&showFR=1 (last accessed March 18, 2024).

## II.   DEFENDANT FALSELY MARKETED ITS INFANT FORMULAS AS HEALTHY AND MADE WITH NUTRITIOUS INGREDIENTS BY OMITTING ANY MENTION OF HEAVY METALS

82.    Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Infant Formulas throughout the United States, including Minnesota.

83.    Defendant's Infant Formulas are available at numerous retail and online outlets. The Infant Formulas are widely advertised.

84.    On its website, Defendant markets its Infant Formulas as the "#1 Trusted Brand of Pediatricians & Parents," "#1 trusted brand for brain-building nutrition and immune support," and "#1 infant formula brand recommended by pediatricians."[63]




85.    On its website, Defendant promises to "[s]upport your baby's development right from the start with brain-building nutrition and MFGM components from the #1 trusted infant formula brand."[64] Defendant represents that "using Enfamil gives you the confidence you've made the right choice for your baby."[65] Defendant boasts and reassures parents of the quality of its products, claiming "we know you've got lots of questions. Relax. We've got you covered. With a

---

[63] https://www.enfamil.com/ (last accessed March 18, 2024).

[64] https://www.enfamil.com/enfamil-neuropro/ (last accessed March 18, 2024).

[65] https://www.enfamil.com/why-enfamil/ (last accessed March 18, 2024).

complete family of brain-building formulas to fuel the wonder of your little one. From everyday nutrition to specialty formulas."[66]

86.     Defendant touts its innovations to its Infant Formula and provides extensive information about the ingredients in its formulas to consumers throughout its website, including on its Frequently Asked Questions ("FAQ") page.[67]

87.     Defendant made the decision to omit any mention of the presence or material risk of Heavy Metals in its Infant Formulas, and to instead package its Infant Formulas as healthy and made with nutritious ingredients even though Defendant had a duty to ensure that the Products' packaging was true and not misleading.

88.     Defendant also had exclusive and/or superior knowledge of the presence or material risk of Heavy Metals in its Infant Formula but chose to not inform consumers.

89.     Defendant intentionally omitted from its packaging any mention of the presence (or material risk) of Heavy Metals in the Infant Formulas in order to induce and mislead reasonable consumers to purchase its Infant Formulas.

90.     With Defendant marketing its Infant Formulas as healthy and made with nutritious ingredients to nourish babies, Defendant clearly recognizes the importance of its Infant Formula to the development of infants.  Indeed, the presence or risk of undisclosed Heavy Metals defeats the purpose of infant formula, which is to nourish babies, a fact touted by Defendant.

91.     As a result of the undisclosed material information on the Infant Formulas' packaging, a reasonable consumer would have no reason to suspect the presence (or material risk)

---

[66]   https://www.enfamil.com/why-enfamil/enfamil-formula-family/ (last accessed March 18, 2024).

[67]   https://www.enfamil.com/help-center/nutrients-ingredients/ (last accessed March 18, 2024).

of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests (which are time consuming and expensive) or reviewing third-party scientific testing of these Products.

## III.    DUE TO THE PRESENCE AND MATERIAL RISK OF HEAVY METALS IN THE INFANT FORMULAS, THE PACKAGING WAS MATERIALLY MISLEADING

92.    At all times during the Relevant Period, Defendant knew or should have known the Infant Formulas contained undisclosed Heavy Metals and were not sufficiently tested for the presence and material risk of Heavy Metals.

93.    Defendant's Infant Formulas contained undisclosed levels of Heavy Metals due to Defendant's failure to monitor for the presence of Heavy Metals in its Products and their ingredients.  Defendant was aware of this risk and failed to disclose it to Plaintiffs and the Class despite having a duty to disclose.

94.    Despite the known risks of exposure to Heavy Metals, Defendant has intentionally, recklessly, and/or knowingly sold the Infant Formulas without disclosing to consumers, like Plaintiffs and the Class, the presence or material risk of Heavy Metals.

95.    Defendant knew or should have known that Heavy Metals pose health risks to infants.

96.    Defendant knew or should have known that it owed consumers a duty of care to prevent or, at the very least, minimize the presence of Heavy Metals in the Infant Formulas to an undetectable level.

97.    Defendant knew or should have known it owed consumers a duty of care to adequately test for Heavy Metals in the Infant Formulas and their ingredients.

98.    Defendant knew consumers purchased the Infant Formulas based on the reasonable expectation that Defendant manufactured the Infant Formulas to the highest standards. In fact, Defendant promised as much – at length – on its website:

29

Our products meet or exceed all **infant formula requirements set out by the FDA,** which are among the **most rigorous** in the food industry. Each of our manufacturing facilities adheres to safety guidelines among the **most rigorous in the food industry** and our own **stringent quality standards** so that we can assure the highest quality products. Parents can be assured that our infant formulas are safe and nutritious feeding options for their infants when prepared, stored, and handled according to package directions.

Our infant products undergo **extensive quality and safety checks** throughout the manufacturing process—from raw materials to finished product. A representative number of samples from every batch we produce are tested to ensure the product meets our **stringent quality standards**. Each batch of our products is assured to meet our **high quality and safety standards** as verified by our **proprietary Quality Systems** that exist in every manufacturing facility. We distribute our products only if they pass our **strict testing**. We track the path of every ingredient in our infant and toddler products from its initial supplier through all processing stages until it reaches our consumer.

The [FDA] has very **specific and rigorous manufacturing standards** for infant formulas and toddler drinks that we adhere to. All Mead Johnson formulas are in compliance with all FDA regulations, including Enfamil® NeuroPro™, Enfamil® Enspire™, Enfamil® Gentlease®, and Nutramigen®. Our products meet or exceed all **infant formula requirements set out by the FDA**, which are among the **most rigorous** in the food industry. The amounts of ingredients in Enfamil Infant Formulas are all within required guidelines established to ensure the safety and nutritional quality of infant formulas. **We are committed to the most stringent manufacturing, packaging, and quality assurance procedures**.[68]

(Emphasis supplied.) Based on consumers' expectation that Defendant manufactured the Infant Formulas to the highest standards, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Infant Formulas to the highest standards for preventing the inclusion of Heavy Metals in the Infant Formulas, which would include testing the Products and their ingredients for Heavy Metals.

---

[68] https://www.enfamil.com/why-enfamil/quality-assurance/ (last accessed March 18, 2024).

99.   A recent consumer survey done by Plaintiffs' counsel ("Consumer Survey") demonstrates such an expectation.[69]

| Consumer Survey | Yes | No |
|---|---|---|
| Do you expect a company to test for arsenic, cadmium, lead, and/or mercury in infant formula that will be fed to infants? | 91.1% | 8.9% |
| Would you expect a company to disclose if there were detectable levels, or risk, of arsenic, cadmium, lead, and/or mercury in an infant formula? | 91.3% | 8.7% |

100.   Further, Defendant has recognized consumer concern for the possible presence of Heavy Metals in baby food products and infant formulas. As a member of the Infant Nutrition Council of America ("INCA") through its parent company Reckitt Benckiser Group PLC, Defendant joined two other major manufacturers of infant formula products to lobby against the promulgation of California Assembly Bill 899 ("AB 899") in 2023.[70] As introduced, the original version of AB 899 would have required infant formula manufacturers – like Defendant – to test for Heavy Metals in their products and disclose the testing results on the packaging.[71] INCA vehemently opposed any disclosure of Heavy Metals to consumers, arguing the proposed measure

---

[69] All Consumer Survey respondents were parents 18 and over with children aged anywhere from 0 to 4 years old from a majority of states, including Illinois, California, and Minnesota, and all of whom had purchased infant formula within the past 3 years.

[70] Analysis of AB 899 as amended March 13, 2023, available at https://billtexts.s3.amazonaws.com/ca/ca-analysishttps-leginfo-legislature-ca-gov-faces-billAnalysisClient-xhtml-bill-id-202320240AB899-ca-analysis-357755.pdf (last accessed March 18, 2024) ("Analysis of AB 899").

[71] *Id*.

would "create confusion"[72] among consumers and "create fear and panic,"[73] and cause them to "mistrust" the manufacturers.[74] Furthermore, INCA has argued that such requirements would cause consumers to change their purchasing behaviors.[75]

101.    Based on the foregoing, reasonable consumers, like Plaintiffs, would consider the inclusion (or material risk of inclusion) of Heavy Metals a material fact when considering what infant formulas to purchase.

102.    Defendant knew that monitoring for Heavy Metals in its Infant Formulas and their ingredients was not only important, but also critical.

103.    Defendant also knew that monitoring Heavy Metals was likewise important to its consumers to protect their babies.

## IV.   INFANT FORMULAS CAN BE MANUFACTURED WITHOUT MEASURABLE LEVELS OF HEAVY METALS

104.    In contrast to the levels of Heavy Metals found in Defendant's Infant Formulas, other infant formula manufacturers have produced formula products that have non-detectable levels of Heavy Metals.

105.    The Clean Label Project tests products for more than 400 contaminants, including heavy metals, chemicals, and plastics, and presents its Purity Award to companies with products with the lowest levels of the contaminants when compared to other products in a given category.[76]

---

[72] *Id.*; *see also* Analysis of AB 899 as amended April 12, 2023, available at https://trackbill.com/s3/bills/CA/2023/AB/899/analyses/senate-health.pdf (last accessed April 12, 2024) ("Analysis of AB 899 as amended April 12, 2023").

[73] Analysis of AB 899.

[74] *Id.*

[75] *See* Analysis of AB 899 as amended April 12, 2023, available at https://trackbill.com/s3/bills/CA/2023/AB/899/analyses/senate-health.pdf (last accessed March 18, 2024).

[76] Clean Label Project Purity Award, available at https://cleanlabelproject.org/purity-award/ (last accessed March 18, 2024).

106.    Bobbie, a manufacturer of infant formula (recognized by the Clean Label Project for manufacturing products that were free from detectable levels of Heavy Metals) was a recipient of the Clean Label Project's Purity Award.[77]

107.    Plaintiffs' counsel had Bobbie Organic Infant Formula independently tested and that testing confirmed the presence of Heavy Metals at non-detectable levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Bobbie Organic Infant Formula | < 2.2 | < 1.3 | < 1.0 |

108.    This testing confirms infant formula manufacturers can manufacture infant formulas with Heavy Metals levels that are not measurable.

109.    Additionally, testing by Consumer Reports identified baby food products with Heavy Metal levels low enough to not cause concern, as well as some products with Heavy Metal levels that were not measurable.[78]   "[T]here are ways for [baby food] manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[79]

110.    In testing conducted by Consumer Reports, other products had non-detectable levels of Heavy Metals.[80]  As stated by Dr. James E. Rogers, the Consumer Reports Director of Food Safety Research and Testing, "Every category of food was represented in that lower-risk

---

[77] Business Wire, *Bobbie is First-Ever Infant Formula to Receive the Clean Label Project Purity Award and Certification as a Pesticide-Free Product* (Jan. 25, 2022), available at https://www.businesswire.com/news/home/20220125005905/en/Bobbie-Is-First-Ever-Infant-Formula-To-Receive-The-Clean-Label-Project-Purity-Award-and-Certification-as-a-Pesticide-Free-Product (last accessed March 18, 2024).

[78] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[79] *Id*.

[80] *Id*.

group. That indicates that there are ways for manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[81]

111.    In the FDA Total Diet Study, it was also demonstrated that infant formulas can be manufactured without detectable levels of Heavy Metals.[82]

112.    Moreover, because of public health efforts, exposure to lead has consistently and notably decreased over the past 40 years.[83] These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[84] The progress towards decreasing childhood exposure to lead was so impressive that the CDC identified "childhood lead poisoning prevention as 1 of 10 great U.S. public health achievements during 2001 to 2010."[85]

113.    Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas in order to achieve non-detectable or zero levels by adequately monitoring its ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained Heavy Metals.

114.    Defendant also knew it was not adequately monitoring and testing for Heavy Metals in the Infant Formulas and their ingredients. Defendant knew its failure to adequately monitor and test for Heavy Metals in the Infant Formulas and their ingredients continued throughout the Relevant Period.

---

[81] *Id.*

[82] FDA Total Diet Study, *supra*, at 73, 81-82.

[83] Dignam, T., Kaufmann, R. B., LeStourgeon, L., & Brown, M. J. (2019). *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure*. Journal of Public Health Management and Practice: JPHMP, 25 Suppl 1, Lead Poisoning Prevention (Suppl 1 LEAD POISONING PREVENTION), S13–S22. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed March 18, 2024).

[84] *Id.*

[85] *Id.*

115.    Defendant's marketing was misleading due to its failure to properly and sufficiently monitor and test for Heavy Metals and/or for its failure to disclose on the packaging of the Products the presence (or material risk) of Heavy Metals in the Infant Formulas.

116.    Defendant knew or should have known consumers paid a price premium for its Products and expected Defendant to test and monitor for Heavy Metals and disclose on the packaging of the Products the presence or material risk of Heavy Metals in the Infant Formulas and their ingredients.

117.    At all times during the Relevant Period, Defendant did not monitor or test for Heavy Metals in the Infant Formulas and their ingredients and Defendant did not disclose on the packaging of the Products the presence or material risk of Heavy Metals.

118.    Defendant knew or should have known that consumers reasonably expected it to test for and monitor the presence of Heavy Metals in the Infant Formulas and their ingredients, and to disclose the presence or material risk of any levels of Heavy Metals in its Products.

119.    Defendant knew or should have known the Infant Formulas contained or risked containing Heavy Metals that were inconsistent with its marketing.

120.    Defendant knew or should have known that, in order to comply with its marketing, consumers expected it to ensure the Infant Formulas and their ingredients were monitored and tested for Heavy Metals, and to disclose the presence (or material risk) of Heavy Metals.

121.    Defendant knew, yet failed to disclose, its lack of adequate testing and/or knowledge of the risk or presence of Heavy Metals in the Infant Formulas' and their ingredients.

122.    Defendant's Omissions are false, misleading, and crafted to deceive the public as they create an image that the Infant Formulas are nutritious and safe from the risk or presence of

Heavy Metals.  The presence or risk of Heavy Metals defeats the purpose of the Infant Formulas, which is nutrition for infants.

123.    Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt Defendant's statements regarding the quality of the Products.  Defendant's nondisclosure and/or concealment of the presence (or risk) of Heavy Metals in the Infant Formulas alleged herein intended to and did, in fact, cause consumers like Plaintiffs and the Class members, to purchase Products they would not have if the true quality of the Products and their ingredients were disclosed.

## V.    DEFENDANT'S PACKAGING MISLED REASONABLE CONSUMERS BASED ON THE MATERIAL OMISSIONS

124.    Defendant's packaging communications misled and deceived reasonable consumers because Defendant actively and knowingly concealed and failed to disclose that the Infant Formulas contained (or had a material risk of containing) Heavy Metals, while representing nutritious quality and characteristics.

125.    Based on the impression given by the packaging communications and Omissions, no reasonable consumer could expect or understand that the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

126.    The Infant Formula packaging communications include, but are not limited to:

(a)      Enfamil® A.R.: "BRAIN BUILDING," "expert-recommended," "#1 ADDED RICE starch formula," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "Calcium for strong bones," and "Vitamin C for immune support."







(b)      Enfamil® Enspire Gentlease: "with LACTOFERRIN a key protein also found in BREAST MILK & COLOSTRUM," "BRAIN BUILDING," "IMMUNE HEALTH supported by LACTOFERRIN," and "Naturally occurring MFGM components."



(c)     Enfamil® Gentlease: "BRAIN BUILDING," "expert-recommended," and "#1 RECOMMENDED BRAND BY PEDIATRICIANS."

   

(d)     Enfamil® NeuroPro: "EXCLUSIVE HuMO6 IMMUNE BLEND," "BRAIN BUILDING," "expert-recommended," "inspired by BREAST MILK," "supports IMMUNE HEALTH," "naturally-occurring MFGM components," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," and "Beta Carotene & DHA for baby's eye health" .

   

(e)    Enfamil® NeuroPro Sensitive: "BRAIN BUILDING," "expert-recommended," "HMO for IMMUNE SUPPOR," "NON-GMO No Artificial Growth Hormones," and "#1 RECOMMENDED BRAND BY PEDIATRICIANS."

  

(f)    Enfamil® Nutramigen: "BRAIN BUILDING," "#1 RECOMMENDED BRAND BY PEDIATRICIANS" (front and back), "THE ONLY HYPOALLERGIC FORMULA WITH LGG® PROBIOTIC" (front and back), "NO ARTIFICIAL GROWTH HORMONES," and "LGG® probiotic to help support digestive health."

  



(g)      Enfamil® ProSobee: "No artificial colors, flavors or sweeteners" (front),
"BRAIN BUILDING," "expert-recommended," "IMMUNE HEALTH Vitamins A, C, E &
Selenium" (front), "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "NO ARTIFICAL
colors, flavors or sweeteners" (back), and "vitamins A, C & E for IMMUNE SUPPORT" (back).







127.    Based on Defendant's Omissions from these communications on the Products'
packaging, no reasonable consumer could expect or understand that the Infant Formulas contained
(or had a material risk of containing) Heavy Metals.

128.    The Omissions wrongfully convey to consumers that Defendant's Infant Formulas
have certain nutritious quality and characteristics that they do not actually possess.

129.    For instance, although Defendant misleadingly causes consumers to believe its
Infant Formulas do not contain Heavy Metals due to the material Omissions, the Infant Formulas
do in fact contain undisclosed Heavy Metals, which is material information to reasonable
consumers.

130.    Plaintiffs' counsel had seven of Defendant's Infant Formulas tested and that testing confirmed the presence of undisclosed Heavy Metals at the following levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil® A.R. | 3.4 | 3.2 | 1.2 |
| Enfamil® Gentlease | 3.7 | 2.6 | 1.7 |
| Enfamil® Enspire Gentlease | 5.0 | 2.3 | < 1.0 |
| Enfamil® NeuroPro | < 2.2 | 2.0 | < 1.0 |
| Enfamil® NeuroPro Sensitive | 5.1 | < 1.3 | 2.3 |
| Enfamil® Nutramigen | 7.9 | 4.6 | 6.5 |
| Enfamil® ProSobee | 6.7 | 6.8 | 3.5 |

131.    Independent testing also confirmed Heavy Metals in two of Defendant's Products:[86]

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee Soy Infant Formula | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

---

[86] HBBF Report, *supra*, at 20.

132.   Regardless of the levels found, the testing shows detectable presence of Heavy Metals when, as stated herein, no level of Heavy Metals is safe.[87]

133.   Based on the Omissions, a reasonable consumer would not expect the presence of Heavy Metals, nor would a reasonable consumer be able to detect the presence of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

134.   In fact, the FDA recently requested $1.2 billion from the U.S. Congress for its Foods Program for initiatives such as reduction of heavy metals in foods for infants and young children.[88] A portion of the funding would be for educational outreach about heavy metals in foods.[89]

135.   Reasonable consumers must and do rely on Defendant to honestly report what its Infant Formulas contain.

136.   Plaintiffs relied on the Products' packaging when making her purchasing decisions.

137.   Plaintiffs' expectations and reliance are consistent with reasonable consumers as shown by the Consumer Survey recently done by Plaintiffs' counsel:

| Consumer Survey | No | Yes |
|---|---|---|
| After seeing the label would you expect arsenic, cadmium, lead, and/or mercury in the infant formula? | 77.8% | 22.2% |

---

[87] Some Baby Food May Contain Toxic Metals, *supra*.

[88] Department of Health and Human Services Fiscal Year 2023: *Food and Drug Administration, Justification of Estimates for Appropriations Committees*, available at https://www.fda.gov/media/157192/download?attachment (last accessed March 18, 2024).

[89] *Id.*

| Consumer Survey | Very important | Important | Not at all important |
|---|---|---|---|
| Please select how important, if at all, would it be to your purchasing decision if the infant formula you purchased contained, or risked containing, even a small amount of arsenic, cadmium, lead, and/or mercury. | 71.0% | 25.4% | 3.6% |

138.   In light of Defendant's communications regarding the quality of the Infant Formulas and its commitment to innovative formulas and nutritious ingredients, Defendant knew or should have known the Infant Formulas or their ingredients contained or risked containing Heavy Metals.

139.   Defendant had a duty to ensure the Infant Formulas were not deceptively, misleadingly, unfairly, and/or falsely marketed and all material information was properly and fully disclosed.  For example, as the FDA recently stated in connection with the recall of applesauce due to the presence of lead, "Companies have the responsibility to take steps to assure that the products they manufacture are not contaminated with unsafe levels of heavy metals."[90] Notably, the FDA acknowledges that there is "no known safe level of exposure to lead."[91]

---

[90] Christina Jewett and Will Fitzgibbon, *Lead-Tainted Applesauce Sailed Through Gaps in Food-Safety System*, N.Y. Times, Feb. 27, 2024, available at https://www.nytimes.com/2024/02/27/world/europe/lead-applesauce-food-safety.html?smid=nytcore-ios-share&referringSource=articleShare (last accessed Mar. 18, 2024).

[91] Lead in Food and Foodwares, FDA, March 6, 2024, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares#:~:text=Although%20no%20safe%20level%20for,blood%20(%C2%B5g%20%2FdL) (last accessed March 18, 2024).

140.   Defendant acted knowingly, recklessly, and/or intentionally with its deceptive packaging based on the material Omissions.

141.   Defendant knew that properly and sufficiently monitoring for Heavy Metals in the Products and their ingredients was not only important, but also critical.

142.   Additionally, Defendant knew or should have been aware that a reasonable consumer would be feeding the Infant Formula multiple times each day to his or her baby, making it a significant source of food and nutrition for the child.  This leads to an infant's repeated exposure to the Heavy Metals, which defeats the purpose of infant formula, *i.e.*, to provide nourishment to infants.

143.   Finally, Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas by properly monitoring their ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained or risked containing Heavy Metals.

144.   The Omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions.  This is true especially considering the long-standing campaign by Defendant to market the Infant Formulas as healthy and made with nutritious ingredients, and to induce consumers, such as Plaintiffs, to purchase the Products.

145.   The Omissions make the Infant Formulas' packaging deceptive.  Reasonable consumers, like Plaintiffs, would consider the facts that Infant Formula contained (or had a material risk of containing) Heavy Metals when considering what infant formula to purchase.

146.   At all times during and throughout the Relevant Period, Defendant knew it was not following proper manufacturing standards and not sufficiently and consistently monitoring or testing the Infant Formulas or their ingredients for Heavy Metals.

147.    Defendant's packaging was misleading due to Defendant's failure to disclose the true quality of the Infant Formulas based on its improper manufacturing processes and the presence or material risk of the presence of Heavy Metals.

148.    Defendant knew or should have known the Infant Formulas contained or risked containing undisclosed levels of Heavy Metals that were inconsistent with Defendant's packaging.

149.    Defendant knew or should have known that reasonable consumers expected it to have strong and adequate manufacturing processes and ensure the Infant Formulas and their ingredients were monitored and tested for Heavy Metals to ensure compliance with Defendant's packaging.

150.    Defendant knew or should have known consumers paid premium prices because the Omissions were not disclosed.

151.    The Omissions are material and render the Infant Formulas' packaging deceptive as without full disclosure, reasonable consumers believe the Infant Formulas are high quality, healthy, and nutritious products.

152.    Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt or question Defendant's statements regarding the quality of the Infant Formulas.  Based on the impression given by the packaging, no reasonable consumer could expect or understand the Infant Formula contained (or had a material risk of containing) Heavy Metals.

153.    The Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the members of the Class to purchase products they would not have if the true quality of the Products and their ingredients were disclosed or for which they would not have paid a premium price.

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

154.    As a result of Defendant's deceptive packaging of the Infant Formulas, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap enormous profits from, consumers who paid the purchase price or premium for the Infant Formulas that were not as advertised.

## PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT

155.    Plaintiffs read and relied upon the packaging of the Infant Formulas when making their purchasing decisions. Had they known Defendant omitted and failed to disclose the Infant Formula contained (or had a material risk of containing) Heavy Metals, they would not have purchased the Infant Formulas.

156.    A reasonable consumer would consider the packaging of a product when deciding whether to purchase it.

## DEFENDANT'S KNOWLEDGE AND NOTICE OF ITS BREACH OF ITS IMPLIED WARRANTIES

157.    Defendant had sufficient notice of its breach of implied warranties.  Defendant has, and had, exclusive knowledge of manufacturing processes, quality control policies, the physical and chemical make-up of the Infant Formulas, and whether the Products and their ingredients contained Heavy Metals.

158.    In 2017 and 2019, the Clean Label Project published results and findings from an investigation of heavy metals in baby and toddler food products, including infant formula. The findings showed the presence of Heavy Metals in Defendant's Infant Formulas. In response to the

Clean Label Project's study, Defendant stated that it "specifically monitors the presence of many materials, including arsenic, cadmium, [and] lead . . . to ensure 'safety and high quality.'"[92]

159.     Moreover, Defendant was put on notice by February and September of 2021, when Congress publicly released findings regarding the presence of Heavy Metals in baby foods.[93] The FDA has also released a study showing the presence of Heavy Metals in baby foods, including infant formulas.[94]

160.     Defendant was likewise given notice through its membership in INCA, for example, through INCA's lobbying efforts in opposition to AB 899 that would have required infant formula manufacturers to test for and disclose levels of Heavy Metals.[95]

161.     Similarly, Defendant was made aware that it failed to implement or maintain proper manufacturing and quality control measures for detecting and controlling the presence of adulterating substances through the FDA's investigations from 2017 to 2023 and the multiple recalls by Defendant in 2023 alone due to bacterial contamination of its formula products.

162.     Defendant has not changed its packaging to include any disclaimer on the Omissions.

---

[92] USA Today, *These Baby Foods and Formulas Tested Positive for Arsenic, Lead, and BPA in New Study* (Oct. 25, 2017), available at https://www.usatoday.com/story/news/nation-now/2017/10/25/these-baby-foods-and-formulas-tested-positive-arsenic-lead-and-bpa-new-study/794291001/ (last accessed March 18, 2024).

[93] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[94] FDA Total Diet Study, *supra*, at 73, 81-82.

[95] Analysis of AB 899, *supra*.

## PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASS

163.    Defendant knew that reasonable consumers such as Plaintiffs and the proposed Class members would be the end purchasers of the Infant Formulas and the targets of its advertising, marketing, packaging, and statements.

164.    Defendant intended that the packaging and implied warranties would be considered by the end purchasers of the Infant Formulas, including Plaintiffs and the proposed Class members.

165.    Defendant directly marketed to Plaintiffs and the proposed Class through its packaging.

166.    Plaintiffs and the proposed Class members are the intended beneficiaries of the implied warranties.

## APPLICABILITY OF EQUITABLE TOLLING AND THE DISCOVERY RULE TO THE STATUTE OF LIMITATIONS

167.    Fraudulent concealment and/or the discovery rule toll Plaintiffs' claims.

168.    The statute of limitations is tolled for all of Plaintiffs' statutory consumer protection and common law claims due to Defendant's fraudulent concealment of facts that the Infant Formulas contained (or had a material risk of containing) Heavy Metals. Defendant intentionally concealed these material facts from Plaintiffs.

169.    Defendant knew the Omissions were a material consideration for any parent buying infant formulas.

170.    Defendant violated the relevant state consumer fraud acts by deceiving customers as to the true nature, quality, and makeup of the Infant Formulas.

171.    Based on Defendant concealing material facts from Plaintiffs, Plaintiffs could not reasonably discover that the Infant Formula contained (or had a material risk of containing) Heavy Metals.

172.     Plaintiffs did not know that the Infant Formula contained (or had a material risk of containing) Heavy Metals. Instead, Defendant only represented that the Infant Formulas were healthy, nutritious, and made of high-quality ingredients to support growing infants.

## CLASS ACTION ALLEGATIONS

173.     Plaintiffs bring this action individually and on behalf of the following Class:

> All persons who are residents of Minnesota who, from May 1, 2018, to the present, purchased the Infant Formulas in Minnesota for household use, and not for resale (the "Class").

174.     Excluded from the Class are the Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

175.     This action is brought and may be properly maintained as a class action.  There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

176.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harm are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

177.     The requirements for class certification have been met pursuant to Rule 23.01 of the Minnesota Rules of Civil Procedure as follows:

(a)     the Class is so numerous that joinder of all members is impracticable and the disposition of the claims of the members of all Class in a single action will provide substantial benefits to the parties and Court;

(b)     Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, including:

1)     whether Defendant owed a duty of care;

2)     whether Defendant owed a duty to disclose;

3)     whether Defendant knew or should have known that the Infant Formulas and their ingredients contained or risked containing Heavy Metals;

4)     whether Defendant failed to disclose the Omissions;

5)     whether the claims of the Plaintiffs and the Class serve a public benefit;

6)     whether Defendant's packaging is false, deceptive, and misleading based on the Omissions;

7)     whether the Omissions are material to a reasonable consumer;

8)     whether the Omissions are likely to deceive a reasonable consumer;

9)     whether Defendant had knowledge that the Omissions were material and false, deceptive, and/or misleading;

10)     whether Defendant breached its duty of care;

11)     whether Defendant breached its duty to disclose;

12)     whether Defendant violated the laws of the State of Minnesota;

13)     whether Defendant breached its implied warranties;

14)     whether Defendant engaged in unfair trade practices;

15)     whether Defendant engaged in false advertising;

16)     whether Defendant made fraudulent omissions;

17)      whether Plaintiffs and Class members' claims are tolled based on Defendant's fraudulent concealment;

18)      whether Plaintiffs and members of the Class are entitled to actual and statutory damages; and

19)      whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief.

(c) Plaintiffs' claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

(d) Plaintiffs will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

(e) Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

178.     As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Minnesota Unlawful Trade Practices Act, Minn. Stat. §325D.13, *et seq*., Against Defendant on Behalf of Plaintiffs and the Class**

179.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

180.     Defendant is a "person" within the meaning of the Minnesota Unlawful Trade Practices Act ("MUTPA").

181.     Defendant violated the MUTPA by knowingly failing to disclose the Omissions.

51

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

182.    Defendant knew or should have known the Infant Formulas and their ingredients were not of the true quality advertised because they contained (or had a material risk of containing) Heavy Metals.

183.    Defendant's pattern of knowing concealment, Omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Class with respect to the Infant Formulas' quality, nature of the ingredients, and suitability for consumption by infants with no development or health risks.

184.    Defendant intended for Plaintiffs and the Class to rely on its Omissions, concealment, implied warranties, and/or deceptions regarding the Infant Formulas' quality, nature of the ingredients, and suitability for consumption.

185.    Defendant's conduct and Omissions described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

186.    Defendant was under a duty to disclose the Omissions because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

187.    Defendant failed to discharge its duty to disclose the Omissions.

188.    The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiffs, the Class, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiffs and the Class known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

189.    Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

190.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

191.    Plaintiffs and the members of the Class would not have purchased the Infant Formulas at all had they known that Infant Formulas do not conform to the packaging.

192.    Pursuant to Minn. Stat. §8.31, subd. 3a, and §325D.15, Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUTPA.

**<u>COUNT II</u>**
**Violations of Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.44, *et seq*., Against Defendant on Behalf of Plaintiffs and the Class**

193.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

194.    Defendant is a "person" within the meaning of the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA").

195.    Defendant willingly engaged in deceptive trade practices, in violation of the MUDTPA, by failing to disclose the Omissions.

196.    Defendant knew or should have known the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

197.    Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Class with respect to the Infant Formulas' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

198.   Defendant intended that Plaintiffs and the Class would rely on Defendant's Omissions, concealment, implied warranties, and/or deceptions regarding the Infant Formulas' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

199.   Defendant's conduct and Omissions described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

200.   The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs, the Class, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiffs and the Class known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas.

201.   Defendant intended that Plaintiffs and the Class would rely on Defendant's Omissions, concealment, and other deceptive conduct when purchasing the Infant Formulas, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

202.   Defendant's unlawful conduct is continuing, with no indication it intends to cease this fraudulent course of conduct.

203.   Defendant was under a duty to disclose the Omissions because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

204.   Defendant failed to discharge its duty to disclose the Omissions about the Infant Formulas.

205.   As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did

not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

206.    Plaintiffs and the members of the Class would not have purchased the Infant Formulas at all had they known of the Omissions.

207.    Pursuant to Minn. Stat. §8.31, subd. 3a, and §325D.45, Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' violations of the MUDTPA.

### COUNT III
**Violations of Minnesota False Statement in Advertising Act, Minn. Stat. §325F.67, *et seq*.,
Against Defendant on Behalf of Plaintiffs and the Class**

208.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

209.    Plaintiffs and the Class purchased "goods," specifically the Infant Formulas discussed herein, and are a "person" within the meaning of the False Statement in Advertising Act ("FSAA").

210.    Plaintiffs and the Class purchased the Infant Formulas because of the Omissions asserted on the packaging that were made, published, disseminated, circulated, and placed before the public by Defendant.

211.    By engaging in the conduct as described herein, Defendant continues to violate Minn. Stat. §325F.67.

212.    Defendant's Omissions and use of other deceptive business practices include, by way of example, representations that the Infant Formulas were healthy, made from nutritious ingredients, and safe for consumption by infants with no development or health risks.

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

213.    Defendant knew or should have known the Infant Formulas did not have the quality described above because they included undisclosed (or material risk of) Heavy Metals.

214.    The Omissions were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Class with respect to the Infant Formulas' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

215.    Defendant's conduct and Omissions described herein occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

216.    The Omissions were made to customers in Minnesota, including Plaintiffs and the Class, thus the cause of action serves the public benefit of informing Minnesota consumers that the Products contained (or had a material risk of containing) Heavy Metals.

217.    The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiffs, the Class, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiffs and the Class known the Infant Formulas did not have the quality as advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

218.    Defendant intended that Plaintiffs and the Class would rely on the deception by purchasing the Infant Formulas, unaware of the Omissions and other undisclosed material facts. This conduct constitutes consumer fraud.

219.    Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

220.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class

suffered actual damages by: (1) paying a premium price for Products they reasonably believed did

not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they

would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving

Products that were worthless because they contained or risked containing Heavy Metals.

221.     Plaintiffs and the members of the Class would not have purchased the Infant

Formulas at all had they known of the presence or material risk of these Heavy Metals.

222.     Pursuant to Minn. Stat. §8.31, subd. 3a, and §325F.67, Plaintiffs and the Class seek

actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and

proper relief available thereunder for Defendant's violations of the FSAA.

### COUNT IV
**Violations of Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §325F.69, et. seq.,
Against Defendant on Behalf of Plaintiffs and the Class**

223.     Plaintiffs incorporate by reference and reallege each and every allegation contained

above, as though fully set forth herein.

224.     Plaintiffs at all times relevant hereto were citizens of the State of Minnesota.

225.     Defendant is a "person" within the meaning of the Minnesota Prevention of

Consumer Fraud Act ("MPCFA").

226.     The Omissions were made in connection with the sale of the Infant Formulas to

Plaintiffs and the Class.

227.     Defendant knowingly acted, used, and employed fraud, false pretenses, and

deceptive practices in connection with the sale of the Infant Formulas.  Specifically, Defendant

failed to disclose the Infant Formulas contained levels or material risk of Heavy Metals.

228.     Defendant knew or should have known the Infant Formulas did not have the quality

reasonable consumers expected because they included undisclosed (or the material risk of) Heavy

57

Metals that do not conform to the packaging. Defendant intended for Plaintiffs and the Class to rely on the Infant Formulas' packaging in deciding whether to purchase the Infant Formulas.

229.     Defendant's unfair or deceptive acts or practices were likely to deceive reasonable consumers about the Infant Formulas' quality, nature of the ingredients, consumption by infants with no development or health risks, and, by extension, the true value of the Infant Formulas. Plaintiffs and the Class relied on, and were in fact deceived by, Defendant's Omissions with respect to the Infant Formulas' quality, nature of the ingredients, and fitness for consumption in deciding to purchase them over competitors' infant formulas.

230.     The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiffs, the Class, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas. Had Plaintiffs and the Class known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

231.     Defendant's Omissions were made to customers in Minnesota, including Plaintiffs and the Class, thus the cause of action serves the public benefit of informing Minnesota consumers that the Products contained (or had a material risk of containing) Heavy Metals.

232.     Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

233.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

234.    Plaintiffs and the members of the Class would not have purchased the Infant Formulas at all had they known of the presence of these Heavy Metals.

235.    Pursuant to Minn. Stat. §8.31, subd. 3a, and §325F.69, Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MPCFA.

### COUNT V
**Breach of Implied Warranty of Merchantability, Minn. Stat. § 336.2-314,**
**Against Defendant on Behalf of Plaintiffs and the Class**

236.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

237.    Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Class.

238.    There was a sale of goods from Defendant to Plaintiffs and the members of the Class.

239.    At all times mentioned herein, Defendant manufactured and sold the Infant Formulas and, prior to the time the Infant Formulas were purchased by Plaintiffs and the Class, impliedly warranted that the Infant Formulas were of merchantable quality and fit for their ordinary use (consumption by infants with no development or health risks).

240.    Plaintiffs and the Class relied on these implied warranties when they purchased the Infant Formulas.

241.    The Infant Formulas were not fit for their ordinary use (consumption by infants with no development or health risks) as they contained (or had a material risk of containing) Heavy Metals that do not conform to the packaging.

242.    These promises became part of the basis of the bargain between Defendant and Plaintiffs and members of the Class, and thus constituted implied warranties.

243.    Defendant breached the implied warranties by selling Infant Formulas that contain (or risk containing) Heavy Metals.

244.    Defendant was on notice of this breach as it was aware of the inclusion (or risk) of Heavy Metals.

245.    Privity exists because Defendant impliedly warranted to Plaintiffs and the members of the Class through the Products' packaging, that the Infant Formulas were healthy, nutritious, and safe for consumption.; however, Defendant failed to mention or disclose the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

246.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

247.    On January 26, 2024, Dominique Lopez sent Defendant a letter on behalf of herself and all other United States citizens, who purchased the Infant Formulas notifying Defendant of its breaches of warranty and demanding that Defendant rectify the problems stated herein before filing her complaint in the district court in Northern District of Illinois, which Plaintiff Seutter joined.[96] Defendant received sufficient notice in advance before filing of this case through the pre-suit letter and through the pleading but has failed to rectify or agree to rectify the problems associated with the actions detailed above.

---

[96] *See Complaint, Lopez et al. v. Mead Johnson Nutrition Co. et al., No. 1:24-cv-00691 (N.D. Ill. Jan. 26, 2024)*

248.    Plaintiffs, on behalf of themselves and the Class, seeks actual damages for Defendant's failure to deliver goods that conform to their implied warranties and resulting breach.

## COUNT VI
**Fraud by Omission against Defendant on Behalf of Plaintiffs and the Class**

249.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

250.    Defendant knew or should have known the Infant Formulas were contained (or had a material risk of containing) Heavy Metals.

251.    Plaintiffs and the Class and Defendant acted within the context of a business transaction when Plaintiffs and the Class purchased Defendant's Infant Formulas for household or business use, and not for resale.

252.    Plaintiffs and the Class were ordinary non-business consumers.

253.    Defendant actively and knowingly concealed from and failed to disclose to Plaintiffs and the Class that the Infant Formulas contained  (or had a material risk of containing) Heavy Metals that do not conform to the Products' packaging.

254.    As an infant formula manufacturer, Defendant is in a special position of trust upon which consumers rely.

255.    Defendant was under a duty to disclose to Plaintiffs and the Class the true quality, characteristics, nature of the ingredients, and suitability of the Infant Formulas because:

(a)    Defendant was in a superior position to know the true state of facts about its Products;

(b)    Defendant was in a superior position to know the nature of the ingredients, characteristics and suitability of the Infant Formulas for consumption by infants with no development or health risks; and

(c)     Defendant knew that Plaintiffs and the Class could not reasonably have been expected to learn about the Omissions without Defendant disclosing it on the Infant Formulas' packaging.

256.    Defendant knows its customers trust the quality of its products and expect Defendant's Infant Formulas to be free of the risk or presence of Heavy Metals. Defendant also knows that consumers seek out and wish to purchase infant formulas that possess high quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas that they believe possess these qualities.

257.    Due to the Omissions on the Infant Formulas' packaging, Defendant had a duty to disclose the whole truth that the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

258.    Defendant acted in bad faith when it intended that Plaintiffs and the Class would rely on the Omissions when purchasing the Infant Formulas, unaware of the undisclosed material facts.

259.    Defendant was under a duty to disclose the Omissions because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

260.    Defendant failed to discharge its duty to disclose the Omissions.

261.    Defendant allowed the Omissions on the Products' packaging to intentionally mislead consumers, such as Plaintiffs and the Class.

262.    The facts concealed, omitted, or not disclosed by Defendant to Plaintiffs and the Class are material in that a reasonable consumer would have considered the Omissions material when deciding whether to purchase the Infant Formulas.

263.     Defendant knew or should have known the Omissions were material to Plaintiffs and the Class's decisions to purchase the Infant Formulas and would induce Plaintiffs and the Class to purchase the Infant Formulas.

264.     Defendant intentionally concealed its improper manufacturing conditions and the presence or material risk of Heavy Metals in the Infant Formulas with the intent to defraud and deceive Plaintiffs and the Class.

265.     Plaintiffs and the Class justifiably relied on Defendant's Omissions to their detriment. The detriment is evident from the true quality, characteristics, and nature of the ingredients of the Infant Formulas, which is misleading when compared to the Infant Formulas' packaging and represented by Defendant and inherently unfair to consumers of the Infant Formulas, such as Plaintiffs and the Class.

266.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

267.     Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT VII
### Fraudulent Misrepresentation by Omission against Defendant
### on Behalf of Plaintiffs and the Class

268.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

269.     Plaintiffs and members of the Class were buyers and Defendant was a seller in a commercial exchange.

270.     Plaintiffs and the Class were ordinary non-business consumers who trusted Defendant to manufacture, distribute, market, and sell Infant Formulas that did not contain (or have a material risk of containing) Heavy Metals.

271.     As an infant formula manufacturer, Defendant is in a special position of trust upon which consumers rely.

272.     Defendant knowingly and actively concealed the Omissions from Plaintiffs and the Class.

273.     Defendant intentionally, knowingly, and/or recklessly made these Omissions to induce Plaintiffs and the Class to purchase the Infant Formulas.

274.     Defendant knew or should have known the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

275.     Defendant allowed its packaging to intentionally mislead consumers, such as Plaintiffs and the Class.

276.     Defendant's packaging did not disclose the Omissions with the intent to deceive and defraud consumers, such as Plaintiffs and the Class.

277.     Defendant intended for Plaintiffs and the Class to rely on the Omissions. Defendant knows its customers trust the quality of its Products and that it is in a special position of trust with the public.

278.     Defendant knows reasonable consumers expected the Infant Formulas to not contain (or have a material risk of containing) Heavy Metals.

279.    Defendant also knows that reasonable consumers seek out and wish to purchase infant formulas that possess high quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas they believe possess these qualities.

280.    Defendant knew that Plaintiffs and the Class were ignorant of the Omissions.

281.    Defendant knew that Plaintiffs and the Class could not reasonably have been expected to learn or discover the Omissions.

282.    Defendant was under a duty to disclose the Omissions regarding its Infant Formulas to Plaintiffs and the Class because:

(a)    Defendant was in possession of special facts that could not have been discovered by Plaintiffs and the Class.

(b)    Defendant's packaging was misleading to consumers by failing to disclose the Omissions.

(c)    Based on Defendant's partial statements on the Infant Formulas' packaging that gave a misleading impression to reasonable consumers without further information about the Omissions, Defendant assumed the obligation to make a full and fair disclosure of the whole truth.

283.    The Omissions were material facts to Plaintiffs and the Class, as Plaintiffs and the Class relied on the Omissions when purchasing the Infant Formulas.

284.    Plaintiffs and the Class had a right to rely on Defendant's packaging as the truth because customers like Plaintiffs and the Class trust the quality of Defendant's Products and they expect the Infant Formulas do not contain (or have a material risk of containing) Heavy Metals.

285.    Plaintiffs and the Class did in fact rely on the material Omissions and purchased the Infant Formulas to their detriment. Given the materiality of the Omissions, Plaintiffs and the Class's reliance on the Omissions was justifiable.

286.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual pecuniary damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

287.     Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT VIII

**Unjust Enrichment Against Defendant on Behalf of Plaintiffs and the Class**

288.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

289.     Substantial benefits have been conferred on Defendant by Plaintiffs and the Class through the purchase of the Infant Formulas. Defendant knowingly and willingly accepted and enjoyed these benefits.

290.     Defendant either knew or should have known that the payments rendered by Plaintiffs and the Class were given and received with the expectation that the Infant Formulas would not contain (or have a material risk of containing) Heavy Metals. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

291.     Defendant was obligated to disclose the Omissions in the Infant Formulas because (1) it had exclusive knowledge they contained (or had a material risk of containing) Heavy Metals; (2) the Omissions were not known or reasonably accessible to Plaintiffs and the Class; (3) Defendant actively concealed the Omissions; and (4) Defendant made partial statements on the

Infant Formulas' packaging that gave a misleading impression to Plaintiffs and the Class and reasonable consumers without further information because the Omissions were not disclosed.

292.    Defendant's acceptance and retention of the benefits of the payments from Plaintiffs and the Class under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiffs and the Class.

293.    Plaintiffs and the Class are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

294.    Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

1.  An order declaring this action to be a proper class action pursuant to Minnesota Rule of Civil Procedure 23, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

2.  An order enjoining Defendant from selling the Infant Formulas until the Heavy Metals are at a non-detectable level;

3.  An order enjoining Defendant from selling the Infant Formulas until the Omissions are disclosed;

4.  An order enjoining Defendant from selling the Infant Formulas in any manner suggesting or implying that they are healthy and made from nutritious ingredients;

5.  An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief;

6. An order awarding declaratory relief, and any further injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's conduct;

7. An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the state laws, plus pre- and post-judgment interest thereon;

8. An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

9. An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

10. An order awarding attorneys' fees and costs to Plaintiffs and the Class; and

11. An order providing for all other such equitable relief as may be just and proper.

## **<u>JURY DEMAND</u>**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  May 3, 2024

**GUSTAFSON GLUEK PLLC**

By: */s/ Catherine K. Smith*
CATHERINE SUNG-YUN K. SMITH
DANIEL E. GUSTAFSON
SHASHI K. GOWDA
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: csmith@gustafsongluek.com
          dgustafson@gustafsongluek.com
          sgowda@gustafsongluek.com


LOCKRIDGE GRINDAL NAUEN PLLP
ROBERT K. SHELQUIST
REBECCA A. PETERSON
KRISTA K. FREIER
CATHERINE A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail:  rkshelquist@locklaw.com
          rapeterson@locklaw.com
          kkfreier@locklaw.com
          capeterson@locklaw.com


WEXLER BOLEY & ELGERSMA LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail: kaw@wbe-llp.com
          kae@wbe-llp.com

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

GEORGE FELDMAN MCDONALD, PLLC
LORI G. FELDMAN
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
Facsimile: (888) 421-4173
E-mail: LFeldman@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
DAVID J. GEORGE
BRITTANY L. SACKRIN
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
E-mail: DGeorge@4-Justice.com
E-mail: bsackrin@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
JANINE L. POLLACK
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (917) 983-2707
E-mail: jpollack@4-Justice.com

LYNCH CARPENTER LLP
KATRINA CARROLL
KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 212-5919
E-mail: katrina@lcllp.com
         kyle@lcllp.com

SALTZ MONGELUZZI & BENDESKY, PC
SIMON B. PARIS, ESQ.
PATRICK HOWARD, ESQ.
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA  19103
Telephone: (215) 496-8282
Facsimile: (215) 754-4443
E-mail:  sparis@smbb.com
          phoward@smbb.com

THRONDSET MICHENFELDER, LLC
JASON GUSTAFSON
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (763) 515-6110
E-mail: jason@throndsetlaw.com

*Counsel for Plaintiffs*

## <u>ACKNOWLEDGEMENT REQUIRED BY MINNESOTA STATUTE, SECTION 549.211, SUBDVISION 2</u>

The undersigned hereby acknowledges that pursuant to Minnesota Statute, section 549.211, subdivision 2, costs, disbursements and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find that the undersigned acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass or committed a fraud upon the Court.

Dated:  May 3, 2024                              /s/  Catherine K. Smith
                                                 Catherine K. Smith

Exhibit 2

APPROVED AND FILED
DIEGO MORALES
INDIANA SECRETARY OF STATE
12/15/2023 10:28 AM

## BUSINESS ENTITY REPORT

### NAME AND PRINCIPAL OFFICE ADDRESS

| | |
|---|---|
| **BUSINESS ID** | 194535-126 |
| BUSINESS TYPE | Foreign Limited Liability Company |
| **BUSINESS NAME** | MEAD JOHNSON & COMPANY, LLC |
| ENTITY CREATION DATE | 12/15/1967 |
| **JURISDICTION OF FORMATION** | Delaware |
| PRINCIPAL OFFICE ADDRESS | 2400 West Lloyd Parkway, Evansville, IN, 47721, USA |

### YEARS FILED

| | |
|---|---|
| YEARS | 2023/2024 |

### EFFECTIVE DATE

| | |
|---|---|
| EFFECTIVE DATE | 12/15/2023 |
| EFFECTIVE TIME | 10:28 AM |

### REGISTERED OFFICE AND ADDRESS

| | |
|---|---|
| REGISTERED AGENT TYPE | Business Commercial Registered Agent |
| **NAME** | CORPORATION SERVICE COMPANY |
| **ADDRESS** | 135 North Pennsylvania Street, Suite 1610, Indianapolis, IN, 46204, USA |

### GOVERNING PERSON INFORMATION

| | |
|---|---|
| TITLE | Member |
| **NAME** | Mead Johnson Nutrition Company |
| **ADDRESS** | 2400 West Lloyd Expressway, Evansville, IN, 47721, USA |

APPROVED AND FILED
DIEGO MORALES
INDIANA SECRETARY OF STATE
12/15/2023 10:28 AM

## SIGNATURE

IN WITNESS WHEREOF, THE UNDERSIGNED HEREBY VERIFIES, SUBJECT TO THE PENALTIES OF PERJURY, THAT THE STATEMENTS CONTAINED HEREIN ARE TRUE, THIS DAY **December 15, 2023.**

THE UNDERSIGNED ACKNOWLEDGES THAT A PERSON COMMITS A CLASS A MISDEMEANOR BY SIGNING A DOCUMENT THAT THE PERSON KNOWS IS FALSE IN A MATERIAL RESPECT WITH THE INTENT THAT THE DOCUMENT BE DELIVERED TO THE SECRETARY OF STATE FOR FILING.

SIGNATURE                    Justin Griner
TITLE                        Authorized Agent

Business ID : 194535-126
Filing No. :  10139555

Exhibit 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| AMANDA SEUTTER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MEAD JOHNSON NUTRITION COMPANY, | ) |
| *et al.*, | ) |
| | ) |
| Defendants. | ) |

**<u>DECLARATION OF DANIEL JENSKI</u>**

I, Daniel Jenski, state as follows:

1.      I am over 18 years old and make this declaration based on my review of certain corporate records maintained by Mead Johnson Nutrition Company and Mead Johnson & Company, LLC.

2.      As part of my job duties as Consumer Insights and Analytics Director, I have visibility to the sales data for Mead Johnson & Company, LLC, a wholly owned subsidiary of Mead Johnson Nutrition Company.

3.      I have reviewed sales data, kept in the normal course of Mead Johnson Nutrition Company's and Mead Johnson & Company, LLC's business, for the following products: Enfamil® A.R.™, Enfamil® Gentlease®, Enfamil® Enspire™ Gentlease®, Enfamil® NeuroPro™, Enfamil® NeuroPro™ Sensitive, Enfamil® Nutramigen®, and Enfamil® ProSobee® (the "Products").

4.      The time period for the data spans from June 2019 through April 2024.

5.      During that time period, aggregate sales revenue for Products sold in the State of Minnesota exceeded $5,000,000.

6.      The total number of units of the Products sold in the State of Minnesota from June 2019 through April 2024 exceeded 100,000 units.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___05-Jun-2024___.

Daniel Jenski (Jun 5, 2024 19:21 EDT)

Daniel Jenski

Exhibit 4

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| **Dominique Lopez, Bianca Raya, Laurie Thomas, and Amanda Seutter,** individually and on behalf of a class of similarly situated individuals, <br><br> **PLAINTIFFS**, <br><br> v. <br><br> **MEAD JOHNSON NUTRITION COMPANY** and **MEAD JOHNSON & COMPANY, LLC**, <br><br> **DEFENDANT**. | Case No. <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

1.     Plaintiffs Dominique Lopez, Bianca Raya, Laurie Thomas, and Amanda Seutter ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Class Action Complaint against Defendant Mead Johnson Nutrition Company and Defendant Mead Johnson & Company, LLC (collectively, "Defendant" or "Mead Johnson"), for its knowing, reckless, and/or intentional practice of failing to disclose the lack of quality controls in manufacturing its infant formula and also failing to disclose the presence of Heavy Metals in its Enfamil® infant formulas ("Products" or "Infant Formulas").[1]

---

[1] As used herein, "Heavy Metals" includes arsenic, cadmium, and lead. "Products" or "Infant Formula(s)" as to the Heavy Metals allegations refer to the following Mead Johnson powdered infant formula products: Enfamil A.R., Enfamil Gentlease, Enfamil Enspire Gentlease, Enfamil NeuroPro, Enfamil NeuroPro Sensitive, Enfamil Nutramigen, and Enfamil ProSobee. Discovery

Exhibit 4

The Infant Formulas are sold throughout the United States and do not conform to their packaging. Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Classes (as defined herein), including requiring full disclosure of the lack of quality controls and disclosure of the risk or presence of Heavy Metals on the Products' packaging, and restoring monies to the members of the proposed Classes. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel as to themselves, and as to all other matters, upon information and belief. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.      Mead Johnson is one of the primary manufacturers of infant formula in the United States and previously held 39.6% of the market share for powdered infant formula.[2] As a trusted manufacturer and vendor of products consumed exclusively by babies and young children, it carries a duty of the highest importance to implement and maintain quality control when manufacturing its products. When a company selling vital products, such as Defendant who sells infant formula, knowingly fails to ensure the safety of its products, it must not allow dangerous toxins or contaminants, such as Heavy Metals, to be consumed by its unsuspecting consumers. Rather, these companies have a duty to disclose material risks of contamination—allowing consumers to make informed decisions about the risks they are willing to take (especially with

---

may reveal additional products that contain Heavy Metals and/or the presence of additional contaminants or heavy metals. Plaintiffs reserve their rights to amend and include any such products or heavy metals in this action.

[2] *Market Share of the Leading Vendors of Baby Formula (Powder) in the United States in 2016, Based on Dollar Sales*, available at https://www.statista.com/statistics/443975/market-share-of-the-leading-us-baby-formula-powder-companies/ (last accessed January 25, 2024).

the health of their infants) and assess the true value of the product they are considering for purchase. Defendant failed to do so in this case.

3.     In August 2023, the FDA found that Defendant ignored its duties to ensure proper quality control measures in its manufacturing facilities.[3] This came after Defendant voluntarily recalled two batches of infant formula products in February 2023 due to bacterial contamination.[4] The FDA then inspected Defendant's facilities and found such poor quality control conditions that it issued a formal "warning letter" to the company for violations of the Food, Drug, and Cosmetic Act (FDCA).[5] The FDA issued the warning because "manufacturers are responsible for ensuring they make safe products," and the letter was "intended to help the industry improve the safety of their manufacturing practices," indicating that existing practices failed to uphold the company's duties.[6] Unfortunately, the inspections and warning letter failed to prevent another recall of Defendant's formula. In December 2023, Defendant voluntarily recalled hundreds of thousands of infant formula products that were similarly at risk of bacterial contamination yet again due to its failure to implement adequate quality control measures.[7]

---

[3] FDA, *FDA Issues Warning Letters to Three Infant Formula Manufacturers*, available at https://www.fda.gov/news-events/press-announcements/fda-issues-warning-letters-three-infant-formula-manufacturers (last accessed January 21, 2024) ("FDA Issues Warning Letters to Three Infant Formula Manufacturers").

[4] *Id.*; *see also* FDA, *Reckitt Recalls Two Batches of Prosobee 12.9 oz Simply Plant Based Infant Formula Because of Possible Health Risk*, available at https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/reckitt-recalls-two-batches-prosobee-129-oz-simply-plant-based-infant-formula-because-possible (last accessed January 21, 2024) ("Reckitt Recalls Two Batches of Prosobee").

[5] FDA Issues Warning Letters to Three Infant Formula Manufacturers, *supra*.

[6] *Id.*

[7] FDA, *Reckitt/Mead Johnson Nutrition Voluntarily Recalls Select Batches of Nutramigen Hypoallergenic Infant Formula Powder Because of Possible Health Risk*, available at https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/reckittmead-johnson-nutrition-voluntarily-recalls-select-batches-nutramigen-hypoallergenic-infant (last accessed

4.     Unsurprisingly, Defendant's Products also contain other dangerous toxins: Heavy Metals. As detailed below, individuals, especially infants, who consume Heavy Metals risk developing serious adverse health effects – a risk which most consumers are aware of and strongly prefer to avoid in food they feed children (who are more vulnerable to those risks than others). Yet, Defendant chose to sell itself to new parents as a trusted company, without disclosing the lack of quality control where it manufactured its infant formula or that the formula contained or had a material risk of containing Heavy Metals (collectively, the "Omissions"), both of which would be material to any parent purchasing formula for their infant.

5.     Infants rely on breastmilk and/or infant formula for their nutrition and growth. The U.S. Dietary Guidelines for Americans and the American Academy of Pediatrics recommends breastfeeding babies exclusively for about six months from birth and continuing afterwards along with introduction of solid foods until they are 12 months old and beyond.[8] However, according to the Centers for Disease Control and Prevention ("CDC"), only 46.3% of babies under three months old are exclusively breastfed, and the percentage of babies exclusively breastfed through six months drops to 25.8%.[9] For babies younger than six months, the CDC recommends that breast milk or infant formula are the only things they eat for their nutrition, and while supplementing with some solid food, breastmilk or infant formula is recommended up to

---

January 21, 2024) ("Mead Johnson Nutrition Voluntarily Recalls Select Batches of Nutramigen"); *see also What's Causing the Latest Baby Formula Recall*, available at https://time.com/6553508/baby-formula-recall-shortage/ (last accessed January 21, 2024).

[8] CDC, *Infant and Toddler Nutrition: Recommendation and Benefits*, available at https://www.cdc.gov/nutrition/infantandtoddlernutrition/breastfeeding/recommendations-benefits .html (last accessed January 21, 2024).

[9] CDC, *Facts: Key Breastfeeding Indicators*, available at https://www.cdc.gov/breastfeeding/data/facts.html (last accessed January 21, 2024).

when they are 24 months old.[10] Therefore, a significant number of babies rely on infant formulas for their growth and nutrition in the first year of their lives and beyond.

6.       Reasonable parents, like Plaintiffs, trust and depend on manufacturers, like Defendant, to sell infant formula that is healthy, nutritious, and free from the presence or material risk of harmful toxins, contaminants, and chemicals and made with reliable quality control measures. They certainly expect the formula they feed their infants to be free of the risk or presence of Heavy Metals, substances known to have significant and unsafe developmental and health consequences as detailed herein.

7.       Consumers lack the knowledge and opportunity to determine if quality control procedures are followed in the manufacturing of the Products. Consumers also lack the scientific knowledge necessary to determine whether Defendant's Products do in fact contain (or have a material risk of containing) Heavy Metals or to ascertain the true nature of the ingredients and quality of the Products. Reasonable consumers therefore must and do rely on Defendant to properly and fully disclose what its Products contain. This is especially true for products such as infant formula, the contents of which include the risk or presence of Heavy Metals, including arsenic, lead, or cadmium, that are being fed to hours-, days- or months-old babies. Such information would be material to any reasonable parent's purchasing decisions.

8.       Defendant's packaging is designed to induce reasonable consumers to believe in the high quality and safety of its infant formula while omitting any information about the inclusion (or material risk of inclusion) of Heavy Metals and the utter failure to use quality control measures in its manufacturing.

---

[10]   CDC, *When, What, and How to Introduce Solid Foods*, available at https://www.cdc.gov/nutrition/InfantandToddlerNutrition/foods-and-drinks/when-to-introduce-solid-foods.html (last accessed January 21, 2024).

9.      For example, the packaging emphasizes that the Infant Formulas are healthy and made with nutritious ingredients that help support proper development and growth:[11]

 

10.   The packaging on the Infant Formulas also stresses that there are no detrimental, harmful, and genetically engineered ingredients:[12]

 

11.      On these packages and others, Defendant states the Infant Formulas contain nutritious ingredients such as Docosahexaenoic Acid ("DHA"), prebiotics such as human milk

---

[11]   https://www.enfamil.com/products/enfamil-neuropro-infant-formula/powder-tub-20-7-oz-tub/ (last accessed January 21, 2024).

[12]   https://www.enfamil.com/products/enfamil-neuropro-gentlease-formula/powder-tub-19-5-oz-tub/ (last accessed January 25, 2024).

oligosaccharides ("HMO"), probiotics, and desirable (naturally occurring) minerals such as selenium.

 

 

12.  Based on the messaging and impression communicated by the packaging and the material nondisclosures, no reasonable consumer could expect or understand that the Infant Formulas contained or risked containing Heavy Metals. This is especially true as the development and physical risks created by ingestion of Heavy Metals by infants are well-recognized.

13.  Likewise, this same packaging promising healthy, high quality and safe products would not lead reasonable consumers to expect or understand that the Infant Formula was manufactured by a company that allowed improper quality control procedures.

14.     Defendant's website provides further context to demonstrate that the Products' packaging is deceptive by promising a healthy product that poses no risks to any infants. Specifically, Defendant promises on its website that: (1) Defendant "[s]upport[s] the brain in everything" it does with products that "are excellent for routine, everyday feeding;"[13] (2) "[t]he health and safety of infants and children is [Defendant's] top priority," and it is "committed to providing a high quality and safe products [sic] for [its] littlest consumers;"[14] (3) Defendant's "products undergo extensive quality and safety checks throughout the manufacturing process— from raw materials to finished product" and that "samples from every batch [it] produce[s] are tested to ensure the product meets [its] stringent quality standards;"[15] and (4) "[p]arents can be assured that our infant formulas are safe and nutritious feeding options for their infants."[16] This is all in direct contradiction to the Omissions.

15.     First, the FDA has cited Defendant for inadequate or nonexistent quality control methods four times since December 2017, three of which were for failing to "establish a system of process controls . . . to ensure that infant formula does not become adulterated due to the presence of microorganisms in the formula or in the processing environment."[17] Similarly, the fourth citation (following an FDA inspection on July 6, 2022) was for failing to "maintain a

---

[13] https://www.enfamil.com/why-enfamil/enfamil-formula-family/ (last accessed January 21, 2024).

[14] https://www.enfamil.com/why-enfamil/quality-assurance/ (last accessed January 21, 2024).

[15] *Id*.

[16] *Id*.

[17] FDA Dashboard: *Firm Profile for Mead Johnson & Company, LLC*, available at https://datadashboard.fda.gov/ora/firmprofile.htm?FEIi=1812170&/identity/1812170 (last accessed January 21, 2024) ("Mead Johnson FDA Dashboard").

building used in manufacture, processing, packing, or holding of infant formula in a clean and sanitary condition."[18]

16.     Despite known control failures and attendant risks, Defendant knowingly chose to not disclose to consumers that the Infant Formulas were manufactured without basic quality controls. Nowhere on the Infant Formulas' packaging (or the Defendant's website or advertisements) is the lack of proper manufacturing controls or the material risk of contamination from failing to ensure safe manufacturing processes disclosed.

17.     Instead, to induce reasonable consumers to believe in the quality and safety of its Products and to justify a price that reflects a premium, Defendant chose to focus on promoting its Infant Formulas on its packaging as high quality and made with nutritious ingredients, and to not disclose the true quality of the Products.

18.     Second, on information and belief, Defendant was knowingly, recklessly, and/or intentionally selling Infant Formulas that contained detectable levels of arsenic, cadmium, or lead, all known to pose health risks to humans, and particularly to infants.[19]

19.     Independent testing also confirmed the presence of Heavy Metals in two of Defendant's Infant Formulas:[20]

---

[18] *Id.*

[19] Healthy Babies Bright Futures' Report: *What's in My Baby's Food?*, available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed January 21, 2024) ("HBBF Report").

[20] *Id.* at 20.

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee Soy Infant Formula | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

20.     Arsenic, cadmium, and lead are all known to pose health risks to humans, and particularly to infants.[21]

21.     Exposure to Heavy Metals has significant and dangerous health consequences. A 2021 report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform highlighted the material risk of including Heavy Metals in baby food, spurred by the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development."[22]

22.     Despite the known health risks, Defendant knowingly chose to not disclose to consumers that the Infant Formulas contain (or have a material risk of containing) Heavy Metals. Nowhere on the Infant Formulas' packaging is it disclosed that they contain (or have a material risk of containing) Heavy Metals.

---

[21] *See generally, id.*

[22] U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury," February 4, 2021, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed January 21, 2024) ("Congressional Committee Report"); *see also* U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods," September 29, 2021, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/ECP%20Second%20Baby%20Food%20Report%209.29.21%20FINAL.pdf (last accessed January 21, 2024) ("Second Congressional Committee Report").

23.     The Infant Formulas' packaging does not include any type of disclaimer or disclosure regarding the presence of Heavy Metals that would inform consumers of their presence or risk. Likewise, nothing on the packaging states that ingestion of Heavy Metals can be unsafe or accumulate over time resulting in developmental issues, poisoning, injury, and/or disease.

24.     Instead, to induce reasonable consumers to believe in the quality and safety of its Products and to justify a price that reflects a premium, Defendant chose to focus on promoting its Infant Formulas on its packaging as high quality and made with nutritious ingredients.

25.     Defendant's marketing strategy reflects the concerns raised by the World Health Organization ("WHO") and UNICEF in its report acknowledging the troubling marketing efforts by infant formula milk manufacturers.[23] This report raises deep concerns over the lasting and pervasive negative effects from the false and misleading information received by parents such as Plaintiffs through such aggressive marketing efforts by infant formula manufacturers such as Defendant.[24]

26.     Based on Defendant's packaging and related omissions, no reasonable consumer had any reason to know or expect that the Infant Formulas contained Heavy Metals. Furthermore, reasonable parents, like Plaintiff, who were feeding the Infant Formulas to their babies (multiple times a day) would consider the mere presence (or risk) of Heavy Metals a material fact when considering whether to purchase the Infant Formulas.

---

[23] WHO, *How the Marketing of Formula Milk Influences our Decisions on Infant Feeding*, February 22, 2022, available at https://www.who.int/teams/maternal-newborn-child-adolescent-health-and-ageing/formula-milk-industry (last accessed January 21, 2024).

[24] National Public Radio, *Infant Formula Promoted in 'Aggressive' and 'Misleading' Ways, Says New Global Report*, March 1, 2022, available at https://www.npr.org/sections/goatsandsoda/2022/03/01/1082775961/infant-formula-promoted-in-aggressive-and-misleading-ways-says-new-global-report (last accessed January 21, 2024).

27.    Defendant knows its customers trust the quality of its Products that are manufactured for the most vulnerable population – infants – and expect the Infant Formulas to be properly and safely manufactured and free from the risk and actual presence of Heavy Metals. Defendant also knows its consumers seek out and wish to purchase infant formulas that possess nutritious ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas they believe possess these qualities. Defendant also knows no reasonable consumer would knowingly provide his or her children with infant formula that contained Heavy Metals or was manufactured without proper quality control procedures.

28.    Defendant knew that parents would find the Omissions material when deciding whether to purchase the Infant Formulas and that it was in a special position of public trust to those consumers.

29.    The material Omissions are deceptive, misleading, unfair, and/or false because the Infant Formulas were manufactured without proper quality control procedures and/or contain (or risk containing) undisclosed Heavy Metals.

30.    The Omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for Infant Formulas that did not disclose material information as to the Products' true quality and value. Defendant continues to wrongfully induce consumers to purchase its Infant Formulas without full disclosure of the Omissions.

31.    Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Classes (as defined herein), who, from the applicable limitations period up to and including the present, purchased for household use and not resale any of Defendant's Infant Formulas.

## JURISDICTION AND VENUE

32.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), because the matter in controversy exceeds the sum or value or $5,000,000 exclusive of interest and costs and more than two-thirds of the Class resides in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d)(2) do not apply.

33.     Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiffs suffered injury as a result of Defendant's acts in this District, many of the acts and transactions giving rise to this action occurred in this District, and Defendant conducts substantial business in this District and has intentionally availed itself of the laws and markets of this District and is headquartered and subject to personal jurisdiction in this District.

## THE PARTIES

34.     Plaintiff Dominique Lopez ("Plaintiff Lopez") is, and at times relevant hereto was, a citizen of the State of California and currently resides in Contra Costa County in the State of California. She purchased the Infant Formula, including Enfamil® Nutramigen, Enfamil® ProSobee, and Enfamil® NeuroPro for household use.

35.     Plaintiff Lopez purchased the Infant Formula for her child from Target, Safeway, and Walmart in Antioch, California, from approximately May 2021 until September 2022.

36.     Plaintiff Lopez believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Lopez saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her children the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of

containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Lopez would be willing to purchase Enfamil® products in the future if she could be certain that they were safely manufactured and do not contain (or have a material risk of containing) Heavy Metals.

37.     Plaintiff Bianca Raya ("Plaintiff Raya") is, and at times relevant hereto was, a citizen of the State of Illinois and currently resides in Rock Island County in the State of Illinois. She purchased the Infant Formula, including Enfamil® Nutramigen and Enfamil® Gentlease for household use.

38.     Plaintiff Raya purchased the Infant Formula for her child from WalMart, Target and Walgreens in Moline, Illinois, from approximately February 2023 until December 2023.

39.     Plaintiff Raya believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Raya saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her children the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Raya would be willing to purchase Enfamil® products in the future if she could be certain that they were safely manufactured and do not contain (or have a material risk of containing) Heavy Metals.

40.     Plaintiff Laurie Thomas ("Plaintiff Thomas") is, and at times relevant hereto was, a resident of Petersburg, Illinois and currently resides in Menard County in the State of Illinois. She purchased the Infant Formula, including Enfamil® NeuroPro and Enfamil® Gentlease for household use.

41.     Plaintiff Thomas purchased the Infant Formula for her children from Hyvee, WalMart, County Market, and other grocery stores in Springfield, Illinois, from approximately 2018 until 2021.

42.     Plaintiff Thomas believed she was feeding her children healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Thomas saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her children the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Thomas would be willing to purchase Enfamil® products in the future if she could be certain that they were safely manufactured and do not contain (or have a material risk of containing) Heavy Metals.

43.     Plaintiff Amanda Seutter ("Plaintiff Seutter") is, and at times relevant hereto was, a resident of Elk River, Minnesota and currently resides in Sherburne County in the State of Minnesota. She purchased the Infant Formula, including Enfamil® Gentlease for household use.

44.     Plaintiff Seutter purchased the Infant Formula for her child from Target in Otsego, Minnesota and Amazon.com, from approximately October 2022 until January 2024.

45.     Plaintiff Seutter believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Seutter saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information

15

had been fully disclosed. Plaintiff Seutter would be willing to purchase Enfamil® products in the future if she could be certain that they were safely manufactured and do not contain (or have a material risk of containing) Heavy Metals.

46. As a result of Defendant's intentionally, recklessly, and/or knowingly deceptive conduct as alleged herein, Plaintiffs were injured when they paid the purchase price or a price premium for the Infant Formula that did not deliver what was promised by Defendant. Plaintiffs paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formulas were manufactured with proper quality control procedures, were free of Heavy Metals, and posed no potential harm to the physical and mental growth of her infant – long term or short term. Plaintiffs would not have paid this money had they known the truth about the Omissions. Further, should Plaintiffs encounter the Infant Formulas in the future, they could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Infant Formulas. Damages can be calculated through expert testimony at trial.

47. Defendant Mead Johnson Nutrition Company is a Delaware corporation with its "Global Headquarters" at 225 North Canal Street in Chicago, Illinois, in Lake County. In June 2017, Mead Johnson Nutrition Company was acquired by Reckitt Benckiser Group PLC, whose U.S. headquarters are located at 399 Interpace Parkway, Parsippany, New Jersey. Mead Johnson & Company, LLC, is a Delaware corporation with its headquarters at 2400 West Lloyd Expressway in Evansville, Indiana, In Vanderburgh County.

48. Defendant, one of the largest producers of infant formula products in the world, have formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold the Infant Formulas under the Enfamil® name throughout the United States, including in this

District. Defendant has done so continuously from January 1, 2018, to the present (the "Relevant Period").

49.     Defendant knowingly created, allowed, oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging and related marketing for the Infant Formulas that did not disclose it used improper quality control procedures in manufacturing the Products and the presence (or risk) of Heavy Metals in the Infant Formulas. Defendant is also responsible for sourcing ingredients, manufacturing the Products, and conducting all relevant quality assurance protocols, including testing of both the ingredients and finished Products.

50.     Plaintiffs relied upon the Infant Formulas' packaging and the material Omissions, which was prepared, reviewed, and/or approved by Defendant and its agents at its headquarters in Illinois and disseminated by Defendant and its agents through the material Omissions from the packaging. The Omissions were nondisclosed material content that a reasonable consumer would consider important in purchasing the Infant Formulas.

51.     The Infant Formulas, at a minimum, include:

(a)     Enfamil® A.R.;



(b)     Enfamil® Gentlease;



(c)    Enfamil® Enspire Gentlease;



(d)    Enfamil® NeuroPro;



(e)    Enfamil® NeuroPro Sensitive;



(f)    Enfamil® Nutramigen; and



(g)     Enfamil® ProSobee.



## **FACTUAL ALLEGATIONS**

## I.     A PATTERN AND PRACTICE OF MANUFACTURING INFANT FORMULA WITHOUT PROPER QUALITY CONTROL PROCEDURES

52.     Defendant has been regarded as one of the most-trusted manufacturers of Infant Formulas in the United States. However, multiple recalls and FDA investigations in recent years have revealed the truth about the company's repeated, systematic failures in its manufacturing conditions and quality controls.[25]

---

[25] *See* Mead Johnson FDA Dashboard, *supra* (Defendant has been cited by the FDA four times from December 2017 to December 2023 for failing to implement and maintain proper sanitation or quality control measures in its manufacturing plants); Reckitt Recalls Two Batches of Prosobee, *supra* (Defendant recalled two batches of infant formula products in February 2023 due to bacterial contamination); FDA Issues Warning Letters to Three Infant Formula Manufacturers, *supra* (FDA found Defendant ignored their duties to ensure proper quality control measures in their manufacturing facilities and issued a formal "warning letter" to Defendants in August 2023); Mead Johnson Nutrition Voluntarily Recalls Select Batches of Nutramigen, *supra* (Defendant yet again recalled infant formula products at risk of bacterial contamination due to its failure to implement adequate quality control measures); CNN,

53.     Further, supporting the lack of proper quality control measures in the manufacturing of Defendant's products, the need for the most recent recall was not discovered in-house. On December 14, 2023, "the Israeli Ministry of Health notified the FDA that product tested at the Israeli border as part of routine sampling tested positive for" Cronobacter sakazakii, bacteria that "can cause rare but potentially deadly infections in newborns." Only after the Israeli government's "routine testing" discovered the contamination did Defendant initiate the recall under FDA oversight.

54.     Defendant's repeated failure to implement and maintain proper quality control measures – including routine testing sufficient to discover detectable adulteration of their products – exists despite the fact that Defendant sells products for infants who are hours, days and months old, and despite Defendant's regular practice of telling consumers that its products are of the highest quality, safe, and nutritious for infants, manufactured under strict and rigorous quality and safety assurance measures, and in compliance with all FDA regulations for infant formula.

55.     Defendant was in a superior position to know that the Infant Formulas were manufactured with a lack of proper quality control.

56.     Despite the known quality control failures and the risks those create, Defendant actively and knowingly concealed from and failed to disclose to consumers that the Infant Formulas were manufactured without proper quality control. Nowhere on the Infant Formulas'

---

*Reckitt/Mead Johnson Voluntarily Recalls Specialty Infant Formula Due to Possible Bacterial Infection* (Dec. 31, 2023) available at https://www.cnn.com/2023/12/31/business/reckitt-mead-johnson-recalls-specialty-infant-formula/index.html (last accessed January 21, 2024) (Defendant's December 2023 recall affected 675,030 cans of Nutramigen formula, a specialty formula meant for infants with severe food allergies).

packaging does Defendant disclose the lack of proper manufacturing controls or material risk of contamination from failing to ensure proper manufacturing processes.

## II.   DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE HEALTH RISKS PRESENTED TO INFANTS AND CHILDREN FROM HEAVY METALS AND THE LIKELIHOOD THEY WERE PRESENT IN ITS PRODUCTS

57.    While there are no U.S. federal regulations regarding acceptable levels of Heavy Metals in infant formulas, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "No level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[26]

58.    Indeed, the FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its heavy metals workgroup looking to reduce the risks associated with human consumption of heavy metals.[27]

59.    Arsenic, cadmium, and lead—the Heavy Metals found in the Infant Formulas—are neurotoxins, or poisons, which affect the nervous system. Exposure to these Heavy Metals "diminish[es] quality of life, reduce[s] academic achievement, and disturb[s] behavior, with profound consequences for the welfare and productivity of entire societies."[28]

---

[26] New York Times, *Some Baby Food May Contain Toxic Metals, U.S. Reports*, available at https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html (last accessed January 21, 2024) ("Some Baby Food May Contain Toxic Metals").

[27] FDA, *Environmental Contaminants in Food*, available at https://www.fda.gov/food/chemical-contaminants-pesticides/environmental-contaminants-food (last accessed January 21, 2024) ("Environmental Contaminants in Food").

[28] HBBF Report, *supra*, at 13.

60.     The Heavy Metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder ('ADHD')."[29] Even when trace amounts are found in food, these Heavy Metals can alter the developing brain and erode a child's intelligence quotient ("IQ").[30]

61.     Because Heavy Metals accumulate in the body, including in the kidneys and other internal organs, the risk they pose grows over time and can remain in one's body for years.[31]

62.     Due to their smaller physical size and still-developing brain and organs, infants and toddlers are particularly susceptible to the toxic effects of Heavy Metals because "[t]hey also absorb more of the heavy metals that get into their bodies than adults do."[32]

63.     Of additional concern to developing infants are the health risks related to simultaneous exposure to multiple Heavy Metals as "co-exposures can have interactive adverse effects."[33] Heavy Metals disturb the body's metabolism and cause "significant changes in various biological processes such as cell adhesion, intra- and inter-cellular signaling, protein

---

[29] *Id.* at 6.

[30] Congressional Committee Report, *supra*, at 1.

[31] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[32] *Id.*

[33] Morello-Frosch R., Cushing L.J., Jesdale B.M., Schwartz J.M., Guo W., Guo T., Wang M., Harwani S., Petropoulou S.E., Duong W., Park J.S., Petreas M., Gajek R., Alvaran J., She J., Dobraca D., Das R., Woodruff T.J. *Environmental Chemicals in an Urban Population of Pregnant Women and Their Newborns from San Francisco.* Environ Sci Technol. 2016 Nov 15;50(22):12464-12472. doi: 10.1021/acs.est.6b03492. Epub 2016 Oct 26. PMID: 27700069; PMCID: PMC6681912. Available at https://stacks.cdc.gov/view/cdc/80511 (last accessed January 21, 2024).

folding, maturation, apoptosis, ionic transportation, enzyme regulation, and release of neurotransmitters."[34]

64.    Exposure to Heavy Metals, even in small amounts, can lead to life-long effects. According to Victor Villarreal, Ph.D., Assistant Professor in the Department of Educational Psychology at the University of Texas at San Antonio who has studied the effects of heavy metals on childhood development, "[t]he effects of early exposure to heavy metals can have long-lasting impacts that may be impossible to reverse."[35]

65.    Because Heavy Metals can bioaccumulate in the body, even regular consumption of small amounts can increase the material risk of various health issues, including the material risk of bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[36]

66.    As Dr. James E. Rogers, the director of food safety research and testing at Consumer Reports has said "[t]*here is no safe level of heavy metals*, so the goal should be to have no measurable levels of any heavy metal in baby and toddler foods."[37] This rings particularly true when considering that generally, babies who are 12 months or younger heavily rely on infant formula as a key source of nutrients and that unless breastmilk is an option,

---

[34] Jaishankar, M., Tseten, T., Anbalagan, N., Mathew, B. B., & Beeregowda, K. N. (2014). *Toxicity, Mechanism and Health Effects of Some Heavy Metals*. Interdisciplinary toxicology, 7(2), 60–72. Available at https://doi.org/10.2478/intox-2014-0009 (last accessed January 21, 2024).

[35] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[36] *Id*.

[37] Consumer Reports, *Congressional Report Finds More Problems With Heavy Metals in Baby Food*, updated Oct. 2021, available at https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/#:~:text=%E2%80%9C There%20is%20no%20safe%20level,research%20and%20testing%20at%20CR (last accessed January 21, 2024) (emphasis added).

formula is the only food babies younger than five months can eat for their development and growth.

67.     Research continues to confirm that exposures to food containing arsenic, cadmium, and lead cause "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[38]

68.     The FDA and the WHO have declared Heavy Metals "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[39]

*Arsenic*

69.     The Infant Formulas contain (or have a material risk of containing) arsenic, which can cause cognitive deficits in children who are exposed early in life, and even neurological problems in adults who were exposed as infants.[40] "[E]ven low levels of arsenic exposure can impact a baby's neurodevelopment."[41] "Studies have shown that consuming products with arsenic over time can lead to impaired brain development, growth problems, breathing problems, and a compromised immune system."[42]

70.     Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage children's central

---

[38] HBBF Report, *supra*, at 1.

[39] Congressional Committee Report, *supra*, at 2.

[40] HBBF Report, *supra*, at 13.

[41] Senators' Letter to the FDA, *supra* (citing Dartmouth Toxic Metals Superfund Research Program (2021), Arsenic and Children, https://sites.dartmouth.edu/arsenicandyou/arsenic-and-children/) (last accessed January 21, 2024)).

[42] *Id.*

nervous systems and cognitive development.[43] Exposure to arsenic can also cause diabetes, atherosclerosis, and cardiovascular disease.[44]

71.    Arsenic can cause cancer in humans, as well as diabetes and atherosclerosis, and potentially cardiovascular disease when ingested chronically.[45] Chronic exposure to arsenic has also been associated with dermatological lesions and malignancies.[46]

72.    Moreover, "[t]here is no evidence that the harm caused by arsenic is reversible."[47]

73.    Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and FDA have set limits concerning the allowable limit of arsenic at 10 ppb for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA as a maximum contaminant level). The FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic.[48]

74.    Although the FDA has not set the action level for arsenic in infant formulas specifically, "the FDA prioritizes monitoring and regulating products that are more likely to be

---

[43] Congressional Committee Report, *supra*, at 10.

[44] States J.C., Singh A.V., Knudsen T.B., Rouchka E.C., Ngalame N.O., Arteel G.E., et al. (2012) *Prenatal Arsenic Exposure Alters Gene Expression in the Adult Liver to a Proinflammatory State Contributing to Accelerated Atherosclerosis*. PLOS ONE 7(6): e38713. Available at https://doi.org/10.1371/journal.pone.0038713 (last accessed January 21, 2024).

[45] *Id.*

[46] Genuis SJ, Schwalfenberg G, Siy A-KJ, Rodushkin I (2012) *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*. PLOS ONE 7(11): e49676. Available at https://doi.org/10.1371/journal.pone.0049676 (last accessed January 21, 2024) ("Toxic Element Contamination of Natural Health Products").

[47] HBBF Report, *supra*, at 3.

[48] Toxic Heavy Metals in Popular Baby Foods, *supra*.

consumed by very young children."[49] The FDA's limit for inorganic arsenic in bottled water is 10 ppb.[50]

75. Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed arsenic levels at 7.9 ppb, an amount that is especially concerning considering the amount of infant formula consumed by developing children.

*Cadmium*

76. The Infant Formulas also contain (or have a material risk of containing) cadmium, which has been shown to cause anemia, liver disease, and nerve or brain damage in animals that eat or drink it.

77. Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage. Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children[.]"[51]

78. Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[52] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens, and the EPA has likewise determined

[49] NutritionInsight.com, *FDA Studies Reveal Drop in Infant Rice Cereal's Arsenic Levels* (March 9, 2020), available at https://www.nutritioninsight.com/news/fda-studies-reveal-drop-in-infant-rice-cereals-arsenic-levels.html (last accessed January 21, 2024).

[50] 21 C.F.R. §165.110(b)(4)(iii)(A).

[51] HBBF Report, *supra*, at 14.

[52] *Id.*

that cadmium is a probable human carcinogen.[53] Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequesters in [human] tissue."[54]

79.     The EPA has set a maximum contaminant level for cadmium in drinking water of 5 ppb, 40 C.F.R. §141.62; the FDA has set a maximum level in bottled water to 5 ppb; and the WHO set a maximum cadmium level in drinking water to 3 ppb.[55]

80.     Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed cadmium levels as high as 6.8 ppb.

***Lead***

81.     The Infant Formulas contain (or have a material risk of containing) lead, which is a probable carcinogen.[56]

82.     Lead exposure can seriously harm the brain and nervous system in infants and children and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

83.     Exposure to lead in foods builds up over time. Build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.

---

[53] CDC, Agency for Toxic Substances and Disease Registry, *Public Health Statement for Cadmium*, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed January 21, 2024).

[54] Toxic Element Contamination of Natural Health Products, *supra*.

[55] Congressional Committee Report, *supra*, at 29.

[56] American Cancer Society, *Known and Probable Carcinogens*, last revised August 14, 2019, available at https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html (last accessed January 21, 2024).

84.     Even very low exposure levels to lead can "cause lower academic achievement, attention deficits and behavior problems. No safe level of exposure has been identified."[57] The FDA, CDC, American Academy of Pediatrics (AAP), and WHO have all plainly stated that there is no safe level of lead.[58]

85.     Lead is extremely toxic, and its effects cannot be reversed or remediated.[59]

86.     One study found that "children age 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food."[60]  Additionally, studies have established a link between lead exposure and ADHD.[61]

87.     Although there is no federal standard for lead in baby food, health experts, including the American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports, have agreed that lead in baby foods should not exceed 1 ppb.[62]

---

[57] HBBF Report, *supra*, at 13.

[58] FDA, *Lead in Food and Foodwares*, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares#:~:text=Although%20no%20safe%20level%20for,blood%20(%C2%B5g%20%2FdL) (last accessed January 21, 2024); CDC, *Health Effects of Lead Exposure*, available at https://www.cdc.gov/nceh/lead/prevention/health-effects.htm (last accessed January 21, 2024); AAP, Lead Exposure in Children, available at https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-children/#:~:text=How%20Much%20Lead%20is%20Safe,Prevention%20recommends%20evaluation%20and%20intervention (last accessed January 21, 2024); WHO, *Lead Poisoning*, available at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health#:~:text=The%20neurological%20and%20behavioural%20effects,and%20learning%20problems%20(1) (last accessed January 21, 2024); *see also* USA Today, *FDA: Recalled Applesauce Pouches Had Elevated Lead Levels and Another Possible Contaminant* (Jan. 5, 2024), available at https://www.usatoday.com/story/money/food/2024/01/05/applesauce-pouch-recall-contamination-spreads/72121869007/ (last accessed January 21, 2024).

[59] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[60]  HBBF Report, *supra*, at 7.

[61] Congressional Committee Report, *supra*, at 12.

[62] Toxic Heavy Metals in Popular Baby Foods, *supra*.

88.     Despite this, laboratory tests indicate Defendant sold products containing undisclosed lead levels as high as 6.5 ppb.[63]

89.     The Heavy Metals – arsenic, cadmium, and lead– are significant detriments to children.

90.     The FDA has acknowledged that "exposure to [these four heavy] metals are likely to have the most significant impact on public health" and has prioritized them in connection with its Toxic Elements Working Group, which is aimed toward reducing human exposure to contaminants in dietary supplements, food and cosmetics.[64]

91.     Importantly, and relevant to this lawsuit, action levels do not require disclosure of the presence of Heavy Metals on the packaging of products that are placed in the market. Action levels only set limits for determining when products cannot be placed in the market.

92.     The presence of Heavy Metals and/or other undesirable toxins or contaminants in baby foods have bene confirmed by investigations and reports by the U.S. Congress, Healthy Babies Bright Futures,[65] Consumer Reports,[66] and Politico,[67] and studies by the FDA,[68] University of Miami, the Clean Label Project, and Ellipse Analytics.[69]

---

[63] HBBF Report, *supra,* at 20, 34.

[64] Environmental Contaminants in Food, *supra*.

[65] HBBF Report at 12, 20, *supra*.

[66] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know* (Aug. 16, 2018, updated Sept. 29, 2021), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed January 21, 2024) ("Consumer Reports: Heavy Metals in Baby Food").

[67] Politico, *The FDA's Food Failure* (Apr. 8, 2022), available at https://www.politico.com/interactives/2022/fda-fails-regulate-food-health-safety-hazards/ (last accessed January 21, 2024).

93.     Both the Congressional Committee Report, published on February 4, 2021, which acknowledged that Heavy Metals "can endanger infant neurological development,"[70] followed by a second report published on September 29, 2021, revealed alarming levels of Heavy Metals in baby foods.[71] The Congressional Committee Report acknowledged that Heavy Metals— including arsenic, cadmium, and lead—were present in "significant levels" in numerous commercial baby food products.[72]

94.     As such, the knowledge of the risks associated with exposure to Heavy Metals is not a new phenomenon. Defendant knew or should have known the risks associated with the presence of Heavy Metals in foods consumed by infants,[73] and that, over time, these toxins can accumulate and remain in infants' bodies, to their detriment.

---

[68] FDA, *FDA Total Diet Study Report, Fiscal Years 2018-2020 Elements Data (July 2022)*, available at https://www.fda.gov/media/159751/download?attachment (last accessed January 23, 2024) ("FDA Total Diet Study").

[69] Gardener, et al., *Lead and Cadmium Contamination In A Large Sample of United States Infant Formulas and Baby Foods*, 651 SCI. TOTAL ENVIRON. 1, 822-827 (2019), available at: https://www.sciencedirect.com/science/article/abs/pii/S0048969718334442?via%3Dihub (last accessed January 21, 2024) ("Lead and Cadmium Contamination in Infant Formulas and Baby Foods").

[70] Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), available at https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/ (last accessed January 21, 2024) ("Toxic Heavy Metals in Popular Baby Foods").

[71] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[72] Congressional Committee Report, *supra*.

[73] *See e.g.*, *FDA Compliance Program Guidance Manual: Toxic Elements in Food and Foodware, and Radionuclides in Food- Import and Domestic*, available at http://wayback.archive-it.org/7993/20170404233343/https://www.fda.gov/downloads/Food/ComplianceEnforcement/UCM073204.pdf (last accessed May 17, 2022); *see also* 21 CFR §172, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?CFRPart=172&showFR=1 (last accessed May 17, 2022).

95.     Despite the material risk and/or actual presence of these unnatural and harmful chemicals, Defendant fails to disclose the presence (or risk) of Heavy Metals in its Products.

## III.    DEFENDANT FALSELY MARKETED ITS INFANT FORMULAS AS HEALTHY AND MADE WITH NUTRITIOUS INGREDIENTS BY OMITTING ANY MENTION OF HEAVY METALS

96.     Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Infant Formulas throughout the United States, including Illinois.

97.     Defendant's Infant Formulas are available at numerous retail and online outlets. The Infant Formulas are widely advertised.

98.     On its website, Defendant markets its Infant Formulas as the "#1 Trusted Brand of Pediatricians & Parents," "#1 trusted brand for brain-building nutrition and immune support," and "#1 infant formula brand recommended by pediatricians."[74]




99.     On its website, Defendant promises to "[s]upport your baby's development right from the start with brain-building nutrition and MFGM components from the #1 trusted infant formula brand."[75] Defendant represents that "using Enfamil gives you the confidence you've

---

[74] https://www.enfamil.com/ (last accessed January 25, 2024).

[75] https://www.enfamil.com/enfamil-neuropro/ (last accessed January 25, 2024).

made the right choice for your baby."[76] Defendant boasts and reassures parents of the quality of its products, claiming "we know you've got lots of questions. Relax. We've got you covered. With a complete family of brain-building formulas to fuel the wonder of your little one. From everyday nutrition to specialty formulas."[77]

100. Defendant touts its innovations to its Infant Formula and provides thorough information about the ingredients in its formulas to consumers throughout its website, including on its Frequently Asked Questions ("FAQ") page.[78]

101. Based on Defendant's decision to wholly omit any mention of the presence of Heavy Metals in its Infant Formulas, and to instead package its Infant Formulas as healthy and made with nutritious ingredients, it had a duty to ensure that the Products' packaging was true and not misleading.

102. Defendant intentionally omitted from its packaging any mention of the presence (or material risk) of Heavy Metals in the Infant Formulas in order to induce and mislead reasonable consumers to purchase its Infant Formulas.

103. With Defendant marketing its Infant Formulas as healthy and made with nutritious ingredients to nourish babies, Defendant clearly recognizes the importance of its Infant Formula to the development of infants.

104. As a result of the material undisclosed information on the Infant Formulas' packaging, a reasonable consumer would have no reason to suspect the presence (or material risk) of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests

---

[76] https://www.enfamil.com/why-enfamil/ (last accessed January 25, 2024).

[77] https://www.enfamil.com/why-enfamil/enfamil-formula-family/ (last accessed January 25, 2024).

[78] https://www.enfamil.com/help-center/nutrients-ingredients/ (last accessed January 25, 2024).

(which are time consuming and expensive) or reviewing third-party scientific testing of these Products.

## IV.    DUE TO THE PRESENCE AND MATERIAL RISK OF HEAVY METALS IN THE INFANT FORMULAS, THE PACKAGING WAS MATERIALLY MISLEADING

105.    At all times during the Relevant Period, Defendant knew or should have known the Infant Formulas contained undisclosed Heavy Metals and were not sufficiently tested for the presence and material risk of Heavy Metals.

106.    Defendant's Infant Formulas contained undisclosed levels of Heavy Metals due to Defendant's failure to monitor for the presence in the ingredients and finished products. Defendant was aware of this risk and failed to disclose it to Plaintiffs and the Classes despite having a duty to disclose.

107.    Despite the known risks of exposure to Heavy Metals, Defendant has intentionally, recklessly, and/or knowingly sold the Infant Formulas without disclosing to consumers like Plaintiffs the presence or material risk of arsenic, cadmium, and lead.

108.    Defendant knew or should have known that Heavy Metals pose health risks to infants.

109.    Defendant knew or should have known that it owed consumers a duty of care to prevent or, at the very least, minimize the presence of Heavy Metals in the Infant Formulas to the extent reasonably possible.

110.    Defendant knew or should have known it owed consumers a duty of care to adequately test for Heavy Metals in the Infant Formulas.

111.    Defendant knew consumers purchased the Infant Formulas based on the reasonable expectation that Defendant manufactured the Infant Formulas to the highest standards. In fact, Defendant promised as much – at length – on its website:

> Our products meet or exceed all **infant formula requirements set out by the FDA**, which are among the **most rigorous** in the food industry. Each of our manufacturing facilities adheres to safety guidelines among the **most rigorous in the food industry** and our own **stringent quality standards** so that we can assure the highest quality products. Parents can be assured that our infant formulas are safe and nutritious feeding options for their infants when prepared, stored, and handled according to package directions.
>
> Our infant products undergo **extensive quality and safety checks** throughout the manufacturing process—from raw materials to finished product. A representative number of samples from every batch we produce are tested to ensure the product meets our **stringent quality standards**. Each batch of our products is assured to meet our **high quality and safety standards** as verified by our **proprietary Quality Systems** that exist in every manufacturing facility. We distribute our products only if they pass our **strict testing**. We track the path of every ingredient in our infant and toddler products from its initial supplier through all processing stages until it reaches our consumer.
>
> The [FDA] has very **specific and rigorous manufacturing standards** for infant formulas and toddler drinks that we adhere to. All Mead Johnson formulas are in compliance with all FDA regulations, including Enfamil® NeuroPro™, Enfamil® Enspire™, Enfamil® Gentlease®, and Nutramigen®. Our products meet or exceed all **infant formula requirements set out by the FDA**, which are among the **most rigorous** in the food industry. The amounts of ingredients in Enfamil Infant Formulas are all within required guidelines established to ensure the safety and nutritional quality of infant formulas. **We are committed to the most stringent manufacturing, packaging, and quality assurance procedures**.[79]

Based on consumers' expectation that Defendant manufactured the Infant Formulas to the highest standards, Defendant knew or should have known consumers reasonably inferred that

---

[79] https://www.enfamil.com/why-enfamil/quality-assurance/ (last accessed January 25, 2024).

Defendant would hold the Infant Formulas to the highest standards for preventing the inclusion of Heavy Metals in the Infant Formulas, which would include testing the Infant Formulas' ingredients and finished products for Heavy Metals.

112.    A recent consumer survey done by Plaintiffs' counsel ("Consumer Survey") demonstrates such an expectation.[80]

| Consumer Survey | Yes | No |
|---|---|---|
| Do you expect a company to test for arsenic, cadmium, lead, and/or mercury in infant formula that will be fed to infants? | 376 | 30 |
| Do you expect a company to disclose if there were detectable levels, or risk, of arsenic, cadmium, lead, and/or mercury in an infant formula? | 364 | 42 |

113.    Further, Defendant has recognized consumer concern for the possible presence of Heavy Metals in baby food products and infant formulas. As a member of the Infant Nutrition Council of America ("INCA") through its parent company Reckitt Benckiser Group PLC, Defendant joined two other major manufacturers of infant formula products to lobby against the promulgation of California Assembly Bill 899 ("AB 899") in 2023.[81] As introduced, the original version of AB 899 would have required infant formula manufacturers – like Defendant – to test for Heavy Metals in their products and disclose the testing results on the labels.[82] INCA vehemently opposed any disclosure of Heavy Metals to consumers, arguing the proposed measure would "confuse" consumers and "create fear and panic," and cause them to "mistrust"

---

[80] All Consumer Survey respondents were parents with children aged anywhere from 0 to 4 years old nationwide, including 13 respondents in Illinois, and all of whom had purchased infant formula within the past 3 years.

[81]    Analysis    of    AB    899    as    amended    March    13,    2023,    available    at https://billtexts.s3.amazonaws.com/ca/ca-analysishttps-leginfo-legislature-ca-gov-faces-billAnalysisClient-xhtml-bill-id-202320240AB899-ca-analysis-357755.pdf    (last    accessed January 25, 2024) ("Analysis of AB 899").

[82] *Id.*

the manufacturers. Furthermore, INCA has argued that such requirements would cause consumers to change their purchasing behaviors.[83]

114.     Based on the foregoing, reasonable consumers, like Plaintiffs, would consider the inclusion (or material risk of inclusion) of Heavy Metals a material fact when considering what infant formulas to purchase.

115.     Defendant knew that monitoring for Heavy Metals in its ingredients and Infant Formulas was not only important, but also critical.

116.     Defendant also knew that monitoring Heavy Metals was likewise important to its consumers to protect their babies.

## V.     INFANT FORMULAS CAN BE MANUFACTURED WITHOUT MEASURABLE LEVELS OF HEAVY METALS

117.     In contrast to the levels of Heavy Metals found in Defendant's Infant Formulas, other infant formula manufacturers have produced formula products that have non-detectable levels of Heavy Metals.

118.     The Clean Label Project tests products for more than 400 contaminants, including heavy metals, chemicals, and plastics, and presents its Purity Award to companies with products with the lowest levels of the contaminants when compared to other products in a given category.[84]

---

[83]     *Id.*; Analysis of AB 899 as amended April 12, 2023, available at https://trackbill.com/s3/bills/CA/2023/AB/899/analyses/senate-health.pdf (last accessed January 25, 2024).

[84] Clean Label Project Purity Award, available at https://cleanlabelproject.org/purity-award/ (last accessed January 25, 2024).

119. Bobbie, a manufacturer of infant formula (recognized by the Clean Label Project for manufacturing products that were free from detectable levels of Heavy Metals) was a recipient of the Clean Label Project's Purity Award.[85]

120. Plaintiffs' counsel had Bobbie Organic Infant Formula independently tested and that testing confirmed the presence of Heavy Metals at non-detectable levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Bobbie Organic Infant Formula | < 2.2 | < 1.3 | < 1.0 |

121. This testing confirms infant formula manufacturers can manufacture infant formulas with Heavy Metals levels that are not measurable.

122. Additionally, testing by Consumer Reports identified baby food products with Heavy Metal levels low enough to not cause concern, as well as some products with Heavy Metal levels that were not measurable.[86] "[T]here are ways for [baby food] manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[87]

123. In testing conducted by Consumer Reports, approximately one-third of tested products had levels of Heavy Metals that were below levels of concern and other products had immeasurable levels of Heavy Metals.[88] As stated by Dr. James E. Rogers, the Consumer Reports Director of Food Safety Research and Testing, "Every category of food was represented

---

[85] Business Wire, *Bobbie is First-Ever Infant Formula to Receive the Clean Label Project Purity Award and Certification as a Pesticide-Free Product* (Jan. 25, 2022), available at https://www.businesswire.com/news/home/20220125005905/en/Bobbie-Is-First-Ever-Infant-Formula-To-Receive-The-Clean-Label-Project-Purity-Award-and-Certification-as-a-Pesticide-Free-Product (last accessed January 21, 2024).

[86] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[87] *Id*.

[88] *Id*.

in that lower-risk group. That indicates that there are ways for manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[89]

124.    In the FDA Total Diet Study, it was also demonstrated that infant formulas can be manufactured without detectable levels of Heavy Metals.[90]

125.    Moreover, because of public health efforts, exposure to lead has consistently and notably decreased over the past 40 years.[91] These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[92] The progress towards decreasing childhood exposure to lead was so impressive that the CDC identified "childhood lead poisoning prevention as 1 of 10 great U.S. public health achievements during 2001 to 2010."[93]

126.    Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas in order to achieve non-detectable or zero levels by adequately monitoring its ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained higher levels of Heavy Metals.

---

[89] *Id.*

[90] FDA Total Diet Study, *supra*, at 73, 81-82.

[91] Dignam, T., Kaufmann, R. B., LeStourgeon, L., & Brown, M. J. (2019). *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure*. Journal of Public Health Management and Practice: JPHMP, 25 Suppl 1, Lead Poisoning Prevention (Suppl 1 LEAD POISONING PREVENTION), S13–S22. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed January 21, 2024).

[92] *Id.*

[93] *Id.*

127.     Defendant also knew it was not adequately monitoring and testing for Heavy Metals in the Infant Formulas. Defendant knew its failure to adequately monitor and test for Heavy Metals in the Infant Formulas continued throughout the Relevant Period.

128.     Defendant's marketing was misleading due to its failure to properly and sufficiently monitor and test for Heavy Metals and/or for its failure to disclose on the packaging of the Products the presence (or material risk) of Heavy Metals in the Infant Formulas.

129.     Defendant knew or should have known consumers paid a price premium for its Products and expected Defendant to test and monitor for Heavy Metals and disclose on the packaging of the Products the presence or material risk of Heavy Metals in the Infant Formulas and ingredients.

130.     At all times during the Relevant Period, Defendant did not monitor or test for Heavy Metals in the Infant Formulas and ingredients and Defendant did not disclose on the packaging of the Products the presence or material risk of Heavy Metals.

131.     Defendant knew or should have known that consumers reasonably expected it to test for and monitor the presence of Heavy Metals in the Infant Formulas and ingredients, and to disclose the presence or material risk of any levels of Heavy Metals in its Products.

132.     Defendant knew or should have known the Infant Formulas contained or risked containing Heavy Metals that were inconsistent with its marketing.

133.     Defendant knew or should have known that, in order to comply with its marketing, consumers expected it to ensure the Infant Formulas were monitored and tested for Heavy Metals, and to disclose the presence (or material risk) of Heavy Metals.

134.     Defendant knew, yet failed to disclose, its lack of adequate testing and/or knowledge of the risk or presence of Heavy Metals in the Infant Formulas' ingredients.

135.    Defendant's Omissions are false, misleading, and crafted to deceive the public as they create an image that the Infant Formulas are nutritious and safe from the risk or presence of Heavy Metals.

136.    Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt Defendant's statements regarding the quality of the Products. Defendant's nondisclosure and/or concealment of the presence (or risk) of Heavy Metals in the Infant Formulas alleged herein intended to and did, in fact, cause consumers like Plaintiffs and the members of the Class, to purchase Products they would not have if the true quality and ingredients were disclosed.

## VI.    DEFENDANT'S PACKAGING MISLED REASONABLE CONSUMERS BASED ON THE MATERIAL OMISSIONS

137.    Defendant's packaging communications misled and deceived reasonable consumers because Defendant actively and knowingly concealed from and failed to disclose that the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals, while representing nutritious quality and characteristics.

138.    Based on the impression given by the packaging communications and Omissions, no reasonable consumer could expect or understand that the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

139.    The Infant Formula packaging communications include, but are not limited to:

      (a)    Enfamil® A.R.: "BRAIN BUILDING," "expert-recommended," "#1 ADDED RICE starch formula," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "Calcium for strong bones," and "Vitamin C for immune support."







      (b)    Enfamil® Enspire Gentlease: "with LACTOFERRIN a key protein also found in BREAST MILK & COLOSTRUM," "BRAIN BUILDING," "IMMUNE HEALTH supported by LACTOFERRIN," and "Naturally occurring MFGM components."



43

(c)     Enfamil® Gentlease: "BRAIN BUILDING," "expert-recommended," and "#1 RECOMMENDED BRAND BY PEDIATRICIANS."

    

(d)     Enfamil® NeuroPro: "EXCLUSIVE HuMO6 IMMUNE BLEND," "BRAIN BUILDING," "expert-recommended," "inspired by BREAST MILK," "supports IMMUNE HEALTH," "naturally-occurring MFGM components," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," and "Beta Carotene & DHA for baby's eye health" .

    

(e) Enfamil® NeuroPro Sensitive: "BRAIN BUILDING," "expert-recommended," "HMO for IMMUNE SUPPOR," "NON-GMO No Artificial Growth Hormones," and "#1 RECOMMENDED BRAND BY PEDIATRICIANS."

  

(f) Enfamil® Nutramigen: "BRAIN BUILDING," "#1 RECOMMENDED BRAND BY PEDIATRICIANS" (front and back), "THE ONLY HYPOALLERGIC FORMULA WITH LGG® PROBIOTIC" (front and back), "NO ARTIFICIAL GROWTH HORMONES," and "LGG® probiotic to help support digestive health."

  



(g)     Enfamil® ProSobee: "No artificial colors, flavors or sweeteners" (front), "BRAIN BUILDING," "expert-recommended," "IMMUNE HEALTH Vitamins A, C, E & Selenium" (front), "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "NO ARTIFICAL colors, flavors or sweeteners" (back), and "vitamins A, C & E for IMMUNE SUPPORT" (back).





140.    Based on Defendant's Omissions from these communications on the Products' packaging, no reasonable consumer could expect or understand that the Infant Formula was manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

141.    The Omissions wrongfully convey to consumers that Defendant's Infant Formulas have certain nutritious quality and characteristics that they do not actually possess.

142.    For instance, although Defendant misleadingly causes consumers to believe its Infant Formulas do not contain Heavy Metals due to the material Omissions, the Infant Formulas

do in fact contain undisclosed Heavy Metals, which is material information to reasonable consumers.

143.  Plaintiffs' counsel had seven of Defendant's Infant Formulas tested and that testing confirmed the presence of undisclosed Heavy Metals at the following levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil® A.R. | 3.4 | 3.2 | 1.2 |
| Enfamil® Gentlease | 3.7 | 2.6 | 1.7 |
| Enfamil® Enspire Gentlease | 5.0 | 2.3 | < 1.0 |
| Enfamil® NeuroPro | < 2.2 | 2.0 | < 1.0 |
| Enfamil® NeuroPro Sensitive | 5.1 | < 1.3 | 2.3 |
| Enfamil® Nutramigen | 7.9 | 4.6 | 6.5 |
| Enfamil® ProSobee | 6.7 | 6.8 | 3.5 |

144.  Independent testing also confirmed Heavy Metals in two of Defendant's Products:[94]

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee Soy Infant Formula | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

145.  Regardless of level, though, as stated herein, no level of Heavy Metals is safe.[95]

---

[94] HBBF Report, *supra*, at 20.

[95] Some Baby Food May Contain Toxic Metals, *supra*.

146.    Based on the Omissions, a reasonable consumer would not expect the presence of Heavy Metals, nor would a reasonable consumer be able to detect the presence of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

147.    In fact, the FDA recently requested $1.2 billion from the U.S. Congress for its Foods Program for initiatives such as reduction of heavy metals in foods for infants and young children.[96] A portion of the funding would be for educational outreach about heavy metals in foods.[97]

148.    Reasonable consumers must and do rely on Defendant to honestly report what its Infant Formulas contain.

149.    Plaintiffs relied on the Products' packaging when making their purchasing decisions.

150.    Plaintiffs' expectations and reliance are consistent with reasonable consumers as shown by the Consumer Survey recently done by Plaintiffs' counsel:

| Consumer Survey | No | Yes |
|---|---|---|
| After seeing the label would you expect arsenic, cadmium, lead, and/or mercury in the infant formula? | 327 | 79 |

---

[96] Department of Health and Human Services Fiscal Year 2023: *Food and Drug Administration, Justification of Estimates for Appropriations Committees*, available at https://www.fda.gov/media/157192/download?attachment (last accessed January 25, 2024).

[97] *Id.*

| Consumer Survey | Very important | Important | Not at all important |
|---|---|---|---|
| Please select how important, if at all, would it be to your purchasing decision if the infant formula you purchased contained, or risked containing, even a small amount of arsenic, cadmium, lead, and/or mercury. | 318 | 75 | 13 |

151.    In light of Defendant's communications regarding the quality of the Infant Formulas and its commitment to innovative formulas and nutritious ingredients, Defendant knew or should have known the Infant Formulas contained or risked containing Heavy Metals.

152.    Defendant had a duty to ensure the Infant Formulas were not deceptively, misleadingly, unfairly, and/or falsely marketed and all material information was properly and fully disclosed.

153.    Defendant acted knowingly, recklessly, and/or intentionally with its deceptive packaging based on the material Omissions.

154.    Defendant knew that properly and sufficiently monitoring the Infant Formulas for Heavy Metals in their ingredients and finished Infant Formulas was not only important, but also critical.

155.    Additionally, Defendant knew or should have been aware that a reasonable consumer would be feeding the Infant Formula multiple times each day to his or her baby, making it a significant source of food and nutrition for the child.  This leads to an infant's repeated exposure to the Heavy Metals.

156.    Finally, Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas by properly monitoring their ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained or may contain higher levels of Heavy Metals.

157.     The Omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions.  This is true especially considering the long-standing campaign by Defendant to market the Infant Formulas as healthy and made with nutritious ingredients, and to induce consumers, such as Plaintiffs, to purchase the Products.

158.     The Omissions make the Infant Formulas' packaging deceptive.  Reasonable consumers, like Plaintiffs, would consider the facts that Infant Formula was manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals when considering what infant formula to purchase.

159.     At all times during and throughout the Relevant Period, Defendant knew it was not following proper manufacturing standards and also sufficiently and consistently monitoring or testing the Infant Formulas or their ingredients for Heavy Metals.

160.     Defendant's packaging was misleading due to Defendant's failure to disclose the true quality of the Infant Formulas based on its improper manufacturing processes and the presence or material risk of the presence of Heavy Metals.

161.     Defendant knew or should have known the Infant Formulas contained or risked containing undisclosed levels of Heavy Metals that were inconsistent with Defendant's packaging.

162.     Defendant knew or should have known that reasonable consumers expected it to have strong and adequate manufacturing processes and ensure the Infant Formulas and ingredients were monitored and tested for Heavy Metals to ensure compliance with Defendant's packaging.

163.     Defendant knew or should have known consumers paid premium prices because the Omissions were not disclosed.

164. The Omissions are material and render the Infant Formulas' packaging deceptive as without full disclosure, reasonable consumers believe the Infant Formulas are high quality, healthy, and nutritious products.

165. Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt or question Defendant's statements regarding the quality of the Infant Formulas. Based on the impression given by the packaging, no reasonable consumer could expect or understand the Infant Formula was manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

166. The Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the members of the Class to purchase products they would not have if the true quality and ingredients were disclosed or for which they would not have paid a premium price.

167. As a result of Defendant's deceptive packaging of the Infant Formulas, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap enormous profits from, consumers who paid the purchase price or premium for the Infant Formulas that were not as advertised.

## PLAINTIFFS' RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT

168. Plaintiffs read and relied upon the packaging of the Infant Formulas when making their purchasing decisions. Had they known Defendant omitted and failed to disclose the Infant Formula was manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals, they would not have purchased the Infant Formulas.

169. A reasonable consumer would consider the packaging of a product when deciding whether to purchase it.

## DEFENDANT'S KNOWLEDGE AND
## NOTICE OF ITS BREACH OF ITS IMPLIED WARRANTIES

170. Defendant had sufficient notice of its breach of implied warranties. Defendant has, and had, exclusive knowledge of manufacturing processes, quality control policies, the physical and chemical make-up of the Infant Formulas, and whether the ingredients contained Heavy Metals.

171. In 2017 and 2019, the Clean Label Project published results and findings from an investigation of heavy metals in baby and toddler food products, including infant formula. The findings showed the presence of Heavy Metals in Defendant's Infant Formulas. In response to the Clean Label Project's study, Defendant stated that it "specifically monitors the presence of many materials, including arsenic, cadmium, [and] lead . . . to ensure 'safety and high quality.'"[98]

172. Moreover, Defendant was put on notice by February and September of 2021, when Congress publicly released findings regarding the presence of Heavy Metals in baby foods.[99] The FDA has also released a study showing the presence of Heavy Metals in baby foods, including infant formulas.[100]

---

[98] USA Today, *These Baby Foods and Formulas Tested Positive for Arsenic, Lead, and BPA in New Study* (Oct. 25, 2017), available at https://www.usatoday.com/story/news/nation-now/2017/10/25/these-baby-foods-and-formulas-tested-positive-arsenic-lead-and-bpa-new-study/794291001/ (last accessed January 21, 2024).

[99] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[100] FDA Total Diet Study, *supra*, at 73, 81-82.

173. Defendant was likewise given notice through its membership in INCA, for example, through INCA's lobbying efforts in opposition to AB 899 that would have required infant formula manufacturers to test for and disclose levels of Heavy Metals.[101]

174. Similarly, Defendant was made aware that it failed to implement or maintain proper manufacturing and quality control measures for detecting and controlling the presence of adulterating substances through the FDA's investigations from 2017 to 2023 and the multiple recalls by Defendant in 2023 alone due to bacterial contamination of its formula products.

175. Defendant has not changed its packaging to include any disclaimer on the Omissions.

## PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASS

176. Defendant knew that reasonable consumers such as Plaintiffs and the proposed Class members would be the end purchasers of the Infant Formulas and the targets of its advertising, marketing, packaging, and statements.

177. Defendant intended that the packaging and implied warranties would be considered by the end purchasers of the Infant Formulas, including Plaintiffs and the proposed Class members.

178. Defendant directly marketed to Plaintiffs and the proposed Classes through its packaging.

179. Plaintiffs and the proposed Class members are the intended beneficiaries of the implied warranties.

---

[101] Analysis of AB 899, *supra*.

## APPLICABILITY OF EQUITABLE TOLLING AND
## THE DISCOVERY RULE TO THE STATUTE OF LIMITATIONS

180. Fraudulent concealment and/or the discovery rule toll Plaintiffs' claims.

181. The statute of limitations is tolled for all of Plaintiffs' statutory consumer protection and common law claims due to Defendant's fraudulent concealment of the improper quality control procedures where it manufactured the Infant Formulas and that contained (or had a material risk of containing) Heavy Metals. Defendant intentionally concealed these material facts from Plaintiffs.

182. Defendant knew the Omissions were a material consideration for any parent buying infant formulas.

183. Defendant violated the relevant state consumer fraud acts by deceiving customers as to the true nature, quality, and makeup of the Infant Formulas.

184. The discovery rule also protects Plaintiffs' Illinois Consumer Fraud and Deceptive Business Practices Act and unjust enrichment claims.

185. Based on Defendant concealing material facts from Plaintiffs, Plaintiffs could not reasonably discover that the Infant Formula was manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

186. Plaintiffs did not know that the Infant Formula was manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals. Instead, Defendant only represented that the Infant Formulas were healthy, nutritious, and made of high-quality ingredients to support growing infants.

# CLASS ACTION ALLEGATIONS

187.    Plaintiffs bring this action individually and on behalf of the following Class pursuant to Rules 23(a), 23(b)(2) and (3), and 23(c)(4) of the Federal Rules of Civil Procedure:

> All persons who, from January 25, 2018, to the present, purchased the Infant Formulas for household use, and not for resale (the "Class").

188.    Plaintiff Lopez brings this action individually and on behalf of the following California Subclass:

> All persons who are residents of California who, from January 1, 2018, to the present, purchased the Infant Formulas in California for household use, and not for resale (the "California Subclass").

189.    Plaintiffs Raya and Thomas bring this action individually and on behalf of the following Illinois Subclass:

> All persons who are residents of Illinois who, from January 1, 2018, to the present, purchased the Infant Formulas in Illinois for household use, and not for resale (the "Illinois Subclass").

190.    Plaintiff Seutter brings this action individually and on behalf of the following Minnesota Subclass:

> All persons who are residents of Minnesota who, from January 1, 2018, to the present, purchased the Infant Formulas in Minnesota for household use, and not for resale (the "Minnesota Subclass").

191.    Excluded from the Class and California, Illinois, and Minnesota Subclasses (collectively, "Classes") are the Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

192.    This action is brought and may be properly maintained as a class action.  There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable.

193.    The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes in a single action will provide substantial benefits to the parties and Court.

194.    Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

(a)    whether Defendant owed a duty of care;

(b)    whether Defendant owed a duty to disclose;

(c)    whether Defendant knew the Infant Formula was manufactured without proper quality control procedures;

(d)    whether Defendant knew or should have known that the Infant Formulas contained or may contain Heavy Metals;

(e)    whether Defendant failed to disclose the Omissions;

(f)    whether the claims of the Plaintiffs and the Classes serve a public benefit;

(g)    whether Defendant's packaging is false, deceptive, and misleading based on the Omissions;

(h)    whether the Omissions are material to a reasonable consumer;

(i)    whether the Omissions are likely to deceive a reasonable consumer;

(j)    whether Defendant had knowledge that the Omissions were material and false, deceptive, and/or misleading;

(k)    whether Defendant breached its duty of care;

(l)    whether Defendant breached its duty to disclose;

(m)    whether Defendant violated the laws of the State of Illinois;

(n)    whether Defendant violated the laws of the State of California;

(o)     whether Defendant violated the laws of the State of Minnesota;

(p)     whether Defendant breached its implied warranties;

(q)     whether Defendant engaged in unfair trade practices;

(r)     whether Defendant engaged in false advertising;

(s)     whether Defendant made fraudulent omissions;

(t)     whether Plaintiffs and Class members' claims are tolled based on Defendant's fraudulent concealment;

(u)     whether Plaintiffs and members of the Classes are entitled to actual, statutory, and punitive damages; and

(v)     whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

195.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Classes.  Identical statutory violations and business practices and harm are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

196.     Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

197.     Plaintiffs will fairly and adequately represent and protect the interests of the Classes, has no interests incompatible with the interests of the Classes, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

198. Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

199. Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes.

200. As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §505/1, *et seq.*, Against Defendant on Behalf of the Class, or Alternatively, Plaintiffs Raya and Thomas and the Illinois Subclass**

201. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

202. Plaintiffs and the Class are "persons" within the meaning of 815 Illinois Compiled Statute §505/1(c).

203. Defendant is a "person" within the meaning of 815 Illinois Compiled Statute §505/1(c).

204. The Infant Formulas are "merchandise" within the meaning of 815 Illinois Compiled Statute §505/1(b).

205. There was a sale of merchandise within the meaning of 815 Illinois Compiled Statute §505/1(d).

206. The conduct described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Illinois Compiled Statute §505/1, *et seq*. ("ICFA").

207. Defendant engaged in a deceptive act or practice in violation of ICFA by knowingly concealing, omitting, or failing to disclose the Infant Formulas' true quality, ingredients, and suitability for consumption by infants with no development or health risks.

208. Defendant's deceptive acts and practices are continuing.

209. Defendant intended for Plaintiffs and the Class members to rely on and accept as true the Products' packaging and Omissions in deciding whether to purchase the Infant Formulas, and at what price.

210. Defendant's concealment, Omissions, and other deceptive conduct were likely to deceive consumers with respect to the Infant Formulas' quality, ingredients, and suitability for consumption by infants with no development or health risks.

211. Defendant's concealment, Omissions, and other deceptive conduct were likely to cause consumers to purchase and/or overpay for the Infant Formulas.

212. Defendant's concealment, Omissions, and other deceptive acts occurred before Plaintiffs and the Class decided to purchase the Infant Formulas.

213. Defendant's concealment, Omissions, and other deceptive conduct did in fact deceive Plaintiffs and the Class with respect to the Infant Formulas' quality, ingredients, and suitability for consumption by infants with no development or health risks.

214. Defendant's concealment, Omissions, and other deceptive conduct did in fact deceive and cause Plaintiffs and the Class members to purchase and overpay for the Infant Formulas.

215. Defendant's concealment, Omissions, and other deceptive conduct described herein repeatedly occurred in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

216. The facts concealed, omitted, or not disclosed by Defendant, including that the Infant Formula was manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals that do not conform to the packaging, are material facts because Plaintiffs and any reasonable consumer would have considered those facts important in deciding whether to purchase the Infant Formulas, and at what price.

217. If Plaintiffs and the Class members had known that the Infant Formula was manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals, they would not have paid the price premium they paid for the Infant Formulas.

218. If Plaintiffs and the Class members had known that the Infant Formulas did not in fact match the quality and ingredients described above, they would not have purchased the Infant Formulas at all.

219. As a result of Defendant's conduct, Plaintiffs and the Class members have suffered actual damages by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had the Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

220. As a result of Defendant's conduct, Plaintiffs and the Class members have suffered actual damages, in that they purchased Infant Formulas that they would not have purchased at all if they had knowledge of the Omissions.

221.    As a direct and proximate result of the deceptive, misleading, unfair, and unconscionable practices of the Defendant set forth above, Plaintiffs and the Class members are entitled to actual damages, compensatory damages, penalties, attorneys' fees, and costs, as set forth in Section 10a of the ICFA.

222.    Defendant's deceptive, misleading, unfair, and unconscionable practices set forth above were done willfully, wantonly, and maliciously, entitling Plaintiffs and the Class members to an award of punitive damages.

**COUNT II**
**Breach of Implied Warranty of Merchantability Against**
**Defendant on Behalf of the Class**

223.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

224.    Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Class.

225.    There was a sale of goods from Defendant to Plaintiffs and the members of the Class.

226.    At all times mentioned herein, Defendant manufactured and sold the Infant Formulas and, prior to the time the Infant Formulas were purchased by Plaintiffs and the Class, impliedly warranted that the Infant Formulas were of merchantable quality and fit for their ordinary use (consumption by infants with no development or health risks).

227.    Plaintiffs and the Class relied on these implied warranties when they purchased the Infant Formulas.

228.    The Infant Formulas were not fit for their ordinary use (consumption by infants with no development or health risks) as they were manufactured without proper quality control

procedures and contained (or had a material risk of containing) Heavy Metals that do not conform to the packaging.

229.    These promises became part of the basis of the bargain between Defendant and Plaintiffs and members of the Class, and thus constituted implied warranties.

230.    Defendant breached the implied warranties by selling Infant Formulas that contain (or risk containing) Heavy Metals.

231.    Defendant was on notice of this breach as it was aware of the inclusion (or risk) of Heavy Metals.

232.    Privity exists because Defendant impliedly warranted to Plaintiffs and the members of the Class through the Products' packaging, that the Infant Formulas were healthy, nutritious, and safe for consumption and that the Infant Formulas were manufactured with proper quality control measures; however, Defendant failed to mention or disclose the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

233.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

234.    Plaintiffs, on behalf of herself and the Class, seek actual damages for Defendant's failure to deliver goods that conform to their implied warranties and resulting breach.

## COUNT III
### Fraudulent Misrepresentation by Omission Against Defendant
### on Behalf of the Class or, Alternatively, the State Subclasses

235.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

236.     Plaintiffs and members of the Class were buyers and Defendant was a seller in a commercial exchange.

237.     Plaintiffs and the Class were ordinary non-business consumers who trusted Defendant to manufacture, distribute, market, and sell Infant Formulas that were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals.

238.     As infant formulas manufacturers, Defendant is in a special position of trust upon which consumers rely.

239.     Defendant knowingly and actively concealed the Omissions from Plaintiffs and the Class.

240.     Defendant intentionally, knowingly, and/or recklessly made these Omissions to induce Plaintiffs and the Class to purchase the Infant Formulas.

241.     Defendant knew or should have known the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

242.     Defendant allowed its packaging to intentionally mislead consumers, such as Plaintiffs and the Class.

243.     Defendant's packaging did not disclose the Omissions with the intent to deceive and defraud consumers, such as Plaintiffs and the Class.

244.    Defendant intended for Plaintiffs and the Class to rely on the Omissions. Defendant knows its customers trust the quality of its Products and that it is in a special position of trust with the public.

245.    Defendant knows reasonable consumers expected the Infant Formulas to be manufactured with proper quality control procedures and not contain (or have a material risk of containing) Heavy Metals.

246.    Defendant also knows that reasonable consumers seek out and wish to purchase infant formulas that possess high quality ingredients free of toxins, contaminants, or chemicals and that are manufactured with proper quality control procedures, and that these consumers will pay for infant formulas they believe possess these qualities.

247.    Defendant knew that Plaintiffs and the Class were ignorant of the Omissions.

248.    Defendant knew that Plaintiffs and the Class could not reasonably have been expected to learn or discover the Omissions.

249.    Defendant was under a duty to disclose the Omissions regarding its Infant Formulas to Plaintiffs and the Class because:

        (a)    Defendant was in possession of special facts that could not have been discovered by Plaintiffs and the Class.

        (b)    Defendant's packaging disclosed misleading information to consumers by including the Omissions.

        (c)    Based on Defendant's partial statements on the Infant Formulas' packaging that gave a misleading impression to reasonable consumers without further information about the Omissions, Defendant assumed the obligation to make a full and fair disclosure of the whole truth.

250.    The Omissions were material facts to Plaintiffs and the Class, as Plaintiffs and the Class relied on the Omissions when purchasing the Infant Formulas.

251.    Plaintiffs and the Class had a right to rely on Defendant's packaging as the truth because customers like Plaintiffs and the Class trust the quality of Defendant's Products and they expect the Infant Formulas were manufactured with proper quality control procedures and do not contain (or have a material risk of containing) Heavy Metals.

252.    Plaintiffs and the Class did in fact rely on the material Omissions and purchased the Infant Formulas to their detriment. Given the materiality of the Omissions, Plaintiffs' and the Class's reliance on the Omissions was justifiable.

253.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual pecuniary damages by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

254.    Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT IV
### Fraud by Omission Against Defendant on Behalf of the Class
### or, Alternatively, the State Subclasses

255.    Plaintiffs incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

256.    Defendant knew or should have known the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

257.    Plaintiffs and the Class and Defendant acted within the context of a business transaction when Plaintiffs and the Class purchased Defendant's Infant Formulas for household or business use, and not for resale.

258.    Plaintiffs and the Class were ordinary non-business consumers.

259.    Defendant actively and knowingly concealed from and failed to disclose to Plaintiffs and the Class that the Infant Formulas included were manufactured without proper quality control procedures and contained undisclosed levels (or had a material risk of containing) Heavy Metals that do not conform to the Products' packaging.

260.    As infant formula manufacturers, Defendant is in a special position of trust upon which consumers rely.

261.    Defendant was under a duty to disclose to Plaintiffs and the Class the true quality, characteristics, ingredients, and suitability of the Infant Formulas because:

(a)    Defendant was in a superior position to know the true state of facts about its Products;

(b)    Defendant was in a superior position to know the actual ingredients, characteristics, and suitability of the Infant Formulas for consumption by infants with no development or health risks; and

(c)    Defendant knew that Plaintiffs and the Class could not reasonably have been expected to learn about the Omissions without Defendant disclosing it on the Infant Formulas' packaging.

262.    Defendant knows its customers trust the quality of its products and expect Defendant's Infant Formulas to be manufactured with proper quality control procedures and to be free of the risk or presence of Heavy Metals. Defendant also knows that consumers seek out and wish to purchase infant formulas that possess high quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas that they believe possess these qualities.

263.    Due to the Omissions on the Infant Formulas' packaging, Defendant had a duty to disclose the whole truth about the improper quality control procedures and that the Infant Formula contained (or had a material risk of containing) Heavy Metals.

264.    Defendant acted in bad faith when it intended that Plaintiffs and the Class would rely on the Omissions when purchasing the Infant Formulas, unaware of the undisclosed material facts.

265.    Defendant was under a duty to disclose the Omissions because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

266.    Defendant failed to discharge its duty to disclose the Omissions.

267.    Defendant allowed the Omissions on the Products' packaging to intentionally mislead consumers, such as Plaintiffs and the Class.

268.    The facts concealed, omitted, or not disclosed by Defendant to Plaintiffs and the Class are material in that a reasonable consumer would have considered the Omissions material when deciding whether to purchase the Infant Formulas.

269.     Defendant knew or should have known the Omissions were material to Plaintiffs' and the Class's decisions to purchase the Infant Formulas and would induce Plaintiffs and the Class to purchase the Infant Formulas.

270.     Defendant intentionally concealed its improper manufacturing conditions and the presence or material risk of Heavy Metals in the Infant Formulas with the intent to defraud and deceive Plaintiffs and the Class.

271.     Plaintiffs and the Class justifiably relied on Defendant's Omissions to their detriment. The detriment is evident from the true quality, characteristics, and ingredients of the Infant Formulas, which is misleading when compared to the Infant Formulas' packaging and represented by Defendant and inherently unfair to consumers of the Infant Formulas, such as Plaintiffs and the Class.

272.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

273.     Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT V

**Violations of California's Consumers Legal Remedies Act, California Civil Code §§1750, *et seq*., Against Defendant on Behalf of Plaintiff Lopez and the California Subclass**

274. Plaintiff Lopez incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

275. Plaintiff Lopez and each California Subclass member is a "consumer," as that term is defined in California Civil Code section 1761(d).

276. The Infant Formula Products are "goods," as that term is defined in California Civil Code section 1761(a).

277. Defendant is a "person" as that term is defined in California Civil Code section 1761(c).

278. Plaintiff Lopez and each California Subclass member's purchase of the Products constituted a "transaction" as that term is defined in California Civil Code section 1761(e).

279. Defendant's conduct alleged herein violates the following provisions of California's Consumers Legal Remedies Act (the "CLRA"):

(a) California Civil Code section 1770(a)(5), by negligently, recklessly, and/or intentionally failing to disclose the Omissions;

(b) California Civil Code section 1770(a)(7), by negligently, recklessly, and/or intentionally representing that the Infant Formulas were of a particular standard, quality, or grade, when they were of another;

(c) California Civil Code section 1770(a)(9), by negligently, recklessly, and/or intentionally advertising the Infant Formulas with intent not to sell them as advertised; and

(d)    California Civil Code section 1770(a) (16), by representing that the Infant

Formulas have been supplied in accordance with previous representations when they have not.

280.    The omissions were material as reasonable consumers such as Plaintiff Lopez and

the California Subclass would deem that the Infant Formulas were manufactured without proper

quality control procedures and contained (or had a material risk of containing) Heavy Metals

important in determining whether to purchase the Infant Formulas.

281.    As a direct and proximate result of these violations, Plaintiff Lopez and the

California Subclass have been harmed, and that harm will continue unless Defendant is enjoined

from using the misleading marketing described herein in any manner in connection with the

advertising and sale of the Products.

282.    Plaintiff Lopez seeks an award of attorneys' fees pursuant to, *inter alia,* California

Civil section 1780(e) and California Code of Civil Procedure section 1021.5.

<u>**COUNT VI**</u>
**Violations of California False Advertising Law, California Business & Professions Code
§§17500, *et seq*., Against Defendant on Behalf of Plaintiff Lopez and the California
Subclass**

283.    Plaintiff Lopez incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

284.    California's False Advertising Law prohibits any statement in connection with the

sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

285.    As set forth herein, Defendant's Omissions were false and likely to deceive the

public.

286.    Defendant failed to disclose that the Products were manufactured without proper

quality control procedures and the presence (or material risk) of Heavy Metals.

287. Defendant knew, or reasonably should have known, that these Omissions were untrue or misleading.

288. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Lopez's desire to purchase these Products in the future if she can be assured that the Infant Formulas are as advertised, are manufactured with proper quality control measures, and do not contain Heavy Metals.

289. Plaintiff Lopez and members of the California Subclass are entitled to injunctive and equitable relief, and restitution in an amount to be determined at trial.

## COUNT VII
### Violations of the Unfair Competition Law, California Business & Professions Code §§17200, *et seq*., Against Defendant on Behalf of Plaintiff Lopez and the California Subclass

290. Plaintiff Lopez incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

291. The Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200:

**Fraudulent**

292. Defendant failed to disclose the Omissions.

**Unlawful**

293. As alleged herein, Defendant has advertised the Infant Formulas with false or misleading Omissions, such that Defendant's actions violate at least the following laws:

• The CLRA, California Business & Professions Code §§1750, *et seq*.; and

• The False Advertising Law, California Business & Professions Code §§17500, *et seq*.

**Unfair**

294.     Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

295.     Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to, the False Advertising Law and the CLRA.

296.     Defendant's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Products is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves can reasonably avoid.

297.     In accordance with California Business & Professions Code section 17203, Plaintiff Lopez, on behalf of herself and the California Subclass, seeks an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff Lopez's desire to purchase these Products in the future if she can be assured that the Infant Formulas were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals.

298.     Plaintiff Lopez, on behalf of herself and the California Subclass, also seeks an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

## COUNT VIII
### Breach of the Implied Warranty of Merchantability – California Uniform Commercial Code, California Commercial Code §2314, Against Defendant on Behalf of Plaintiff Lopez and the California Subclass

299.     Plaintiff Lopez incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

300.     This claim is brought by Plaintiff Lopez on behalf of herself and the California Subclass members.

301.     Defendant is and was at all relevant times a merchant as defined by California Commercial Code section 2104.

302.     A warranty that the Products were in merchantable condition is implied by law pursuant to California Commercial Code section 2314.

303.     Plaintiff Lopez and the members of the California Subclass purchased the Products manufactured and marketed by Defendant by and through Defendant's authorized sellers for retail or online sale to consumers.  At all relevant times, Defendant was the merchant, manufacturer, marketer, warrantor, and/or seller of the Products. Defendant knew or had reason to know of the specific use for which its Products were purchased.

304.     The Products are and were at all relevant times goods within the meaning of California Commercial Code section 2105.

305.     Defendant impliedly warranted that the Products were in merchantable condition and fit for consumption or ingestion by infants. The Products when sold at all times thereafter were not in merchantable condition and did not conform to the promises on the packaging. The

Products are not safe for babies based on accumulation of Heavy Metals that was manufactured without proper quality control procedures. Thus, Defendant breached its implied warranty of merchantability for the ordinary purpose for which the Products are purchased and used.

306. Defendant cannot disclaim its implied warranty as it knowingly sold Products that were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

307. Defendant was provided notice as described above by the FDA inspections, its product recalls, and membership with INCA (and e.g., through INCA's lobbying efforts in opposition to AB 899). Affording any further opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendant has known of and concealed the safety risks attendant to the Infant Formulas.

308. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff Lopez and members of the California Subclass have suffered damages in an amount to be proven at trial by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

309. Plaintiff Lopez and members of the California Subclass have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

## COUNT IX
**Violations of Minnesota Unlawful Trade Practices Act, Minn. Stat. §325D.13, *et seq*., Against Defendant on Behalf of Plaintiff Seutter and the Minnesota Subclass**

310.    Plaintiff Seutter incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

311.    Defendant is a "person" within the meaning of the Minnesota Unlawful Trade Practices Act ("MUTPA").

312.    Defendant violated the MUTPA by knowingly failing to disclose the Omissions.

313.    Defendant knew or should have known the Infant Formulas were not of the true quality and ingredients advertised because they were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

314.    Defendant's pattern of knowing concealment, Omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff Seutter and the Minnesota Subclass with respect to the Infant Formulas' quality, ingredients, and suitability for consumption by infants with no development or health risks.

315.    Defendant intended for Plaintiff Seutter and the Minnesota Subclass to rely on its Omissions, concealment, implied warranties, and/or deceptions regarding the Infant Formulas' quality, ingredients, and suitability for consumption.

316.    Defendant's conduct and Omissions described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

317.    Defendant was under a duty to disclose the Omissions, because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

318.    Defendant failed to discharge its duty to disclose the Omissions.

319.     The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiff Seutter, the Minnesota Subclass, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiff Seutter and the Minnesota Subclass known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

320.     Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

321.     As a direct and proximate result of Defendant's conduct, Plaintiff Seutter and the Minnesota Subclass suffered actual damages by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

322.     Plaintiff Seutter and the members of the Minnesota Subclass would not have purchased the Infant Formulas at all had they known that Infant Formulas do not conform to the packaging.

323.     Pursuant to Minn. Stat. §8.31, subd. 3a, and §325D.15, Plaintiff Seutter and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUTPA.

## COUNT X
**Violations of Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.44, *et seq*., Against Defendant on Behalf of Plaintiff Seutter and the Minnesota Subclass**

324.    Plaintiff Seutter incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

325.    Defendant is a "person" within the meaning of the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA").

326.    Defendant willingly engaged in deceptive trade practices, in violation of the MUDTPA, by failing to disclose the Omissions.

327.    Defendant knew or should have known the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals.

328.    Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff Seutter and the Minnesota Subclass with respect to the Infant Formulas' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

329.    Defendant intended that Plaintiff Seutter and the Minnesota Subclass would rely on Defendant's Omissions, concealment, implied warranties, and/or deceptions regarding the Infant Formulas' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

330.    Defendant's conduct and Omissions described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

331.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff Seutter, the Minnesota Subclass, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiff Seutter and the

Minnesota Subclass known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas.

332.    Defendant intended that Plaintiff Seutter and the Minnesota Subclass would rely on Defendant's Omissions, concealment, and other deceptive conduct when purchasing the Infant Formulas, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

333.    Defendant's unlawful conduct is continuing, with no indication it intends to cease this fraudulent course of conduct.

334.    Defendant was under a duty to disclose the Omissions because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

335.    Defendant failed to discharge its duty to disclose the Omissions about the Infant Formulas.

336.    As a direct and proximate result of Defendant's conduct, Plaintiff Seutter and the Minnesota Subclass suffered actual damages by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

337.    Plaintiff Seutter and the members of the Minnesota Subclass would not have purchased the Infant Formulas at all had they known of the Omissions.

338.     Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325D.45, Plaintiff Seutter and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' violations of the MUDTPA.

### COUNT XI
**Violations of Minnesota False Statement in Advertising Act, Minn. Stat. §325F.67, *et seq*., Against Defendant on Behalf of Plaintiff Seutter and the Minnesota Subclass**

339.     Plaintiff Seutter incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

340.     Plaintiff Seutter and the Minnesota Subclass purchased "goods," specifically the Infant Formulas discussed herein, and are a "person" within the meaning of the False Statement in Advertising Act ("FSAA").

341.     Plaintiff Seutter and the Minnesota Subclass purchased the Infant Formulas because of the Omissions asserted on the packaging that were made, published, disseminated, circulated, and placed before the public by Defendant.

342.     By engaging in the conduct as described herein, Defendant continue to violate Minn. Stat. § 325F.67.

343.     Defendant's Omissions and use of other deceptive business practices include, by way of example, representations that the Infant Formulas were healthy, made from nutritious ingredients, and safe for consumption by infants with no development or health risks.

344.     Defendant knew or should have known the Infant Formulas did not have the quality and ingredients described above because they were manufactured without proper quality control procedures and included undisclosed (or material risk of) Heavy Metals.

345.     The Omissions were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff Seutter and the Minnesota Subclass with respect to the Infant Formulas'

ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

346.     Defendant's conduct and Omissions described herein occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

347.     The Omissions were made to customers in Minnesota, including Plaintiff Seutter and the Minnesota Subclass, thus the cause of action serves the public benefit of informing Minnesota consumers about the Infant Formulas' manufacturing conditions that lacked proper quality control procedures and that the Products contained (or had a material risk of containing) Heavy Metals.

348.     The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiff Seutter, the Minnesota Subclass, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiff Seutter and the Minnesota Subclass known the Infant Formulas did not have the quality as advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

349.     Defendant intended that Plaintiff Seutter and the Minnesota Subclass would rely on the deception by purchasing the Infant Formulas, unaware of the Omissions and other undisclosed material facts. This conduct constitutes consumer fraud.

350.     Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

351.     As a direct and proximate result of Defendant's conduct, Plaintiff Seutter and the Minnesota Subclass suffered actual damages by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not

contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

352.    Plaintiff Seutter and the members of the Minnesota Subclass would not have purchased the Infant Formulas at all had they known of the presence or material risk of these Heavy Metals.

353.    Pursuant to Minn. Stat. §8.31, subd. 3a, and §325F.67, Plaintiff Seutter and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the FSAA.

**COUNT XII**
**Violations of Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §325F.69, et. seq.,**
**Against Defendant on Behalf of Plaintiff Seutter and the Minnesota Subclass**

354.    Plaintiff Seutter incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

355.    Plaintiff Seutter at times relevant hereto was a citizen of the State of Minnesota.

356.    Defendant is a "person" within the meaning of the Minnesota Prevention of Consumer Fraud Act ("MPCFA").

357.    The Omissions were made in connection with the sale of the Infant Formulas to Plaintiff Seutter and the Minnesota Subclass.

358.    Defendant knowingly acted, used, and employed fraud, false pretenses, and deceptive practices in connection with the sale of the Infant Formulas. Specifically, Defendant failed to disclose the Infant Formulas contained levels or material risk of Heavy Metals and were manufactured without proper quality control procedures.

359.     Defendant knew or should have known the Infant Formulas did not have the quality reasonable consumers expected because they were manufactured without proper quality control procedures and included undisclosed (or the material risk of) Heavy Metals that do not conform to the packaging. Defendant intended for Plaintiff Seutter and the Minnesota Subclass to rely on the Infant Formulas' packaging in deciding whether to purchase the Infant Formulas.

360.     Defendant's unfair or deceptive acts or practices were likely to deceive reasonable consumers about the Infant Formulas' quality, ingredients, consumption by infants with no development or health risks, and, by extension, the true value of the Infant Formulas. Plaintiff Seutter and the Minnesota Subclass relied on, and were in fact deceived by, Defendant's Omissions with respect to the Infant Formulas' quality, ingredients, and fitness for consumption in deciding to purchase them over competitors' infant formulas.

361.     The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiff Seutter, the Minnesota Subclass, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas. Had Plaintiff Seutter and the Minnesota Subclass known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

362.     Defendant's Omissions were made to customers in Minnesota, including Plaintiff Seutter and the Minnesota Subclass, thus the cause of action serves the public benefit of informing Minnesota consumers about the Infant Formulas' manufacturing conditions that lacked proper quality control procedures and that the Products contained (or had a material risk of containing) Heavy Metals.

363.     Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

364.    As a direct and proximate result of Defendant's conduct, Plaintiff Seutter and the Minnesota Subclass suffered actual damages by: (1) paying a premium price for Products they reasonably believed were manufactured with proper quality control procedures and did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they were manufactured without proper quality control procedures and contain or risk containing Heavy Metals.

365.    Plaintiff Seutter and the members of the Minnesota Subclass would not have purchased the Infant Formulas at all had they known of the presence of these Heavy Metals.

366.    Pursuant to Minn. Stat. §8.31, subd. 3a, and §325F.69, Plaintiff Seutter and the Minnesota Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MPCFA.

## COUNT XIII
### Unjust Enrichment Against Defendant on Behalf of the Class or, Alternatively, the State Subclasses

367.    Plaintiffs incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

368.    Substantial benefits have been conferred on Defendant by Plaintiffs and the Class through the purchase of the Infant Formulas. Defendant knowingly and willingly accepted and enjoyed these benefits.

369.    Defendant either knew or should have known that the payments rendered by Plaintiffs and the Class were given and received with the expectation that the Infant Formulas would be manufactured with proper quality control procedures and would not contain (or have a

material risk of containing) Heavy Metals. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

370.    Defendant was obligated to disclose the Omissions in the Infant Formulas because (1) it had exclusive knowledge they were manufactured without proper quality control procedures and that the Infant Formulas contained (or had a material risk of containing) Heavy Metals; (2) the Omissions were not known or reasonably accessible to Plaintiffs and the Class; (3) Defendant actively concealed the Omissions; and (4) Defendant made partial statements on the Infant Formulas' packaging that gave a misleading impression to Plaintiffs and the Class and reasonable consumers without further information because the Omissions were not disclosed.

371.    Defendant's acceptance and retention of the benefits of the payments from Plaintiffs and the Class under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiffs and the Class.

372.    Plaintiffs and the Class are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

373.    Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Classes, and requiring Defendant to bear the costs of class notice;

B.     An order enjoining Defendant from selling the Infant Formulas until the higher and/or unsafe levels of Heavy Metals are removed and the proper quality control procedures are implemented;

C.     An order enjoining Defendant from selling the Infant Formulas until the Omissions are disclosed;

D.     An order enjoining Defendant from selling the Infant Formulas in any manner suggesting or implying that they are healthy and made from nutritious ingredients;

E.     An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief;

F.     An order awarding declaratory relief, and any further injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's conduct;

G.     An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the State Subclass laws, plus pre- and post-judgment interest thereon;

H.     An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

J.     An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

K.     An order requiring Defendant to pay punitive damages on any count so allowable;

L.     An order awarding attorneys' fees and costs to Plaintiffs and the Classes; and

M.     An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:  January 26, 2024                    LOCKRIDGE GRINDAL NAUEN PLLP

                                            By: s/  *Rebecca A. Peterson*
                                            ROBERT K. SHELQUIST
                                            REBECCA A. PETERSON
                                            KRISTA K. FREIER
                                            CATHERINE A. PETERSON
                                            DEVELYN J. MISTRIOTTI
                                            100 Washington Avenue South, Suite 2200
                                            Minneapolis, MN 55401
                                            Telephone: (612) 339-6900
                                            Facsimile: (612) 339-0981
                                            E-mail:  rkshelquist@locklaw.com
                                                     rapeterson@locklaw.com
                                                     kkfreier@locklaw.com
                                                     capeterson@locklaw.com
                                                     djmistriotti@locklaw.com

                                            WEXLER BOLEY & ELGERSMA LLP
                                            KENNETH A. WEXLER
                                            KARA A. ELGERSMA
                                            55 West Monroe Street, Suite 3300
                                            Chicago, IL 60603
                                            Telephone: (312) 346-2222
                                            Facsimile: (312) 346-0022
                                            E-mail: kaw@wbe-llp.com
                                                    kae@wbe-llp.com

                                            GUSTAFSON GLUEK, PLLC
                                            DANIEL E. GUSTAFSON
                                            CATHERINE SUNG-YUN K. SMITH
                                            Canadian Pacific Plaza
                                            120 South 6th Street, Suite 2600
                                            Minneapolis, MN 55402
                                            Telephone: (612) 333-8844
                                            Facsimile: (612) 339-6622
                                            E-mail: dgustafson@gustafsongluek.com
                                                    csmith@gustafsongluek.com

GEORGE FELDMAN MCDONALD, PLLC
LORI G. FELDMAN
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
Facsimile: (888) 421-4173
E-mail: LFeldman@4-Justice.com
E-service: eService@4-Justice.com

LYNCH CARPENTER LLP
KATRINA CARROLL
KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 212-5919
E-mail: katrina@lcllp.com
        kyle@lcllp.com

GEORGE FELDMAN MCDONALD, PLLC
DAVID J. GEORGE
BRITTANY L. BROWN
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
E-mail: DGeorge@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
JANINE L. POLLACK
MICHAEL LISKOW
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (917) 983-2707
E-mail: jpollack@4-Justice.com
        mliskow@4-Justice.com

SALTZ MONGELUZZI & BENDESKY, PC
SIMON B. PARIS, ESQ.
PATRICK HOWARD, ESQ.
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA  19103
Telephone: (215) 496-8282
Facsimile: (215) 754-4443
E-mail:  sparis@smbb.com
              phoward@smbb.com

THRONDSET MICHENFELDER, LLC
JASON GUSTAFSON
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (763) 515-6110
E-mail: jason@throndsetlaw.com

**Counsel for Plaintiffs**

Exhibit 5

STATE OF MINNESOTA                              DISTRICT COURT

COUNTY OF HENNEPIN                      FOURTH JUDICIAL DISTRICT
                                              Case Type:  Civil Other

| | |
|---|---|
| Amanda Seutter and Brittany Yelle**,** individually and on behalf of a class of similarly situated individuals,<br><br>               Plaintiffs,<br><br>v.<br><br>MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC,<br><br>               Defendants. | Court File No. 27-CV-24-7741<br><br>Hon. Thomas J. Conley<br><br><br>**WAIVER OF SERVICE OF SUMMONS** |

TO:    CATHERINE K. SMITH, GUSTAFSON GLUEK PLLC

       I received your request that Defendants, Mead Johson Nutrition Company and Mead Johnson & Company, LLC, waive service of a summons in *Seutter, et al. v. Mead Johnson Nutrition Company, et al.*, District Court for the Fourth Judicial District of Minnesota, Hennepin County.

       I have received a copy of the Complaint in this lawsuit, a copy of this waiver, and a means for returning the signed waiver to you without cost to Defendants.  I agree to save the cost of service of the Summons and Complaint in this lawsuit.

       I understand that Defendants will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the Summons or in service of the Summons.  I understand that a judgment may be entered against Defendants if an answer or motion under Rule 12 is not served upon you with 60 days after May 7, 2024, or within 90 days after that date if the request was sent outside the United States.

Dated: _____05/07/2024_____        _____
                                           Signature

                                             Jennifer L. Mesko
                                           _____
                                           Typed/Printed Name

**DUTY TO AVOID UNNECESSARY COSTS OF SERVICE OF SUMMONS**

Rule 4 of the Minnesota Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and complaint. A defendant/respondent located in the United States who, after being notified of an action and asked by a plaintiff/ petitioner located in the United States to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver. It is not good cause for a failure to waive service that a party believes that the complaint/petition is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property.  A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the court or to the place where the action has been brought. A defendant/ respondent who waives service must within the time specified on the waiver form serve on the plaintiff/petitioner's attorney (or unrepresented plaintiff/petitioner) a response to the complaint/ petition. If the answer or motion is not served within this time, a default judgment may be taken against that defendant/respondent. By waiving service, a defendant/respondent is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received.

Exhibit 6

**MINNESOTA
JUDICIAL BRANCH**

MINNESOTA COURT RECORDS ONLINE (MCRO)

## Case Details (Register of Actions)

Search executed on 06/05/2024 03:46 PM

### Case Information

**Case Number:** 27-CV-24-7741

**Case Title:** Amanda Seutter and Brittany Yelle, individually and on behalf of a class of similarly situated individuals vs MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC.

**Case Type:** Civil Other/Misc.

**Date Filed:** 05/03/2024

**Case Location:** Hennepin County, Hennepin Civil

**Judicial Officer:** Conley, Thomas J.

**Case Status:** Open

### Party Information

**Plaintiff**
Seutter, Amanda

**Attorneys Active**
- SMITH, CATHERINE SUNG-YUN KIM – Lead Attorney
- GOWDA, SHASHI KUMAR
- GUSTAFSON, DANIEL E

**Plaintiff**
Yelle, Brittany

**Attorneys Active**
- SMITH, CATHERINE SUNG-YUN KIM – Lead Attorney
- GOWDA, SHASHI KUMAR
- GUSTAFSON, DANIEL E

**Defendant**
Mead Johnson & Company, LLC
Wilmington, DE 19808

**Self-Represented Litigant**

**Defendant**
Mead Johnson Nutrition Company
Wilmington, DE 19808

**Self-Represented Litigant**

### Case Events

| Date | Description | | Pages |
|---|---|---|---|
| 05/10/2024 | Waiver of Personal Service<br>Index #6 | 📄 | 2 pages |
| 05/06/2024 | Notice of Case Assignment<br>Index #5 | 📄 | 1 page |
| 05/03/2024 | Civil Cover Sheet<br>Index #4 | 📄 | 8 pages |
| 05/03/2024 | Complaint-Civil<br>Index #3 | 📄 | 72 pages |

| 05/03/2024 | Summons<br>Index #2 | 📄<br>*4 pages* |
| 05/03/2024 | Summons<br>Index #1 | 📄<br>*4 pages* |

---

**Financial Information**

**Plaintiff - Seutter, Amanda**

| | Fines and Fees | $ | 397.00 |
| | Total Payments and Credits | - $ | 397.00 |
| | **Current Balance as of 06/05/2024** | $ | 0.00 |

**Transaction Details**

| 05/06/2024 | E-File Electronic Payment | Receipt # EP27C-2024-14773 | - $ | 397.00 |
| 05/06/2024 | Charge | | $ | 397.00 |

Search executed on 06/05/2024 03:46 PM

STATE OF MINNESOTA                        DISTRICT COURT

COUNTY OF HENNEPIN            FOURTH JUDICIAL DISTRICT
                                      Case Type:  Civil Other

| | |
|---|---|
| Amanda Seutter and Brittany Yelle**,** individually and on behalf of a class of similarly situated individuals,<br><br>          Plaintiffs,<br><br>v.<br><br>MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC,<br><br>          Defendants. | Court File No. _____<br><br><br>**SUMMONS** |

THIS SUMMONS IS DIRECTED TO MEAD JOHNSON NUTRITION COMPANY:

     1. **YOU ARE BEING SUED**. Plaintiffs have started a lawsuit against you. Plaintiffs' Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

     2. **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.**   You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

     120 South Sixth Street, Suite 2600, Minneapolis, MN 55402**.**

     3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to Plaintiffs' Complaint. In your Answer, you must state whether you agree or disagree with each paragraph of the Complaint. If you believe Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

     4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you may lose this case by default. You will not get to tell your side of the story, and the Court may decide against you and award Plaintiffs everything asked for in the Complaint.  If you do not want to contest the claims stated in the Complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

    5.  **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case**.

    6. **ALTERNATIVE DISPUTE RESOLUTION.**  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated:  May 3, 2024

**GUSTAFSON GLUEK PLLC**

By: */s/ Catherine K. Smith*
CATHERINE SUNG-YUN K. SMITH
DANIEL E. GUSTAFSON
SHASHI K. GOWDA
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: csmith@gustafsongluek.com
      dgustafson@gustafsongluek.com
      sgowda@gustafsongluek.com

LOCKRIDGE GRINDAL NAUEN PLLP
ROBERT K. SHELQUIST
REBECCA A. PETERSON
KRISTA K. FREIER
CATHERINE A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail:  rkshelquist@locklaw.com
      rapeterson@locklaw.com
      kkfreier@locklaw.com
      capeterson@locklaw.com

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

WEXLER BOLEY & ELGERSMA LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail: kaw@wbe-llp.com
          kae@wbe-llp.com

GEORGE FELDMAN MCDONALD, PLLC
LORI G. FELDMAN
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
Facsimile: (888) 421-4173
E-mail: LFeldman@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
DAVID J. GEORGE
BRITTANY L. SACKRIN
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
E-mail: DGeorge@4-Justice.com
E-mail: bsackrin@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
JANINE L. POLLACK
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (917) 983-2707
E-mail: jpollack@4-Justice.com

LYNCH CARPENTER LLP
KATRINA CARROLL
KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 212-5919
E-mail: katrina@lcllp.com
           kyle@lcllp.com

SALTZ MONGELUZZI & BENDESKY, PC
SIMON B. PARIS, ESQ.
PATRICK HOWARD, ESQ.
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA 19103
Telephone: (215) 496-8282
Facsimile: (215) 754-4443
E-mail: sparis@smbb.com
           phoward@smbb.com

THRONDSET MICHENFELDER, LLC
JASON GUSTAFSON
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (763) 515-6110
E-mail: jason@throndsetlaw.com

*Counsel for Plaintiffs*

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT
                                                Case Type:  Civil Other

| | |
|---|---|
| Amanda Seutter and Brittany Yelle**,** individually and on behalf of a class of similarly situated individuals, | Court File No. _____ |
| Plaintiffs, | |
| v. | **SUMMONS** |
| MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC, | |
| Defendants. | |

THIS SUMMONS IS DIRECTED TO MEAD JOHNSON & COMPANY, LLC:

1. **YOU ARE BEING SUED**. Plaintiffs have started a lawsuit against you. Plaintiffs' Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS**.   You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

120 South Sixth Street, Suite 2600, Minneapolis, MN 55402**.**

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to Plaintiffs' Complaint. In your Answer, you must state whether you agree or disagree with each paragraph of the Complaint. If you believe Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you may lose this case by default. You will not get to tell your side of the story, and the Court may decide against you and award Plaintiffs everything asked for in the Complaint.  If you do not want to contest the claims stated in the Complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

5.  **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case**.

6. **ALTERNATIVE DISPUTE RESOLUTION.**  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated:  May 3, 2024

**GUSTAFSON GLUEK PLLC**

By: */s/ Catherine K. Smith*
CATHERINE SUNG-YUN K. SMITH
DANIEL E. GUSTAFSON
SHASHI K. GOWDA
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: csmith@gustafsongluek.com
          dgustafson@gustafsongluek.com
          sgowda@gustafsongluek.com


LOCKRIDGE GRINDAL NAUEN PLLP
ROBERT K. SHELQUIST
REBECCA A. PETERSON
KRISTA K. FREIER
CATHERINE A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail:  rkshelquist@locklaw.com
          rapeterson@locklaw.com
          kkfreier@locklaw.com
          capeterson@locklaw.com

27-CV-24-7741

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

WEXLER BOLEY & ELGERSMA LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail: kaw@wbe-llp.com
        kae@wbe-llp.com

GEORGE FELDMAN MCDONALD, PLLC
LORI G. FELDMAN
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
Facsimile: (888) 421-4173
E-mail: LFeldman@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
DAVID J. GEORGE
BRITTANY L. SACKRIN
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
E-mail: DGeorge@4-Justice.com
E-mail: bsackrin@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
JANINE L. POLLACK
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (917) 983-2707
E-mail: jpollack@4-Justice.com

LYNCH CARPENTER LLP
KATRINA CARROLL
KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 212-5919
E-mail: katrina@lcllp.com
          kyle@lcllp.com

SALTZ MONGELUZZI & BENDESKY, PC
SIMON B. PARIS, ESQ.
PATRICK HOWARD, ESQ.
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA  19103
Telephone: (215) 496-8282
Facsimile: (215) 754-4443
E-mail:  sparis@smbb.com
          phoward@smbb.com

THRONDSET MICHENFELDER, LLC
JASON GUSTAFSON
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (763) 515-6110
E-mail: jason@throndsetlaw.com

***Counsel for Plaintiffs***

4

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                            FOURTH JUDICIAL DISTRICT
                                                Case Type:  Civil Other

| | |
|---|---|
| Amanda Seutter and Brittany Yelle, individually and on behalf of a class of similarly situated individuals, | Court File No. _____ |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

1.      Plaintiffs Amanda Seutter and Brittany Yelle ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, bring this Class Action Complaint against Defendant Mead Johnson Nutrition Company and Defendant Mead Johnson & Company, LLC (collectively, "Defendant" or "Mead Johnson"), for its knowing, reckless, and/or intentional practice of failing to disclose the presence or material risk of Heavy Metals in its Enfamil® infant formulas ("Products" or "Infant Formulas").[1] The Infant Formulas are sold in Minnesota and throughout the United States and do not conform to their packaging.

---

[1] As used herein, "Heavy Metals" includes arsenic, cadmium, and lead. "Products" or "Infant Formula(s)" as to the Heavy Metals allegations refer to the following Mead Johnson powdered infant formula products: Enfamil A.R., Enfamil Gentlease, Enfamil Enspire Gentlease, Enfamil NeuroPro, Enfamil NeuroPro Sensitive, Enfamil Nutramigen, and Enfamil ProSobee. Discovery may reveal additional products that contain Heavy Metals and/or the presence of additional heavy metals.  Plaintiffs reserve their right to amend and include any such additional products or heavy metals in this action.

1

Plaintiffs seek both injunctive and monetary relief on behalf of the proposed Class (as defined herein), including requiring full disclosure of the risk or presence of Heavy Metals on the Products' packaging, and restoring monies to the members of the proposed Class. Plaintiffs allege the following based upon personal knowledge as well as investigation by their counsel as to themselves, and as to all other matters, upon information and belief. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

2.      Mead Johnson is one of the primary manufacturers of infant formula in the United States and previously held 39.6% of the market share for powdered infant formula.[2] As a trusted manufacturer and vendor of products consumed exclusively by babies and young children, it carries a duty of the highest importance to implement and maintain quality control when manufacturing its products. When a company selling vital products, such as Defendant who sells infant formula, it must not knowingly fail to ensure the safety of its products and must not allow dangerous toxins or contaminants, such as Heavy Metals, to be consumed by its unsuspecting consumers. Rather, these companies have a duty to disclose material risks of contamination— allowing consumers to make informed decisions about the risks they are willing to take (especially with the health of their infants) and assess the true value of the product they are considering for purchase. Defendant failed to do so in this case.

3.      Defendant's Products contain dangerous toxins: Heavy Metals. As detailed below, individuals, especially infants, who consume Heavy Metals risk developing serious adverse health

---

[2] *Market Share of the Leading Vendors of Baby Formula (Powder) in the United States in 2016, Based on Dollar Sales*, available at https://www.statista.com/statistics/443975/market-share-of-the-leading-us-baby-formula-powder-companies/ (last accessed April 29, 2024).

effects – a risk which most consumers strongly prefer to avoid in food they feed children (who are more vulnerable to those risks than others). Yet, Defendant chose to sell itself to new parents as a trusted company, without disclosing that its formula contained or had a material risk of containing Heavy Metals (collectively, the "Omissions"), which would be material to any parent purchasing formula for their infant.

4.     Infants rely on breastmilk and/or infant formula for their nutrition and growth. The U.S. Dietary Guidelines for Americans and the American Academy of Pediatrics recommends breastfeeding babies exclusively for about six months from birth and continuing afterwards along with introduction of solid foods until they are 12 months old and beyond.[3]  However, according to the Centers for Disease Control and Prevention ("CDC"), only 46.3% of babies under three months old are exclusively breastfed, and the percentage of babies exclusively breastfed through six months drops to 25.8%.[4] For babies younger than six months, the CDC recommends that breast milk or infant formula are the only things they eat for their nutrition, and while supplementing with some solid food, breastmilk or infant formula is recommended up to when they are 24 months old.[5] Therefore, a significant number of babies rely on infant formulas for their growth and nutrition in the first year of their lives and beyond.

5.     Reasonable parents, like Plaintiffs, trust and depend on manufacturers, like Defendant, to sell infant formula that is healthy, nutritious, and free from the presence or material

---

[3]  CDC, *Infant and Toddler Nutrition: Recommendation and Benefits*, available at https://www.cdc.gov/nutrition/infantandtoddlernutrition/breastfeeding/recommendations-benefits.html (last accessed January 21, 2024).

[4]  CDC, *Facts: Key Breastfeeding Indicators*, available at https://www.cdc.gov/breastfeeding/data/facts.html (last accessed March 18, 2024).

[5]  CDC, *When, What, and How to Introduce Solid Foods*, available at https://www.cdc.gov/nutrition/InfantandToddlerNutrition/foods-and-drinks/when-to-introduce-solid-foods.html (last accessed March 18, 2024).

risk of harmful toxins, contaminants, and chemicals. They certainly expect the formula they feed their infants to be free of the risk or presence of Heavy Metals, substances known to have significant and unsafe developmental and health consequences as detailed herein.

6.      Consumers lack the knowledge and opportunity to determine whether Defendant's Products do in fact contain (or have a material risk of containing) Heavy Metals or to ascertain the true nature of the ingredients and quality of the Products. Reasonable consumers therefore must and do rely on Defendant to properly and fully disclose what its Products contain. This is especially true for the risk or presence of Heavy Metals that are being fed to hours-, days- or months-old babies. Such information would be material to any reasonable parent's purchasing decisions.

7.      Defendant's packaging is designed to induce reasonable consumers to believe in the high quality and safety of its infant formula while omitting any information about the inclusion (or material risk of inclusion) of Heavy Metals.

8.      For example, the packaging emphasizes that the Infant Formulas are healthy and made with nutritious ingredients that help support proper development and growth:[6]



---

[6]      https://www.enfamil.com/products/enfamil-neuropro-infant-formula/powder-tub-20-7-oz-tub/
(last accessed March 18, 2024).

9.     The packaging on the Infant Formulas also stresses that there are no detrimental, harmful, and genetically engineered ingredients:[7]



10.     On these packages and others, Defendant states the Infant Formulas contain nutritious ingredients such as Docosahexaenoic Acid ("DHA"), prebiotics such as human milk oligosaccharides ("HMO"), probiotics, and desirable (naturally occurring) minerals such as selenium.



---

[7]     https://www.enfamil.com/products/enfamil-neuropro-gentlease-formula/powder-tub-19-5-oz-tub/ (last accessed March 18, 2024).

11.     Based on the messaging and impression communicated by the packaging and the material nondisclosures, no reasonable consumer could expect or understand that the Infant Formulas contained or risked containing Heavy Metals. This is especially true as the development and physical risks created by ingestion of Heavy Metals by infants are well-recognized.

12.     Likewise, this same packaging promising healthy, high quality and safe products would not lead reasonable consumers to expect or understand that the Infant Formulas were manufactured by a company that allowed improper quality control procedures.

13.     Defendant's website provides further context to demonstrate that the Products' packaging is deceptive by promising a healthy product that poses no risks to any infants. Specifically, Defendant promises on its website that: (1) Defendant "[s]upport[s] the brain in everything" it does with products that "are excellent for routine, everyday feeding;"[8] (2) "[t]he health and safety of infants and children is [Defendant's] top priority," and it is "committed to providing a high quality and safe products [sic] for [its] littlest consumers;"[9] (3) Defendant's "products undergo extensive quality and safety checks throughout the manufacturing process—from raw materials to finished product" and that "samples from every batch [it] produce[s] are tested to ensure the product meets [its] stringent quality standards;"[10] and (4) "[p]arents can be assured that our infant formulas are safe and nutritious feeding options for their infants."[11] These representations are each in direct contradiction to the Omissions.

---

[8] https://www.enfamil.com/why-enfamil/enfamil-formula-family/ (last accessed March 18, 2024).

[9] https://www.enfamil.com/why-enfamil/quality-assurance/ (last accessed March 18, 2024).

[10] *Id*.

[11] *Id*.

14.    On information and belief, Defendant was knowingly, recklessly, and/or intentionally selling Infant Formulas that contained or risked containing detectable levels of arsenic, cadmium, and/or lead.

15.    Independent testing also confirmed the presence of Heavy Metals in two of Defendant's Infant Formulas:[12]

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee Soy Infant Formula | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

16.    Arsenic, cadmium, and lead are all known to pose health risks to humans, and particularly to infants.[13]

17.    Exposure to Heavy Metals has significant and dangerous health consequences. A 2021 report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform highlighted the material risk of including Heavy Metals in baby food, spurred by the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development."[14]

---

[12] Healthy Babies Bright Futures' Report: *What's in My Baby's Food?*, at 20, available at https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed March 18, 2024) ("HBBF Report")..

[13] *See generally, id.*

[14] U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury," February 4, 2021, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed March 18, 2024)

18.     Despite the known health risks, Defendant knowingly chose to not disclose to consumers that the Infant Formulas contain (or have a material risk of containing) Heavy Metals. Nowhere on the Infant Formulas' packaging is it disclosed that they contain (or have a material risk of containing) Heavy Metals.

19.     The Infant Formulas' packaging does not include any type of disclaimer or disclosure regarding the presence of Heavy Metals that would inform consumers of their presence or risk. Likewise, nothing on the packaging states that ingestion of Heavy Metals can be unsafe or accumulate over time resulting in developmental issues, poisoning, injury, and/or disease.

20.     Instead, to induce reasonable consumers to believe in the quality and safety of its Products and to justify a price that reflects a premium, Defendant chose to focus on promoting its Infant Formulas on its packaging as high quality and made with nutritious ingredients.

21.     Defendant's marketing strategy reflects the concerns raised by the World Health Organization ("WHO") and UNICEF in their report acknowledging the troubling marketing efforts by infant formula milk manufacturers.[15] This report raises deep concerns over the lasting and pervasive negative effects from the false and misleading information received by parents such as

---

("Congressional Committee Report"); *see also* U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in Even More Baby Foods," September 29, 2021, available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/ECP%20Second%20Baby%20Food%20Report%209.29.21%20FINAL.pdf (last accessed March 18, 2024) ("Second Congressional Committee Report").

[15] WHO, *How the Marketing of Formula Milk Influences our Decisions on Infant Feeding*, February 22, 2022, available at https://www.who.int/teams/maternal-newborn-child-adolescent-health-and-ageing/formula-milk-industry (last accessed March 18, 2024).

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

Plaintiffs and the Class members through such aggressive marketing efforts by infant formula manufacturers such as Defendant.[16]

22.    Based on Defendant's packaging and related omissions, no reasonable consumer had any reason to know or expect that the Infant Formulas contained Heavy Metals. Furthermore, reasonable parents, like Plaintiffs and the Class members, who were feeding the Infant Formulas to their babies (multiple times a day) would consider the mere presence (or risk) of Heavy Metals a material fact when considering whether to purchase the Infant Formulas.

23.    Defendant knows its customers trust the quality of its Products that are manufactured for the most vulnerable population – infants – and expect the Infant Formulas to be properly and safely manufactured and free from the risk and actual presence of Heavy Metals. Defendant also knows its consumers seek out and wish to purchase infant formulas that possess nutritious ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas they believe possess these qualities. Defendant also knows no reasonable consumer would knowingly provide his or her children with infant formula that contained Heavy Metals.

24.    Defendant knew that parents would find the Omissions material when deciding whether to purchase the Infant Formulas and that it was in a special position of public trust to those consumers.

---

[16] National Public Radio, *Infant Formula Promoted in 'Aggressive' and 'Misleading' Ways, Says New Global Report*, March 1, 2022, available at https://www.npr.org/sections/goatsandsoda/2022/03/01/1082775961/infant-formula-promoted-in-aggressive-and-misleading-ways-says-new-global-report (last accessed March 18, 2024).

25.     The material Omissions are deceptive, misleading, unfair, and/or false because the Infant Formulas were manufactured in a such a way that they contained (or risked containing) undisclosed Heavy Metals.

26.     The Omissions allowed Defendant to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for Infant Formulas that did not disclose material information as to the Products' true quality and value. Defendant continues to wrongfully induce consumers to purchase its Infant Formulas without full disclosure of the Omissions.

27.     Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein), who, from the applicable limitations period up to and including the present, purchased for household use and not resale any of Defendant's Infant Formulas.

**JURISDICTION AND VENUE**

28.     This Court has subject matter jurisdiction over this action as it is based on Minnesota Statute sections 8.31, 336.2-314**,** 325D.09 to 325D.16, 325D.43 to 325D.48, 325F.67, 325F.68 to 325F.70, and Minnesota common law.

29.     This Court has personal jurisdiction over Defendant as it conducts a substantial part of its operations with regular and continuous business activity in Minnesota, on information and belief, through its marketing and retail of the Products. This Court has personal jurisdiction over the Plaintiffs as they both were, and still are, residents of Minnesota during the occurrence of the acts and transactions giving rise to this action and they purchased the Infant Formulas in this State.

30.     Venue is proper in Hennepin County because Plaintiff Yelle suffered injury as a result of Defendant's acts in this County, and many of the acts and transactions giving rise to this action occurred in this County.

## PARTIES

31.     Plaintiff Amanda Seutter ("Plaintiff Seutter") is, and at times relevant hereto was, a resident of Elk River, Minnesota and currently resides in Hennepin County in the State of Minnesota. She purchased the Infant Formula, including Enfamil® Gentlease, for household use.

32.     Plaintiff Seutter purchased the Infant Formula for her child from Target in Otsego, Minnesota and Amazon.com, from approximately October 2022 until January 2024.

33.     Plaintiff Seutter believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Seutter saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formulas contained (or had a material risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Seutter would be willing to purchase Enfamil® products in the future if she could be certain that they do not contain (or have a material risk of containing) Heavy Metals.

34.     As a result of Defendant's intentionally, recklessly, and/or knowingly deceptive conduct as alleged herein, Plaintiff Seutter was injured when she paid the purchase price or a price premium for the Infant Formula that did not deliver what was promised by Defendant.  Plaintiff Seutter paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formulas were free of Heavy Metals, and posed no potential harm to the physical and mental growth of her infant – long term or short term. Plaintiff Seutter would not have paid this money had she known the truth about the Omissions.  Further, should Plaintiff Seutter encounter the Infant Formulas in the future, she could not rely on the truthfulness of the packaging, absent corrective

changes to the packaging and advertising of the Infant Formulas. Damages can be calculated through expert testimony at trial.

35.      Plaintiff Brittany Yelle ("Plaintiff Yelle") is, and at times relevant hereto was, a resident of Plymouth, Minnesota and currently resides in Hennepin County in the State of Minnesota. She purchased the Infant Formula, including Enfamil® Neuropro and Enfamil® Gentlease for household use.

36.      Plaintiff Yelle purchased the Infant Formula for her child from Target locations in Medina and Minnetonka, Minnesota, from approximately December 2023 through April 2024.

37.      Plaintiff Yelle believed she was feeding her child healthy and nutritious Infant Formula.  Prior to purchasing the Infant Formula, Plaintiff Yelle saw and relied upon the packaging of the Infant Formula. During the time she purchased and fed her child the Infant Formula, and due to the Omissions by Defendant, she was unaware the Infant Formulas were manufactured without proper quality control procedures and contained (or had a material risk of containing) Heavy Metals and would not have purchased the Infant Formulas if that information had been fully disclosed. Plaintiff Yelle would be willing to purchase Defendant's Products in the future if she could be certain that they were safely manufactured and do not contain (or have a material risk of containing) Heavy Metals.

38.      As a result of Defendant's intentionally, recklessly, and/or knowingly deceptive conduct as alleged herein, Plaintiff Yelle was injured when she paid the purchase price or a price premium for the Infant Formula that did not deliver what was promised by Defendant. Plaintiff Yelle paid the purchase price on the reasonable assumptions that the packaging was accurate, the Infant Formulas were manufactured with proper quality control procedures, were free of Heavy Metals, and posed no potential harm to the physical and mental growth of her infant – long term

or short term. Plaintiff Yelle would not have paid this money had she known the truth about the Omissions. Further, should Plaintiff Yelle encounter the Infant Formulas in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to the packaging and advertising of the Infant Formulas. Damages can be calculated through expert testimony at trial.

39.    Defendant Mead Johnson Nutrition Company is a Delaware corporation with its principal place of business located at 2400 West Lloyd Expressway, Evansville, Indiana. In June 2017, Mead Johnson Nutrition Company was acquired by Reckitt Benckiser Group PLC, whose U.S. headquarters is located at 399 Interpace Parkway, Parsippany, New Jersey. Mead Johnson & Company, LLC, is a Delaware corporation with its headquarters at 2400 West Lloyd Expressway in Evansville, Indiana.

40.    Defendant, one of the largest producers of infant formula products in the world, has formulated, developed, manufactured, packaged, labeled, distributed, marketed, advertised, and sold the Infant Formulas under the Enfamil® name throughout the United States, including in this State. Defendant has done so continuously from May 1, 2018, to the present (the "Relevant Period").

41.    Defendant knowingly created, allowed, oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive packaging and related marketing for the Infant Formulas that did not disclose the presence (or risk) of Heavy Metals in the Infant Formulas. Defendant is also responsible for sourcing ingredients, manufacturing the Products, and conducting all relevant quality assurance protocols, including testing of both the Products and their ingredients.

42.    Plaintiffs relied upon the Infant Formulas' packaging and the material Omissions, which was disseminated by Defendant and its agents in this State through the material Omissions

from the packaging.   The Omissions were nondisclosed material content that a reasonable consumer would consider important in purchasing the Infant Formulas.

43.    The Infant Formulas, at a minimum, include:

(a)    Enfamil® A.R.;



(b)    Enfamil® Gentlease;



(c)     Enfamil® Enspire Gentlease;



(d)     Enfamil® NeuroPro;





(e)    Enfamil® NeuroPro Sensitive;



(f)    Enfamil® Nutramigen; and



     (g)     Enfamil® ProSobee.



## FACTUAL ALLEGATIONS

**I.**    **DEFENDANT KNEW OR SHOULD HAVE KNOWN OF THE HEALTH RISKS PRESENTED TO INFANTS AND BABIES FROM HEAVY METALS AND THE LIKELIHOOD THEY WERE PRESENT IN ITS PRODUCTS**

     44.     While there are no U.S. federal regulations regarding Heavy Metals in infant formulas, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "No level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[17]

     45.     Arsenic, cadmium, and lead—the Heavy Metals found in the Infant Formulas—are neurotoxins, or poisons, which affect the nervous system. Exposure to these Heavy Metals

---

[17] New York Times, *Some Baby Food May Contain Toxic Metals, U.S. Reports*, available at https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html (last accessed March 18, 2024) ("Some Baby Food May Contain Toxic Metals").

"diminish[es] quality of life, reduce[s] academic achievement, and disturb[s] behavior, with profound consequences for the welfare and productivity of entire societies."[18]

46.     The Heavy Metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder ('ADHD')."[19] Even when trace amounts are found in food, these Heavy Metals can alter the developing brain and erode a child's intelligence quotient ("IQ").[20]

47.     Heavy Metals can remain in one's body for years and, thus, can accumulate in the body, such as in the kidneys and other internal organs, increasing the risk to a person over time.[21]

48.     Due to their smaller physical size and still-developing brain and organs, infants and toddlers are particularly susceptible to the toxic effects of Heavy Metals because "[t]hey also absorb more of the heavy metals that get into their bodies than adults do."[22]

49.     Of additional concern to developing infants are the health risks related to simultaneous exposure to multiple Heavy Metals as "co-exposures can have interactive adverse effects."[23] Heavy Metals disturb the body's metabolism and cause "significant changes in various

---

[18] HBBF Report, *supra*, at 13.

[19] *Id.* at 6.

[20] Congressional Committee Report, *supra*, at 1.

[21] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know* (Aug. 16, 2018, updated Sept. 29, 2021), available at https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last accessed April 12, 2024) ("Consumer Reports: Heavy Metals in Baby Food").

[22] *Id.*

[23] Morello-Frosch R., Cushing L.J., Jesdale B.M., Schwartz J.M., Guo W., Guo T., Wang M., Harwani S., Petropoulou S.E., Duong W., Park J.S., Petreas M., Gajek R., Alvaran J., She J., Dobraca D., Das R., Woodruff T.J. *Environmental Chemicals in an Urban Population of Pregnant Women and Their Newborns from San Francisco.* Environ Sci Technol. 2016 Nov 15;50(22):12464-12472. doi: 10.1021/acs.est.6b03492. Epub 2016 Oct 26. PMID: 27700069;

biological processes such as cell adhesion, intra- and inter-cellular signaling, protein folding, maturation, apoptosis, ionic transportation, enzyme regulation, and release of neurotransmitters."[24]

50.      Exposure to Heavy Metals, even in small amounts, can lead to life-long effects. According to Victor Villarreal, Ph.D., Assistant Professor in the Department of Educational Psychology at the University of Texas at San Antonio who has studied the effects of heavy metals on childhood development, "[t]he effects of early exposure to heavy metals can have long-lasting impacts that may be impossible to reverse."[25]

51.      Because Heavy Metals can bioaccumulate in the body, even regular consumption of small amounts can increase the material risk of various health issues, including the material risk of bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[26]

52.      As Dr. James E. Rogers, the director of food safety research and testing at Consumer Reports has said "[t]*here is no safe level of heavy metals*, so the goal should be to have no measurable levels of any heavy metal in baby and toddler foods."[27] This rings particularly true when considering that generally, babies who are 12 months or younger heavily rely on infant

---

PMCID: PMC6681912. Available at https://stacks.cdc.gov/view/cdc/80511 (last accessed March 18, 2024).

[24] Jaishankar, M., Tseten, T., Anbalagan, N., Mathew, B. B., & Beeregowda, K. N. (2014). *Toxicity, Mechanism and Health Effects of Some Heavy Metals*. Interdisciplinary toxicology, 7(2), 60–72. Available at https://doi.org/10.2478/intox-2014-0009 (last accessed March 18, 2024).

[25] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[26] *Id.*

[27] Consumer Reports, *Congressional Report Finds More Problems With Heavy Metals in Baby Food*, updated Oct. 2021, available at https://www.consumerreports.org/food-safety/problems-with-heavy-metals-in-baby-food-congressional-report-a6400080224/#:~:text=%E2%80%9CThere%20is%20no%20safe%20level,research%20and%20testing%20at%20CR (last accessed March 18, 2024) (emphasis added).

formula as a key source of nutrients and that unless breastmilk is an option, formula is the only food babies younger than five months can eat for their development and growth.

53.    Research continues to confirm that exposures to food containing arsenic, cadmium, and lead cause "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[28]

54.    The FDA and the WHO have declared Heavy Metals "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects."[29]

*Arsenic*

55.    The Infant Formulas contain (or have a material risk of containing) arsenic, which can cause cognitive deficits in children who are exposed early in life, and even neurological problems in adults who were exposed as infants.[30] "[E]ven low levels of arsenic exposure can impact a baby's neurodevelopment."[31] "Studies have shown that consuming products with arsenic over time can lead to impaired brain development, growth problems, breathing problems, and a compromised immune system."[32]

56.    Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage children's central

---

[28] HBBF Report, *supra*, at 1.

[29] Congressional Committee Report, *supra*, at 2.

[30] HBBF Report, *supra*, at 13.

[31] Senators' Letter to the FDA, *supra* (citing Dartmouth Toxic Metals Superfund Research Program (2021), Arsenic and Children, available at https://sites.dartmouth.edu/arsenicandyou/arsenic-and-children/) (last accessed March 18, 2024)).

[32] *Id.*

nervous systems and cognitive development.[33] Exposure to arsenic can also cause diabetes, atherosclerosis, and cardiovascular disease.[34]

57.     Arsenic can cause cancer in humans, as well as diabetes and atherosclerosis, and potentially cardiovascular disease when ingested chronically.[35] Chronic exposure to arsenic has also been associated with dermatological lesions and malignancies.[36]

58.     Moreover, "[t]here is no evidence that the harm caused by arsenic is reversible."[37]

59.     Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and FDA have set limits concerning the allowable limit of arsenic at 10 ppb for human consumption in apple juice (regulated by the FDA) and drinking water (regulated by the EPA as a maximum contaminant level). The FDA has set the maximum allowable arsenic levels in bottled water at 10 ppb of inorganic arsenic.[38]

---

[33] Congressional Committee Report, *supra*, at 10.

[34] States J.C., Singh A.V., Knudsen T.B., Rouchka E.C., Ngalame N.O., Arteel G.E., et al. (2012) *Prenatal Arsenic Exposure Alters Gene Expression in the Adult Liver to a Proinflammatory State Contributing to Accelerated Atherosclerosis*. PLOS ONE 7(6): e38713. Available at https://doi.org/10.1371/journal.pone.0038713 (last accessed March 18, 2024).

[35] *Id*.

[36] Genuis SJ, Schwalfenberg G, Siy A-KJ, Rodushkin I (2012) *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*. PLOS ONE 7(11): e49676. Available at https://doi.org/10.1371/journal.pone.0049676 (last accessed March 18, 2024) ("Toxic Element Contamination of Natural Health Products").

[37] HBBF Report, *supra*, at 3.

[38] Toxic Heavy Metals in Popular Baby Foods, *supra*; *see also* 21 C.F.R. §165.110(b)(4)(iii)(A).

21

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

60.     Although the FDA has not set the action level for arsenic in infant formulas specifically, "the FDA prioritizes monitoring and regulating products that are more likely to be consumed by very young children."[39]

61.     Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed arsenic levels at 7.9 ppb, an amount that is especially concerning considering the amount of infant formula consumed by developing children.

***Cadmium***

62.     The Infant Formulas also contain (or have a material risk of containing) cadmium, which has been shown to cause anemia, liver disease, and nerve or brain damage in animals that eat or drink it.

63.     Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage. Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at exposure levels common among U.S. children[.]"[40]

64.     Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[41] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens, and the EPA has likewise determined

---

[39] NutritionInsight.com, *FDA Studies Reveal Drop in Infant Rice Cereal's Arsenic Levels* (March 9, 2020), available at https://www.nutritioninsight.com/news/fda-studies-reveal-drop-in-infant-rice-cereals-arsenic-levels.html (last accessed March 18, 2024).

[40] HBBF Report, *supra*, at 14.

[41] *Id*.

that cadmium is a probable human carcinogen.[42] Compounding such concerns is the fact that cadmium has a prolonged half-life as it "sequesters in [human] tissue."[43]

65.    The EPA has set a maximum contaminant level for cadmium in drinking water of 5 ppb (*see* 40 C.F.R. §141.62); the FDA has set a maximum level in bottled water to 5 ppb; and the WHO set a maximum cadmium level in drinking water to 3 ppb.[44]

66.    Despite this, laboratory tests indicate that Defendant sold Products containing undisclosed cadmium levels as high as 6.8 ppb.

*Lead*

67.    The Infant Formulas contain (or have a material risk of containing) lead, which is "reasonably anticipated to be [a] human carcinogen []."[45]

68.    Lead exposure can seriously harm the brain and nervous system in infants and children and is associated with a range of negative health outcomes such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

69.    Exposure to lead in foods builds up over time. Build-up can and has been scientifically demonstrated to lead to the development of chronic poisoning, cancer, developmental, and reproductive disorders, as well as serious injuries to the nervous system, and other organs and body systems.

---

[42] CDC, Agency for Toxic Substances and Disease Registry, *Public Health Statement for Cadmium*, available at https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last accessed March 18, 2024).

[43] Toxic Element Contamination of Natural Health Products, *supra*.

[44] Congressional Committee Report, *supra*, at 29.

[45] American Cancer Society, *Known and Probable Carcinogens*, last revised August 14, 2019, available at https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html (last accessed March 18, 2024).

70.     Even very low exposure levels to lead can "cause lower academic achievement, attention deficits and behavior problems. No safe level of exposure has been identified."[46] The FDA, CDC, American Academy of Pediatrics ("AAP"), and the WHO have all stated that there is no safe level of lead.[47]

71.     Lead is extremely toxic, and its effects cannot be reversed or remediated.[48]

72.     One study found that "children age 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food."[49]  Additionally, studies have established a link between lead exposure and ADHD.[50]

73.     Although there is no federal standard for lead in baby food, health experts, including the AAP, the Environmental Defense Fund, and Consumer Reports, have agreed that lead in baby foods should not exceed 1 ppb.[51]

---

[46] HBBF Report, *supra*, at 13.

[47] FDA, *Lead in Food and Foodwares*, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares#:~:text=Although%20no%20safe%20level%20for,blood%20(%C2%B5g%20%2FdL) (last accessed March 18, 2024); CDC, *Health Effects of Lead Exposure*, available at https://www.cdc.gov/nceh/lead/prevention/health-effects.htm (last accessed March 18, 2024); AAP, Lead Exposure in Children, available at https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-children/#:~:text=How%20Much%20Lead%20is%20Safe,Prevention%20recommends%20evaluation%20and%20intervention (last accessed March 18, 2024); WHO, *Lead Poisoning*, available at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health#:~:text=The%20neurological%20and%20behavioural%20effects,and%20learning%20problems%20(1) (last accessed March 18, 2024); *see also* USA Today, *FDA: Recalled Applesauce Pouches Had Elevated Lead Levels and Another Possible Contaminant* (Jan. 5, 2024), available at https://www.usatoday.com/story/money/food/2024/01/05/applesauce-pouch-recall-contamination-spreads/72121869007/ (last accessed March 18, 2024).

[48] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[49] HBBF Report, *supra*, at 7.

[50] Congressional Committee Report, *supra*, at 12.

[51] Toxic Heavy Metals in Popular Baby Foods, *supra*.

74.    Despite this, laboratory tests indicate Defendant sold products containing undisclosed lead levels as high as 6.5 ppb.[52]

75.    The Heavy Metals – arsenic, cadmium, and lead – are significant detriments to children.

76.    The FDA has acknowledged that "exposure to [these heavy] metals are [sic] likely to have the most significant impact on public health."[53]

77.    Importantly, however, and relevant to this lawsuit, the FDA's action levels do not require disclosure of the presence of Heavy Metals on the packaging of products that are placed in the market. Action levels only set limits for determining when products cannot be placed into the market.

78.    The presence of Heavy Metals and/or other undesirable toxins or contaminants in baby foods have been confirmed by investigations and reports by the U.S. Congress, Healthy Babies Bright Futures,[54] Consumer Reports,[55] and Politico,[56] and studies by the FDA,[57] University of Miami, the Clean Label Project, and Ellipse Analytics.[58]

---

[52] HBBF Report, *supra,* at 20, 34.

[53] FDA, *Environmental Contaminants in Food*, available at https://www.fda.gov/food/chemical-contaminants-pesticides/environmental-contaminants-food (last accessed March 18, 2024) ("Environmental Contaminants in Food").

[54] HBBF Report at 12, 20, *supra*.

[55] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[56] Politico, *The FDA's Food Failure* (Apr. 8, 2022), available at https://www.politico.com/interactives/2022/fda-fails-regulate-food-health-safety-hazards/ (last accessed March 18, 2024).

[57] FDA, *FDA Total Diet Study Report, Fiscal Years 2018-2020 Elements Data (July 2022)*, available at https://www.fda.gov/media/159751/download?attachment (last accessed March 18, 2024) ("FDA Total Diet Study").

[58] Gardener, et al., *Lead and Cadmium Contamination In A Large Sample of United States Infant Formulas and Baby Foods*, 651 SCI. TOTAL ENVIRON. 1, 822-827 (2019), available at:

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

79.     Both the Congressional Committee Report, published on February 4, 2021, which acknowledged that Heavy Metals "can endanger infant neurological development,"[59] followed by a second report published on September 29, 2021, revealed alarming levels of Heavy Metals in baby foods.[60] The Congressional Committee Report acknowledged that Heavy Metals—including arsenic, cadmium, and lead—were present in "significant levels" in numerous commercial baby food products.[61]

80.     As such, the knowledge of the risks associated with exposure to Heavy Metals is not a new phenomenon. Defendant knew or should have known the risks associated with the presence of Heavy Metals in foods consumed by infants,[62] and that, over time, these toxins can accumulate and remain in infants' bodies, to their detriment.

81.     Despite the material risk and/or presence of these harmful chemicals, Defendant fails to disclose the presence (or risk) of Heavy Metals in its Products.

---

https://www.sciencedirect.com/science/article/abs/pii/S0048969718334442?via%3Dihub       (last accessed March 18, 2024) ("Lead and Cadmium Contamination in Infant Formulas and Baby Foods").

[59] Laura Reiley, *New Report Finds Toxic Heavy Metals in Popular Baby Foods. FDA Failed to Warn Consumers of Risk*, The Washington Post (Feb. 4, 2021), available at https://www.washingtonpost.com/business/2021/02/04/toxic-metals-baby-food/ (last accessed March 18, 2024) ("Toxic Heavy Metals in Popular Baby Foods").

[60] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[61] Congressional Committee Report, *supra*.

[62] *See*, *e.g.*, *FDA Compliance Program Guidance Manual: Toxic Elements in Food and Foodware, and Radionuclides in Food- Import and Domestic*, available at http://wayback.archive-it.org/7993/20170404233343/https://www.fda.gov/downloads/Food/ComplianceEnforcement/UCM073204.pdf (last accessed March 18, 2024); *see also* 21 CFR §172, available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?CFRPart=172&showFR=1 (last accessed March 18, 2024).

## II.   DEFENDANT FALSELY MARKETED ITS INFANT FORMULAS AS HEALTHY AND MADE WITH NUTRITIOUS INGREDIENTS BY OMITTING ANY MENTION OF HEAVY METALS

82.    Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Infant Formulas throughout the United States, including Minnesota.

83.    Defendant's Infant Formulas are available at numerous retail and online outlets. The Infant Formulas are widely advertised.

84.    On its website, Defendant markets its Infant Formulas as the "#1 Trusted Brand of Pediatricians & Parents," "#1 trusted brand for brain-building nutrition and immune support," and "#1 infant formula brand recommended by pediatricians."[63]

 

85.    On its website, Defendant promises to "[s]upport your baby's development right from the start with brain-building nutrition and MFGM components from the #1 trusted infant formula brand."[64] Defendant represents that "using Enfamil gives you the confidence you've made the right choice for your baby."[65] Defendant boasts and reassures parents of the quality of its products, claiming "we know you've got lots of questions. Relax. We've got you covered. With a

---

[63] https://www.enfamil.com/ (last accessed March 18, 2024).

[64] https://www.enfamil.com/enfamil-neuropro/ (last accessed March 18, 2024).

[65] https://www.enfamil.com/why-enfamil/ (last accessed March 18, 2024).

complete family of brain-building formulas to fuel the wonder of your little one. From everyday nutrition to specialty formulas."[66]

86.     Defendant touts its innovations to its Infant Formula and provides extensive information about the ingredients in its formulas to consumers throughout its website, including on its Frequently Asked Questions ("FAQ") page.[67]

87.     Defendant made the decision to omit any mention of the presence or material risk of Heavy Metals in its Infant Formulas, and to instead package its Infant Formulas as healthy and made with nutritious ingredients even though Defendant had a duty to ensure that the Products' packaging was true and not misleading.

88.     Defendant also had exclusive and/or superior knowledge of the presence or material risk of Heavy Metals in its Infant Formula but chose to not inform consumers.

89.     Defendant intentionally omitted from its packaging any mention of the presence (or material risk) of Heavy Metals in the Infant Formulas in order to induce and mislead reasonable consumers to purchase its Infant Formulas.

90.     With Defendant marketing its Infant Formulas as healthy and made with nutritious ingredients to nourish babies, Defendant clearly recognizes the importance of its Infant Formula to the development of infants.  Indeed, the presence or risk of undisclosed Heavy Metals defeats the purpose of infant formula, which is to nourish babies, a fact touted by Defendant.

91.     As a result of the undisclosed material information on the Infant Formulas' packaging, a reasonable consumer would have no reason to suspect the presence (or material risk)

---

[66]   https://www.enfamil.com/why-enfamil/enfamil-formula-family/ (last accessed March 18, 2024).

[67]   https://www.enfamil.com/help-center/nutrients-ingredients/ (last accessed March 18, 2024).

of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests (which are time consuming and expensive) or reviewing third-party scientific testing of these Products.

## III.   DUE TO THE PRESENCE AND MATERIAL RISK OF HEAVY METALS IN THE INFANT FORMULAS, THE PACKAGING WAS MATERIALLY MISLEADING

92.     At all times during the Relevant Period, Defendant knew or should have known the Infant Formulas contained undisclosed Heavy Metals and were not sufficiently tested for the presence and material risk of Heavy Metals.

93.     Defendant's Infant Formulas contained undisclosed levels of Heavy Metals due to Defendant's failure to monitor for the presence of Heavy Metals in its Products and their ingredients.  Defendant was aware of this risk and failed to disclose it to Plaintiffs and the Class despite having a duty to disclose.

94.     Despite the known risks of exposure to Heavy Metals, Defendant has intentionally, recklessly, and/or knowingly sold the Infant Formulas without disclosing to consumers, like Plaintiffs and the Class, the presence or material risk of Heavy Metals.

95.     Defendant knew or should have known that Heavy Metals pose health risks to infants.

96.     Defendant knew or should have known that it owed consumers a duty of care to prevent or, at the very least, minimize the presence of Heavy Metals in the Infant Formulas to an undetectable level.

97.     Defendant knew or should have known it owed consumers a duty of care to adequately test for Heavy Metals in the Infant Formulas and their ingredients.

98.     Defendant knew consumers purchased the Infant Formulas based on the reasonable expectation that Defendant manufactured the Infant Formulas to the highest standards. In fact, Defendant promised as much – at length – on its website:

> Our products meet or exceed all **infant formula requirements set out by the FDA,** which are among the **most rigorous** in the food industry. Each of our manufacturing facilities adheres to safety guidelines among the **most rigorous in the food industry** and our own **stringent quality standards** so that we can assure the highest quality products. Parents can be assured that our infant formulas are safe and nutritious feeding options for their infants when prepared, stored, and handled according to package directions.
>
> Our infant products undergo **extensive quality and safety checks** throughout the manufacturing process—from raw materials to finished product. A representative number of samples from every batch we produce are tested to ensure the product meets our **stringent quality standards**. Each batch of our products is assured to meet our **high quality and safety standards** as verified by our **proprietary Quality Systems** that exist in every manufacturing facility. We distribute our products only if they pass our **strict testing**. We track the path of every ingredient in our infant and toddler products from its initial supplier through all processing stages until it reaches our consumer.
>
> The [FDA] has very **specific and rigorous manufacturing standards** for infant formulas and toddler drinks that we adhere to. All Mead Johnson formulas are in compliance with all FDA regulations, including Enfamil® NeuroPro™, Enfamil® Enspire™, Enfamil® Gentlease®, and Nutramigen®. Our products meet or exceed all **infant formula requirements set out by the FDA**, which are among the **most rigorous** in the food industry. The amounts of ingredients in Enfamil Infant Formulas are all within required guidelines established to ensure the safety and nutritional quality of infant formulas. **We are committed to the most stringent manufacturing, packaging, and quality assurance procedures**.[68]

(Emphasis supplied.) Based on consumers' expectation that Defendant manufactured the Infant Formulas to the highest standards, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Infant Formulas to the highest standards for preventing the inclusion of Heavy Metals in the Infant Formulas, which would include testing the Products and their ingredients for Heavy Metals.

---

[68] https://www.enfamil.com/why-enfamil/quality-assurance/ (last accessed March 18, 2024).

99.   A recent consumer survey done by Plaintiffs' counsel ("Consumer Survey") demonstrates such an expectation.[69]

| Consumer Survey | Yes | No |
|---|---|---|
| Do you expect a company to test for arsenic, cadmium, lead, and/or mercury in infant formula that will be fed to infants? | 91.1% | 8.9% |
| Would you expect a company to disclose if there were detectable levels, or risk, of arsenic, cadmium, lead, and/or mercury in an infant formula? | 91.3% | 8.7% |

100.   Further, Defendant has recognized consumer concern for the possible presence of Heavy Metals in baby food products and infant formulas. As a member of the Infant Nutrition Council of America ("INCA") through its parent company Reckitt Benckiser Group PLC, Defendant joined two other major manufacturers of infant formula products to lobby against the promulgation of California Assembly Bill 899 ("AB 899") in 2023.[70] As introduced, the original version of AB 899 would have required infant formula manufacturers – like Defendant – to test for Heavy Metals in their products and disclose the testing results on the packaging.[71] INCA vehemently opposed any disclosure of Heavy Metals to consumers, arguing the proposed measure

---

[69] All Consumer Survey respondents were parents 18 and over with children aged anywhere from 0 to 4 years old from a majority of states, including Illinois, California, and Minnesota, and all of whom had purchased infant formula within the past 3 years.

[70] Analysis of AB 899 as amended March 13, 2023, available at https://billtexts.s3.amazonaws.com/ca/ca-analysishttps-leginfo-legislature-ca-gov-faces-billAnalysisClient-xhtml-bill-id-202320240AB899-ca-analysis-357755.pdf (last accessed March 18, 2024) ("Analysis of AB 899").

[71] Id.

would "create confusion"[72] among consumers and "create fear and panic,"[73] and cause them to "mistrust" the manufacturers.[74] Furthermore, INCA has argued that such requirements would cause consumers to change their purchasing behaviors.[75]

101.    Based on the foregoing, reasonable consumers, like Plaintiffs, would consider the inclusion (or material risk of inclusion) of Heavy Metals a material fact when considering what infant formulas to purchase.

102.    Defendant knew that monitoring for Heavy Metals in its Infant Formulas and their ingredients was not only important, but also critical.

103.    Defendant also knew that monitoring Heavy Metals was likewise important to its consumers to protect their babies.

## IV.    INFANT FORMULAS CAN BE MANUFACTURED WITHOUT MEASURABLE LEVELS OF HEAVY METALS

104.    In contrast to the levels of Heavy Metals found in Defendant's Infant Formulas, other infant formula manufacturers have produced formula products that have non-detectable levels of Heavy Metals.

105.    The Clean Label Project tests products for more than 400 contaminants, including heavy metals, chemicals, and plastics, and presents its Purity Award to companies with products with the lowest levels of the contaminants when compared to other products in a given category.[76]

---

[72]  *Id.*; *see also* Analysis of AB 899 as amended April 12, 2023, available at https://trackbill.com/s3/bills/CA/2023/AB/899/analyses/senate-health.pdf (last accessed April 12, 2024) ("Analysis of AB 899 as amended April 12, 2023").

[73] Analysis of AB 899.

[74] *Id.*

[75]  *See* Analysis of AB 899 as amended April 12, 2023, available at https://trackbill.com/s3/bills/CA/2023/AB/899/analyses/senate-health.pdf (last accessed March 18, 2024).

[76] Clean Label Project Purity Award, available at https://cleanlabelproject.org/purity-award/ (last accessed March 18, 2024).

106.    Bobbie, a manufacturer of infant formula (recognized by the Clean Label Project for manufacturing products that were free from detectable levels of Heavy Metals) was a recipient of the Clean Label Project's Purity Award.[77]

107.    Plaintiffs' counsel had Bobbie Organic Infant Formula independently tested and that testing confirmed the presence of Heavy Metals at non-detectable levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Bobbie Organic Infant Formula | < 2.2 | < 1.3 | < 1.0 |

108.    This testing confirms infant formula manufacturers can manufacture infant formulas with Heavy Metals levels that are not measurable.

109.    Additionally, testing by Consumer Reports identified baby food products with Heavy Metal levels low enough to not cause concern, as well as some products with Heavy Metal levels that were not measurable.[78]   "[T]here are ways for [baby food] manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[79]

110.    In testing conducted by Consumer Reports, other products had non-detectable levels of Heavy Metals.[80]  As stated by Dr. James E. Rogers, the Consumer Reports Director of Food Safety Research and Testing, "Every category of food was represented in that lower-risk

---

[77] Business Wire, *Bobbie is First-Ever Infant Formula to Receive the Clean Label Project Purity Award and Certification as a Pesticide-Free Product* (Jan. 25, 2022), available at https://www.businesswire.com/news/home/20220125005905/en/Bobbie-Is-First-Ever-Infant-Formula-To-Receive-The-Clean-Label-Project-Purity-Award-and-Certification-as-a-Pesticide-Free-Product (last accessed March 18, 2024).

[78] Consumer Reports: Heavy Metals in Baby Food, *supra*.

[79] *Id*.

[80] *Id*.

group. That indicates that there are ways for manufacturers to significantly reduce or eliminate these [heavy] metals from their products."[81]

111.    In the FDA Total Diet Study, it was also demonstrated that infant formulas can be manufactured without detectable levels of Heavy Metals.[82]

112.    Moreover, because of public health efforts, exposure to lead has consistently and notably decreased over the past 40 years.[83] These efforts include increasing awareness of the dangers of even low levels of lead exposure to young children.[84] The progress towards decreasing childhood exposure to lead was so impressive that the CDC identified "childhood lead poisoning prevention as 1 of 10 great U.S. public health achievements during 2001 to 2010."[85]

113.    Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas in order to achieve non-detectable or zero levels by adequately monitoring its ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained Heavy Metals.

114.    Defendant also knew it was not adequately monitoring and testing for Heavy Metals in the Infant Formulas and their ingredients. Defendant knew its failure to adequately monitor and test for Heavy Metals in the Infant Formulas and their ingredients continued throughout the Relevant Period.

---

[81] *Id*.

[82] FDA Total Diet Study, *supra*, at 73, 81-82.

[83] Dignam, T., Kaufmann, R. B., LeStourgeon, L., & Brown, M. J. (2019). *Control of Lead Sources in the United States, 1970-2017: Public Health Progress and Current Challenges to Eliminating Lead Exposure*. Journal of Public Health Management and Practice: JPHMP, 25 Suppl 1, Lead Poisoning Prevention (Suppl 1 LEAD POISONING PREVENTION), S13–S22. Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6522252/#R6 (last accessed March 18, 2024).

[84] *Id*.

[85] *Id*.

115.    Defendant's marketing was misleading due to its failure to properly and sufficiently monitor and test for Heavy Metals and/or for its failure to disclose on the packaging of the Products the presence (or material risk) of Heavy Metals in the Infant Formulas.

116.    Defendant knew or should have known consumers paid a price premium for its Products and expected Defendant to test and monitor for Heavy Metals and disclose on the packaging of the Products the presence or material risk of Heavy Metals in the Infant Formulas and their ingredients.

117.    At all times during the Relevant Period, Defendant did not monitor or test for Heavy Metals in the Infant Formulas and their ingredients and Defendant did not disclose on the packaging of the Products the presence or material risk of Heavy Metals.

118.    Defendant knew or should have known that consumers reasonably expected it to test for and monitor the presence of Heavy Metals in the Infant Formulas and their ingredients, and to disclose the presence or material risk of any levels of Heavy Metals in its Products.

119.    Defendant knew or should have known the Infant Formulas contained or risked containing Heavy Metals that were inconsistent with its marketing.

120.    Defendant knew or should have known that, in order to comply with its marketing, consumers expected it to ensure the Infant Formulas and their ingredients were monitored and tested for Heavy Metals, and to disclose the presence (or material risk) of Heavy Metals.

121.    Defendant knew, yet failed to disclose, its lack of adequate testing and/or knowledge of the risk or presence of Heavy Metals in the Infant Formulas' and their ingredients.

122.    Defendant's Omissions are false, misleading, and crafted to deceive the public as they create an image that the Infant Formulas are nutritious and safe from the risk or presence of

Heavy Metals.  The presence or risk of Heavy Metals defeats the purpose of the Infant Formulas, which is nutrition for infants.

123.    Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt Defendant's statements regarding the quality of the Products.  Defendant's nondisclosure and/or concealment of the presence (or risk) of Heavy Metals in the Infant Formulas alleged herein intended to and did, in fact, cause consumers like Plaintiffs and the Class members, to purchase Products they would not have if the true quality of the Products and their ingredients were disclosed.

## V.    DEFENDANT'S PACKAGING MISLED REASONABLE CONSUMERS BASED ON THE MATERIAL OMISSIONS

124.    Defendant's packaging communications misled and deceived reasonable consumers because Defendant actively and knowingly concealed and failed to disclose that the Infant Formulas contained (or had a material risk of containing) Heavy Metals, while representing nutritious quality and characteristics.

125.    Based on the impression given by the packaging communications and Omissions, no reasonable consumer could expect or understand that the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

126.    The Infant Formula packaging communications include, but are not limited to:



(a)    Enfamil® A.R.: "BRAIN BUILDING," "expert-recommended," "#1 ADDED RICE starch formula," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "Calcium for strong bones," and "Vitamin C for immune support."



(b)    Enfamil® Enspire Gentlease: "with LACTOFERRIN a key protein also found in BREAST MILK & COLOSTRUM," "BRAIN BUILDING," "IMMUNE HEALTH supported by LACTOFERRIN," and "Naturally occurring MFGM components."



(c)    Enfamil® Gentlease: "BRAIN BUILDING," "expert-recommended," and "#1 RECOMMENDED BRAND BY PEDIATRICIANS."

 

(d)    Enfamil® NeuroPro: "EXCLUSIVE HuMO6 IMMUNE BLEND," "BRAIN BUILDING," "expert-recommended," "inspired by BREAST MILK," "supports IMMUNE HEALTH," "naturally-occurring MFGM components," "#1 RECOMMENDED BRAND BY PEDIATRICIANS," and "Beta Carotene & DHA for baby's eye health" .

 

(e)    Enfamil® NeuroPro Sensitive: "BRAIN BUILDING," "expert-recommended," "HMO for IMMUNE SUPPOR," "NON-GMO No Artificial Growth Hormones," and "#1 RECOMMENDED BRAND BY PEDIATRICIANS."

  

(f)    Enfamil® Nutramigen: "BRAIN BUILDING," "#1 RECOMMENDED BRAND BY PEDIATRICIANS" (front and back), "THE ONLY HYPOALLERGIC FORMULA WITH LGG® PROBIOTIC" (front and back), "NO ARTIFICIAL GROWTH HORMONES," and "LGG® probiotic to help support digestive health."

  

(g)     Enfamil® ProSobee: "No artificial colors, flavors or sweeteners" (front), "BRAIN BUILDING," "expert-recommended," "IMMUNE HEALTH Vitamins A, C, E & Selenium" (front), "#1 RECOMMENDED BRAND BY PEDIATRICIANS," "NO ARTIFICAL colors, flavors or sweeteners" (back), and "vitamins A, C & E for IMMUNE SUPPORT" (back).



127.    Based on Defendant's Omissions from these communications on the Products' packaging, no reasonable consumer could expect or understand that the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

128.    The Omissions wrongfully convey to consumers that Defendant's Infant Formulas have certain nutritious quality and characteristics that they do not actually possess.

129.    For instance, although Defendant misleadingly causes consumers to believe its Infant Formulas do not contain Heavy Metals due to the material Omissions, the Infant Formulas do in fact contain undisclosed Heavy Metals, which is material information to reasonable consumers.

130.    Plaintiffs' counsel had seven of Defendant's Infant Formulas tested and that testing confirmed the presence of undisclosed Heavy Metals at the following levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil® A.R. | 3.4 | 3.2 | 1.2 |
| Enfamil® Gentlease | 3.7 | 2.6 | 1.7 |
| Enfamil® Enspire Gentlease | 5.0 | 2.3 | < 1.0 |
| Enfamil® NeuroPro | < 2.2 | 2.0 | < 1.0 |
| Enfamil® NeuroPro Sensitive | 5.1 | < 1.3 | 2.3 |
| Enfamil® Nutramigen | 7.9 | 4.6 | 6.5 |
| Enfamil® ProSobee | 6.7 | 6.8 | 3.5 |

131.    Independent testing also confirmed Heavy Metals in two of Defendant's Products:[86]

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee Soy Infant Formula | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

---

[86] HBBF Report, *supra*, at 20.

132.    Regardless of the levels found, the testing shows detectable presence of Heavy Metals when, as stated herein, no level of Heavy Metals is safe.[87]

133.    Based on the Omissions, a reasonable consumer would not expect the presence of Heavy Metals, nor would a reasonable consumer be able to detect the presence of Heavy Metals in the Infant Formulas without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

134.    In fact, the FDA recently requested $1.2 billion from the U.S. Congress for its Foods Program for initiatives such as reduction of heavy metals in foods for infants and young children.[88] A portion of the funding would be for educational outreach about heavy metals in foods.[89]

135.    Reasonable consumers must and do rely on Defendant to honestly report what its Infant Formulas contain.

136.    Plaintiffs relied on the Products' packaging when making her purchasing decisions.

137.    Plaintiffs' expectations and reliance are consistent with reasonable consumers as shown by the Consumer Survey recently done by Plaintiffs' counsel:

| Consumer Survey | No | Yes |
|---|---|---|
| After seeing the label would you expect arsenic, cadmium, lead, and/or mercury in the infant formula? | 77.8% | 22.2% |

---

[87] Some Baby Food May Contain Toxic Metals, *supra*.

[88] Department of Health and Human Services Fiscal Year 2023: *Food and Drug Administration, Justification of Estimates for Appropriations Committees*, available at https://www.fda.gov/media/157192/download?attachment (last accessed March 18, 2024).

[89] *Id*.

| Consumer Survey | Very important | Important | Not at all important |
|---|---|---|---|
| Please select how important, if at all, would it be to your purchasing decision if the infant formula you purchased contained, or risked containing, even a small amount of arsenic, cadmium, lead, and/or mercury. | 71.0% | 25.4% | 3.6% |

138.    In light of Defendant's communications regarding the quality of the Infant Formulas and its commitment to innovative formulas and nutritious ingredients, Defendant knew or should have known the Infant Formulas or their ingredients contained or risked containing Heavy Metals.

139.    Defendant had a duty to ensure the Infant Formulas were not deceptively, misleadingly, unfairly, and/or falsely marketed and all material information was properly and fully disclosed.  For example, as the FDA recently stated in connection with the recall of applesauce due to the presence of lead, "Companies have the responsibility to take steps to assure that the products they manufacture are not contaminated with unsafe levels of heavy metals."[90] Notably, the FDA acknowledges that there is "no known safe level of exposure to lead."[91]

---

[90] Christina Jewett and Will Fitzgibbon, *Lead-Tainted Applesauce Sailed Through Gaps in Food-Safety System*, N.Y. Times, Feb. 27, 2024, available at https://www.nytimes.com/2024/02/27/world/europe/lead-applesauce-food-safety.html?smid=nytcore-ios-share&referringSource=articleShare (last accessed Mar. 18, 2024).

[91] Lead in Food and Foodwares, FDA, March 6, 2024, available at https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares#:~:text=Although%20no%20safe%20level%20for,blood%20(%C2%B5g%20%2FdL) (last accessed March 18, 2024).

140.    Defendant acted knowingly, recklessly, and/or intentionally with its deceptive packaging based on the material Omissions.

141.    Defendant knew that properly and sufficiently monitoring for Heavy Metals in the Products and their ingredients was not only important, but also critical.

142.    Additionally, Defendant knew or should have been aware that a reasonable consumer would be feeding the Infant Formula multiple times each day to his or her baby, making it a significant source of food and nutrition for the child.   This leads to an infant's repeated exposure to the Heavy Metals, which defeats the purpose of infant formula, *i.e.*, to provide nourishment to infants.

143.    Finally, Defendant knew or should have known it could control the levels of Heavy Metals in the Infant Formulas by properly monitoring their ingredients for Heavy Metals and adjusting any formulation to reduce ingredients that contained or risked containing Heavy Metals.

144.    The Omissions are material and reasonably likely to deceive reasonable consumers, such as Plaintiffs, in their purchasing decisions.   This is true especially considering the long-standing campaign by Defendant to market the Infant Formulas as healthy and made with nutritious ingredients, and to induce consumers, such as Plaintiffs, to purchase the Products.

145.    The Omissions make the Infant Formulas' packaging deceptive.   Reasonable consumers, like Plaintiffs, would consider the facts that Infant Formula contained (or had a material risk of containing) Heavy Metals when considering what infant formula to purchase.

146.    At all times during and throughout the Relevant Period, Defendant knew it was not following proper manufacturing standards and not sufficiently and consistently monitoring or testing the Infant Formulas or their ingredients for Heavy Metals.

147.    Defendant's packaging was misleading due to Defendant's failure to disclose the true quality of the Infant Formulas based on its improper manufacturing processes and the presence or material risk of the presence of Heavy Metals.

148.    Defendant knew or should have known the Infant Formulas contained or risked containing undisclosed levels of Heavy Metals that were inconsistent with Defendant's packaging.

149.    Defendant knew or should have known that reasonable consumers expected it to have strong and adequate manufacturing processes and ensure the Infant Formulas and their ingredients were monitored and tested for Heavy Metals to ensure compliance with Defendant's packaging.

150.    Defendant knew or should have known consumers paid premium prices because the Omissions were not disclosed.

151.    The Omissions are material and render the Infant Formulas' packaging deceptive as without full disclosure, reasonable consumers believe the Infant Formulas are high quality, healthy, and nutritious products.

152.    Moreover, reasonable consumers, such as Plaintiffs and the Class members, would have no reason to doubt or question Defendant's statements regarding the quality of the Infant Formulas.  Based on the impression given by the packaging, no reasonable consumer could expect or understand the Infant Formula contained (or had a material risk of containing) Heavy Metals.

153.    The Omissions were intended to and did, in fact, cause consumers like Plaintiffs and the members of the Class to purchase products they would not have if the true quality of the Products and their ingredients were disclosed or for which they would not have paid a premium price.

154.    As a result of Defendant's deceptive packaging of the Infant Formulas, Defendant was able to generate substantial sales, which allowed Defendant to capitalize on, and reap enormous profits from, consumers who paid the purchase price or premium for the Infant Formulas that were not as advertised.

**PLAINTIFFS' RELIANCE WAS REASONABLE**
**AND FORESEEN BY DEFENDANT**

155.    Plaintiffs read and relied upon the packaging of the Infant Formulas when making their purchasing decisions. Had they known Defendant omitted and failed to disclose the Infant Formula contained (or had a material risk of containing) Heavy Metals, they would not have purchased the Infant Formulas.

156.    A reasonable consumer would consider the packaging of a product when deciding whether to purchase it.

**DEFENDANT'S KNOWLEDGE AND**
**NOTICE OF ITS BREACH OF ITS IMPLIED WARRANTIES**

157.    Defendant had sufficient notice of its breach of implied warranties.  Defendant has, and had, exclusive knowledge of manufacturing processes, quality control policies, the physical and chemical make-up of the Infant Formulas, and whether the Products and their ingredients contained Heavy Metals.

158.    In 2017 and 2019, the Clean Label Project published results and findings from an investigation of heavy metals in baby and toddler food products, including infant formula. The findings showed the presence of Heavy Metals in Defendant's Infant Formulas. In response to the

Clean Label Project's study, Defendant stated that it "specifically monitors the presence of many materials, including arsenic, cadmium, [and] lead . . . to ensure 'safety and high quality.'"[92]

159.    Moreover, Defendant was put on notice by February and September of 2021, when Congress publicly released findings regarding the presence of Heavy Metals in baby foods.[93] The FDA has also released a study showing the presence of Heavy Metals in baby foods, including infant formulas.[94]

160.    Defendant was likewise given notice through its membership in INCA, for example, through INCA's lobbying efforts in opposition to AB 899 that would have required infant formula manufacturers to test for and disclose levels of Heavy Metals.[95]

161.    Similarly, Defendant was made aware that it failed to implement or maintain proper manufacturing and quality control measures for detecting and controlling the presence of adulterating substances through the FDA's investigations from 2017 to 2023 and the multiple recalls by Defendant in 2023 alone due to bacterial contamination of its formula products.

162.    Defendant has not changed its packaging to include any disclaimer on the Omissions.

---

[92] USA Today, *These Baby Foods and Formulas Tested Positive for Arsenic, Lead, and BPA in New Study* (Oct. 25, 2017), available at https://www.usatoday.com/story/news/nation-now/2017/10/25/these-baby-foods-and-formulas-tested-positive-arsenic-lead-and-bpa-new-study/794291001/ (last accessed March 18, 2024).

[93] Congressional Committee Report, *supra*; Second Congressional Committee Report, *supra*.

[94] FDA Total Diet Study, *supra*, at 73, 81-82.

[95] Analysis of AB 899, *supra*.

## PRIVITY EXISTS WITH PLAINTIFFS AND THE PROPOSED CLASS

163.    Defendant knew that reasonable consumers such as Plaintiffs and the proposed Class members would be the end purchasers of the Infant Formulas and the targets of its advertising, marketing, packaging, and statements.

164.    Defendant intended that the packaging and implied warranties would be considered by the end purchasers of the Infant Formulas, including Plaintiffs and the proposed Class members.

165.    Defendant directly marketed to Plaintiffs and the proposed Class through its packaging.

166.    Plaintiffs and the proposed Class members are the intended beneficiaries of the implied warranties.

## APPLICABILITY OF EQUITABLE TOLLING AND THE DISCOVERY RULE TO THE STATUTE OF LIMITATIONS

167.    Fraudulent concealment and/or the discovery rule toll Plaintiffs' claims.

168.    The statute of limitations is tolled for all of Plaintiffs' statutory consumer protection and common law claims due to Defendant's fraudulent concealment of facts that the Infant Formulas contained (or had a material risk of containing) Heavy Metals. Defendant intentionally concealed these material facts from Plaintiffs.

169.    Defendant knew the Omissions were a material consideration for any parent buying infant formulas.

170.    Defendant violated the relevant state consumer fraud acts by deceiving customers as to the true nature, quality, and makeup of the Infant Formulas.

171.    Based on Defendant concealing material facts from Plaintiffs, Plaintiffs could not reasonably discover that the Infant Formula contained (or had a material risk of containing) Heavy Metals.

172.     Plaintiffs did not know that the Infant Formula contained (or had a material risk of containing) Heavy Metals. Instead, Defendant only represented that the Infant Formulas were healthy, nutritious, and made of high-quality ingredients to support growing infants.

## CLASS ACTION ALLEGATIONS

173.     Plaintiffs bring this action individually and on behalf of the following Class:

> All persons who are residents of Minnesota who, from May 1, 2018, to the present, purchased the Infant Formulas in Minnesota for household use, and not for resale (the "Class").

174.     Excluded from the Class are the Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

175.     This action is brought and may be properly maintained as a class action.  There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

176.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harm are involved.  Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

177.     The requirements for class certification have been met pursuant to Rule 23.01 of the Minnesota Rules of Civil Procedure as follows:

(a)     the Class is so numerous that joinder of all members is impracticable and the disposition of the claims of the members of all Class in a single action will provide substantial benefits to the parties and Court;

(b)     Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, including:

1)      whether Defendant owed a duty of care;

2)      whether Defendant owed a duty to disclose;

3)      whether Defendant knew or should have known that the Infant Formulas and their ingredients contained or risked containing Heavy Metals;

4)      whether Defendant failed to disclose the Omissions;

5)      whether the claims of the Plaintiffs and the Class serve a public benefit;

6)      whether Defendant's packaging is false, deceptive, and misleading based on the Omissions;

7)      whether the Omissions are material to a reasonable consumer;

8)      whether the Omissions are likely to deceive a reasonable consumer;

9)      whether Defendant had knowledge that the Omissions were material and false, deceptive, and/or misleading;

10)     whether Defendant breached its duty of care;

11)     whether Defendant breached its duty to disclose;

12)     whether Defendant violated the laws of the State of Minnesota;

13)     whether Defendant breached its implied warranties;

14)     whether Defendant engaged in unfair trade practices;

15)     whether Defendant engaged in false advertising;

16)     whether Defendant made fraudulent omissions;

17)      whether Plaintiffs and Class members' claims are tolled based on Defendant's fraudulent concealment;

18)      whether Plaintiffs and members of the Class are entitled to actual and statutory damages; and

19)      whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief.

(c) Plaintiffs' claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

(d) Plaintiffs will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

(e) Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

178.     As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Minnesota Unlawful Trade Practices Act, Minn. Stat. §325D.13, *et seq*.,**
**Against Defendant on Behalf of Plaintiffs and the Class**

179.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

180.     Defendant is a "person" within the meaning of the Minnesota Unlawful Trade Practices Act ("MUTPA").

181.     Defendant violated the MUTPA by knowingly failing to disclose the Omissions.

182.    Defendant knew or should have known the Infant Formulas and their ingredients were not of the true quality advertised because they contained (or had a material risk of containing) Heavy Metals.

183.    Defendant's pattern of knowing concealment, Omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Class with respect to the Infant Formulas' quality, nature of the ingredients, and suitability for consumption by infants with no development or health risks.

184.    Defendant intended for Plaintiffs and the Class to rely on its Omissions, concealment, implied warranties, and/or deceptions regarding the Infant Formulas' quality, nature of the ingredients, and suitability for consumption.

185.    Defendant's conduct and Omissions described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

186.    Defendant was under a duty to disclose the Omissions because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

187.    Defendant failed to discharge its duty to disclose the Omissions.

188.    The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiffs, the Class, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiffs and the Class known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

189.    Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

190.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

191.     Plaintiffs and the members of the Class would not have purchased the Infant Formulas at all had they known that Infant Formulas do not conform to the packaging.

192.     Pursuant to Minn. Stat. §8.31, subd. 3a, and §325D.15, Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUTPA.

## COUNT II
### Violations of Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.44, *et seq*., Against Defendant on Behalf of Plaintiffs and the Class

193.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

194.     Defendant is a "person" within the meaning of the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA").

195.     Defendant willingly engaged in deceptive trade practices, in violation of the MUDTPA, by failing to disclose the Omissions.

196.     Defendant knew or should have known the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

197.     Defendant's Omissions, concealment, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Class with respect to the Infant Formulas' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

198.   Defendant intended that Plaintiffs and the Class would rely on Defendant's Omissions, concealment, implied warranties, and/or deceptions regarding the Infant Formulas' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

199.   Defendant's conduct and Omissions described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

200.   The facts concealed or not disclosed by Defendant were material facts in that Plaintiffs, the Class, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiffs and the Class known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas.

201.   Defendant intended that Plaintiffs and the Class would rely on Defendant's Omissions, concealment, and other deceptive conduct when purchasing the Infant Formulas, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

202.   Defendant's unlawful conduct is continuing, with no indication it intends to cease this fraudulent course of conduct.

203.   Defendant was under a duty to disclose the Omissions because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

204.   Defendant failed to discharge its duty to disclose the Omissions about the Infant Formulas.

205.   As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

206.     Plaintiffs and the members of the Class would not have purchased the Infant Formulas at all had they known of the Omissions.

207.     Pursuant to Minn. Stat. §8.31, subd. 3a, and §325D.45, Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' violations of the MUDTPA.

### COUNT III
**Violations of Minnesota False Statement in Advertising Act, Minn. Stat. §325F.67, *et seq*., Against Defendant on Behalf of Plaintiffs and the Class**

208.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

209.     Plaintiffs and the Class purchased "goods," specifically the Infant Formulas discussed herein, and are a "person" within the meaning of the False Statement in Advertising Act ("FSAA").

210.     Plaintiffs and the Class purchased the Infant Formulas because of the Omissions asserted on the packaging that were made, published, disseminated, circulated, and placed before the public by Defendant.

211.     By engaging in the conduct as described herein, Defendant continues to violate Minn. Stat. §325F.67.

212.     Defendant's Omissions and use of other deceptive business practices include, by way of example, representations that the Infant Formulas were healthy, made from nutritious ingredients, and safe for consumption by infants with no development or health risks.

213.     Defendant knew or should have known the Infant Formulas did not have the quality described above because they included undisclosed (or material risk of) Heavy Metals.

214.     The Omissions were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Class with respect to the Infant Formulas' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption by infants with no development or health risks.

215.     Defendant's conduct and Omissions described herein occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

216.     The Omissions were made to customers in Minnesota, including Plaintiffs and the Class, thus the cause of action serves the public benefit of informing Minnesota consumers that the Products contained (or had a material risk of containing) Heavy Metals.

217.     The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiffs, the Class, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas.  Had Plaintiffs and the Class known the Infant Formulas did not have the quality as advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

218.     Defendant intended that Plaintiffs and the Class would rely on the deception by purchasing the Infant Formulas, unaware of the Omissions and other undisclosed material facts. This conduct constitutes consumer fraud.

219.     Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

220.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

221.     Plaintiffs and the members of the Class would not have purchased the Infant Formulas at all had they known of the presence or material risk of these Heavy Metals.

222.     Pursuant to Minn. Stat. §8.31, subd. 3a, and §325F.67, Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the FSAA.

<u>**COUNT IV**</u>
**Violations of Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §325F.69, et. seq.,**
**Against Defendant on Behalf of Plaintiffs and the Class**

223.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

224.     Plaintiffs at all times relevant hereto were citizens of the State of Minnesota.

225.     Defendant is a "person" within the meaning of the Minnesota Prevention of Consumer Fraud Act ("MPCFA").

226.     The Omissions were made in connection with the sale of the Infant Formulas to Plaintiffs and the Class.

227.     Defendant knowingly acted, used, and employed fraud, false pretenses, and deceptive practices in connection with the sale of the Infant Formulas.  Specifically, Defendant failed to disclose the Infant Formulas contained levels or material risk of Heavy Metals.

228.     Defendant knew or should have known the Infant Formulas did not have the quality reasonable consumers expected because they included undisclosed (or the material risk of) Heavy

Metals that do not conform to the packaging. Defendant intended for Plaintiffs and the Class to rely on the Infant Formulas' packaging in deciding whether to purchase the Infant Formulas.

229.    Defendant's unfair or deceptive acts or practices were likely to deceive reasonable consumers about the Infant Formulas' quality, nature of the ingredients, consumption by infants with no development or health risks, and, by extension, the true value of the Infant Formulas. Plaintiffs and the Class relied on, and were in fact deceived by, Defendant's Omissions with respect to the Infant Formulas' quality, nature of the ingredients, and fitness for consumption in deciding to purchase them over competitors' infant formulas.

230.    The facts concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiffs, the Class, and any reasonable consumer would have considered them in deciding whether to purchase the Infant Formulas. Had Plaintiffs and the Class known the Infant Formulas did not have the quality advertised by Defendant, they would not have purchased the Infant Formulas or paid the premium price.

231.    Defendant's Omissions were made to customers in Minnesota, including Plaintiffs and the Class, thus the cause of action serves the public benefit of informing Minnesota consumers that the Products contained (or had a material risk of containing) Heavy Metals.

232.    Defendant's unlawful conduct is continuing, with no indication that it intends to cease this fraudulent course of conduct.

233.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

234.    Plaintiffs and the members of the Class would not have purchased the Infant Formulas at all had they known of the presence of these Heavy Metals.

235.    Pursuant to Minn. Stat. §8.31, subd. 3a, and §325F.69, Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MPCFA.

**COUNT V**
**Breach of Implied Warranty of Merchantability, Minn. Stat. § 336.2-314,**
**Against Defendant on Behalf of Plaintiffs and the Class**

236.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

237.    Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Class.

238.    There was a sale of goods from Defendant to Plaintiffs and the members of the Class.

239.    At all times mentioned herein, Defendant manufactured and sold the Infant Formulas and, prior to the time the Infant Formulas were purchased by Plaintiffs and the Class, impliedly warranted that the Infant Formulas were of merchantable quality and fit for their ordinary use (consumption by infants with no development or health risks).

240.    Plaintiffs and the Class relied on these implied warranties when they purchased the Infant Formulas.

241.    The Infant Formulas were not fit for their ordinary use (consumption by infants with no development or health risks) as they contained (or had a material risk of containing) Heavy Metals that do not conform to the packaging.

242.    These promises became part of the basis of the bargain between Defendant and Plaintiffs and members of the Class, and thus constituted implied warranties.

243.    Defendant breached the implied warranties by selling Infant Formulas that contain (or risk containing) Heavy Metals.

244.    Defendant was on notice of this breach as it was aware of the inclusion (or risk) of Heavy Metals.

245.    Privity exists because Defendant impliedly warranted to Plaintiffs and the members of the Class through the Products' packaging, that the Infant Formulas were healthy, nutritious, and safe for consumption.; however, Defendant failed to mention or disclose the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

246.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

247.    On January 26, 2024, Dominique Lopez sent Defendant a letter on behalf of herself and all other United States citizens, who purchased the Infant Formulas notifying Defendant of its breaches of warranty and demanding that Defendant rectify the problems stated herein before filing her complaint in the district court in Northern District of Illinois, which Plaintiff Seutter joined.[96] Defendant received sufficient notice in advance before filing of this case through the pre-suit letter and through the pleading but has failed to rectify or agree to rectify the problems associated with the actions detailed above.

---

[96] *See Complaint, Lopez et al. v. Mead Johnson Nutrition Co. et al., No. 1:24-cv-00691 (N.D. Ill. Jan. 26, 2024)*

248.     Plaintiffs, on behalf of themselves and the Class, seeks actual damages for Defendant's failure to deliver goods that conform to their implied warranties and resulting breach.

## <u>COUNT VI</u>
### Fraud by Omission against Defendant on Behalf of Plaintiffs and the Class

249.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

250.     Defendant knew or should have known the Infant Formulas were contained (or had a material risk of containing) Heavy Metals.

251.     Plaintiffs and the Class and Defendant acted within the context of a business transaction when Plaintiffs and the Class purchased Defendant's Infant Formulas for household or business use, and not for resale.

252.     Plaintiffs and the Class were ordinary non-business consumers.

253.     Defendant actively and knowingly concealed from and failed to disclose to Plaintiffs and the Class that the Infant Formulas contained  (or had a material risk of containing) Heavy Metals that do not conform to the Products' packaging.

254.     As an infant formula manufacturer, Defendant is in a special position of trust upon which consumers rely.

255.     Defendant was under a duty to disclose to Plaintiffs and the Class the true quality, characteristics, nature of the ingredients, and suitability of the Infant Formulas because:

(a)     Defendant was in a superior position to know the true state of facts about its Products;

(b)     Defendant was in a superior position to know the nature of the ingredients, characteristics and suitability of the Infant Formulas for consumption by infants with no development or health risks; and

(c)     Defendant knew that Plaintiffs and the Class could not reasonably have been expected to learn about the Omissions without Defendant disclosing it on the Infant Formulas' packaging.

256.    Defendant knows its customers trust the quality of its products and expect Defendant's Infant Formulas to be free of the risk or presence of Heavy Metals. Defendant also knows that consumers seek out and wish to purchase infant formulas that possess high quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas that they believe possess these qualities.

257.    Due to the Omissions on the Infant Formulas' packaging, Defendant had a duty to disclose the whole truth that the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

258.    Defendant acted in bad faith when it intended that Plaintiffs and the Class would rely on the Omissions when purchasing the Infant Formulas, unaware of the undisclosed material facts.

259.    Defendant was under a duty to disclose the Omissions because Defendant undertook the disclosure of information about the Infant Formulas on the Infant Formulas' packaging.

260.    Defendant failed to discharge its duty to disclose the Omissions.

261.    Defendant allowed the Omissions on the Products' packaging to intentionally mislead consumers, such as Plaintiffs and the Class.

262.    The facts concealed, omitted, or not disclosed by Defendant to Plaintiffs and the Class are material in that a reasonable consumer would have considered the Omissions material when deciding whether to purchase the Infant Formulas.

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

263.    Defendant knew or should have known the Omissions were material to Plaintiffs and the Class's decisions to purchase the Infant Formulas and would induce Plaintiffs and the Class to purchase the Infant Formulas.

264.    Defendant intentionally concealed its improper manufacturing conditions and the presence or material risk of Heavy Metals in the Infant Formulas with the intent to defraud and deceive Plaintiffs and the Class.

265.    Plaintiffs and the Class justifiably relied on Defendant's Omissions to their detriment. The detriment is evident from the true quality, characteristics, and nature of the ingredients of the Infant Formulas, which is misleading when compared to the Infant Formulas' packaging and represented by Defendant and inherently unfair to consumers of the Infant Formulas, such as Plaintiffs and the Class.

266.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

267.    Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT VII
### Fraudulent Misrepresentation by Omission against Defendant
### on Behalf of Plaintiffs and the Class

268.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

269.    Plaintiffs and members of the Class were buyers and Defendant was a seller in a commercial exchange.

270.    Plaintiffs and the Class were ordinary non-business consumers who trusted Defendant to manufacture, distribute, market, and sell Infant Formulas that did not contain (or have a material risk of containing) Heavy Metals.

271.    As an infant formula manufacturer, Defendant is in a special position of trust upon which consumers rely.

272.    Defendant knowingly and actively concealed the Omissions from Plaintiffs and the Class.

273.    Defendant intentionally, knowingly, and/or recklessly made these Omissions to induce Plaintiffs and the Class to purchase the Infant Formulas.

274.    Defendant knew or should have known the Infant Formulas contained (or had a material risk of containing) Heavy Metals.

275.    Defendant allowed its packaging to intentionally mislead consumers, such as Plaintiffs and the Class.

276.    Defendant's packaging did not disclose the Omissions with the intent to deceive and defraud consumers, such as Plaintiffs and the Class.

277.    Defendant intended for Plaintiffs and the Class to rely on the Omissions. Defendant knows its customers trust the quality of its Products and that it is in a special position of trust with the public.

278.    Defendant knows reasonable consumers expected the Infant Formulas to not contain (or have a material risk of containing) Heavy Metals.

279.     Defendant also knows that reasonable consumers seek out and wish to purchase infant formulas that possess high quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay for infant formulas they believe possess these qualities.

280.     Defendant knew that Plaintiffs and the Class were ignorant of the Omissions.

281.     Defendant knew that Plaintiffs and the Class could not reasonably have been expected to learn or discover the Omissions.

282.     Defendant was under a duty to disclose the Omissions regarding its Infant Formulas to Plaintiffs and the Class because:

(a)     Defendant was in possession of special facts that could not have been discovered by Plaintiffs and the Class.

(b)     Defendant's packaging was misleading to consumers by failing to disclose the Omissions.

(c)     Based on Defendant's partial statements on the Infant Formulas' packaging that gave a misleading impression to reasonable consumers without further information about the Omissions, Defendant assumed the obligation to make a full and fair disclosure of the whole truth.

283.     The Omissions were material facts to Plaintiffs and the Class, as Plaintiffs and the Class relied on the Omissions when purchasing the Infant Formulas.

284.     Plaintiffs and the Class had a right to rely on Defendant's packaging as the truth because customers like Plaintiffs and the Class trust the quality of Defendant's Products and they expect the Infant Formulas do not contain (or have a material risk of containing) Heavy Metals.

285.     Plaintiffs and the Class did in fact rely on the material Omissions and purchased the Infant Formulas to their detriment. Given the materiality of the Omissions, Plaintiffs and the Class's reliance on the Omissions was justifiable.

286.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered actual pecuniary damages by: (1) paying a premium price for Products they reasonably believed did not contain (or have a material risk of containing) Heavy Metals; (2) purchasing Products they would not have purchased had Defendant's Omissions been disclosed; and/or (3) receiving Products that were worthless because they contained or risked containing Heavy Metals.

287.     Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT VIII

### Unjust Enrichment Against Defendant on Behalf of Plaintiffs and the Class

288.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

289.     Substantial benefits have been conferred on Defendant by Plaintiffs and the Class through the purchase of the Infant Formulas. Defendant knowingly and willingly accepted and enjoyed these benefits.

290.     Defendant either knew or should have known that the payments rendered by Plaintiffs and the Class were given and received with the expectation that the Infant Formulas would not contain (or have a material risk of containing) Heavy Metals. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

291.     Defendant was obligated to disclose the Omissions in the Infant Formulas because (1) it had exclusive knowledge they contained (or had a material risk of containing) Heavy Metals; (2) the Omissions were not known or reasonably accessible to Plaintiffs and the Class; (3) Defendant actively concealed the Omissions; and (4) Defendant made partial statements on the

Infant Formulas' packaging that gave a misleading impression to Plaintiffs and the Class and reasonable consumers without further information because the Omissions were not disclosed.

292.    Defendant's acceptance and retention of the benefits of the payments from Plaintiffs and the Class under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiffs and the Class.

293.    Plaintiffs and the Class are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

294.    Plaintiffs and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

1. An order declaring this action to be a proper class action pursuant to Minnesota Rule of Civil Procedure 23, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

2. An order enjoining Defendant from selling the Infant Formulas until the Heavy Metals are at a non-detectable level;

3. An order enjoining Defendant from selling the Infant Formulas until the Omissions are disclosed;

4. An order enjoining Defendant from selling the Infant Formulas in any manner suggesting or implying that they are healthy and made from nutritious ingredients;

5. An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief;

6. An order awarding declaratory relief, and any further injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's conduct;

7. An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the state laws, plus pre- and post-judgment interest thereon;

8. An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

9. An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

10. An order awarding attorneys' fees and costs to Plaintiffs and the Class; and

11. An order providing for all other such equitable relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  May 3, 2024

**GUSTAFSON GLUEK PLLC**

By: */s/ Catherine K. Smith*
CATHERINE SUNG-YUN K. SMITH
DANIEL E. GUSTAFSON
SHASHI K. GOWDA
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: csmith@gustafsongluek.com
        dgustafson@gustafsongluek.com
        sgowda@gustafsongluek.com


LOCKRIDGE GRINDAL NAUEN PLLP
ROBERT K. SHELQUIST
REBECCA A. PETERSON
KRISTA K. FREIER
CATHERINE A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail:  rkshelquist@locklaw.com
        rapeterson@locklaw.com
        kkfreier@locklaw.com
        capeterson@locklaw.com


WEXLER BOLEY & ELGERSMA LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail: kaw@wbe-llp.com
        kae@wbe-llp.com

GEORGE FELDMAN MCDONALD, PLLC
LORI G. FELDMAN
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
Facsimile: (888) 421-4173
E-mail: LFeldman@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
DAVID J. GEORGE
BRITTANY L. SACKRIN
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
E-mail: DGeorge@4-Justice.com
E-mail: bsackrin@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
JANINE L. POLLACK
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (917) 983-2707
E-mail: jpollack@4-Justice.com

LYNCH CARPENTER LLP
KATRINA CARROLL
KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 212-5919
E-mail: katrina@lcllp.com
        kyle@lcllp.com

SALTZ MONGELUZZI & BENDESKY, PC
SIMON B. PARIS, ESQ.
PATRICK HOWARD, ESQ.
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA  19103
Telephone: (215) 496-8282
Facsimile: (215) 754-4443
E-mail:  sparis@smbb.com
            phoward@smbb.com

THRONDSET MICHENFELDER, LLC
JASON GUSTAFSON
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (763) 515-6110
E-mail: jason@throndsetlaw.com

*Counsel for Plaintiffs*

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

## <u>ACKNOWLEDGEMENT REQUIRED BY MINNESOTA STATUTE, SECTION 549.211,</u><br><u>SUBDVISION 2</u>

The undersigned hereby acknowledges that pursuant to Minnesota Statute, section 549.211, subdivision 2, costs, disbursements and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find that the undersigned acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass or committed a fraud upon the Court.

Dated:  May 3, 2024          */s/  Catherine K. Smith*_____
                             Catherine K. Smith

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT
                                                Case Type:  Civil Other

| | |
|---|---|
| Amanda Seutter and Brittany Yelle**,** individually and on behalf of a class of similarly situated individuals,<br><br>        Plaintiffs,<br><br>v.<br><br>MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC,<br><br>        Defendants. | Court File No. _____<br><br><br>**CIVIL COVER SHEET**<br>**(NON-FAMILY CASE TYPE)** |

Date Case Filed:  May 3, 2024

<u>**Attorneys for Plaintiffs:**</u>                    <u>**Addresses for Defendants:**</u>

GUSTAFSON GLUEK PLLC                    MEAD JOHNSON NUTRITION COMPANY
CATHERINE SUNG-YUN K. SMITH        c/o Corporation Service Company
DANIEL E. GUSTAFSON                         251 Little Falls Drive
SHASHI K. GOWDA                                Wilmington, DE 19808
Canadian Pacific Plaza
120 South 6th Street, Suite 2600           MEAD JOHNSON & COMPANY, LLC
Minneapolis, MN 55402                          c/o Corporation Service Company
Telephone: (612) 333-8844                     251 Little Falls Drive
Facsimile: (612) 339-6622                       Wilmington, DE 19808
E-mail: csmith@gustafsongluek.com
      dgustafson@gustafsongluek.com
      sgowda@gustafsongluek.com


LOCKRIDGE GRINDAL NAUEN PLLP
ROBERT K. SHELQUIST
REBECCA A. PETERSON
KRISTA K. FREIER
CATHERINE A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

27-CV-24-7741

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail:  rkshelquist@locklaw.com
          rapeterson@locklaw.com
          kkfreier@locklaw.com
          capeterson@locklaw.com

WEXLER BOLEY & ELGERSMA LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail: kaw@wbe-llp.com
          kae@wbe-llp.com

GEORGE FELDMAN MCDONALD, PLLC
LORI G. FELDMAN
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
Facsimile: (888) 421-4173
E-mail: LFeldman@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
DAVID J. GEORGE
BRITTANY L. SACKRIN
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
E-mail: DGeorge@4-Justice.com
E-mail: bsackrin@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
JANINE L. POLLACK
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (917) 983-2707
E-mail: jpollack@4-Justice.com

LYNCH CARPENTER LLP
KATRINA CARROLL

2

KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 212-5919
E-mail: katrina@lcllp.com
       kyle@lcllp.com

SALTZ MONGELUZZI & BENDESKY, PC
SIMON B. PARIS, ESQ.
PATRICK HOWARD, ESQ.
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA 19103
Telephone: (215) 496-8282
Facsimile: (215) 754-4443
E-mail: sparis@smbb.com
       phoward@smbb.com

THRONDSET MICHENFELDER, LLC
JASON GUSTAFSON
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (763) 515-6110
E-mail: jason@throndsetlaw.com

1.    Provide a concise statement of the case including facts and legal basis:

Plaintiffs allege that Defendant's infant formula products contain toxic heavy metals, which
Defendant failed to disclose to Plaintiffs. As a result of Defendant's omissions, Plaintiffs seek
claims on behalf of a class of Minnesota residents under the Minnesota Unlawful Trade Practices
Act, Minnesota Uniform Deceptive Trade Practices Act, Minnesota False Statement in
Advertising Act, Minnesota Prevention of Consumer Fraud Act, and under Minnesota common
law.

2.    Date Complaint was served: <u>Sent for Service</u>

3.    For Expedited Litigation Track (ELT) Pilot Courts only:
      a.    ☐ the parties jointly and voluntarily agree that this case shall be governed by the
            Special Rules for ELT Pilot. Date of agreement: _____
      b.    ☐ The court is requested to consider excluding this case from ELT for the
            following reasons: _____
      Note: ELT is mandatory in certain cases, and where mandatory, exclusion may also be
      sought by timely motion under the Special Rules for ELT Pilot.
      c.    Anticipated number of trial witnesses: _____

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

    d.     Amount of medical expenses to date: _____

    e.     Amount of lost wages to date: _____

    f.     Identify any known subrogation interests: _____

4.    For Complex Cases (See Minn. Gen. R. Prac. 146):

    a.     Is this case a "complex case" as defined in Rule 146?  _X__ Yes ___ No

    b.     State briefly the reasons for complex case treatment for this case:

This is an action that requires a complex case designation, as it is a products liability class action that will likely have numerous hearings, a substantial amount of documentary evidence, multiple expert witnesses, coordination with similar actions filed in other states, and involves complex legal issues.

5.    Estimated discovery completion within 12 months from the date of this form.

6.    Disclosure / discovery of electronically stored information discussed with other party?

    ☒ No   ☐ Yes, date of discussion: _____

    If Yes, list agreements, plans, and disputes: _____

7.    Proposed trial start date: ____May 2026____

8.    Estimated trial time: _10__ days _____ hours (estimates less than a day must be stated in hours).

9.    Jury trial is:

    ☐ waived by consent of _____ pursuant to Minn. R. Civ. P. 38.02.

    ☒ requested by ____Plaintiffs____ (NOTE: Applicable fee must be enclosed)

10.    Physical/mental/blood examination pursuant to Minn. R. Civ. P. 35 is requested:

    ☐ Yes ☒ No

11.    Identify any party or witness who will require interpreter services, and describe the services needed (specifying language, and if known, particular dialect): ___Unknown___

12.    Issues in dispute:

      i. whether Defendant owed a duty of care;

     ii. whether Defendant owed a duty to disclose;

    iii. whether Defendant knew or should have known that the Infant Formulas and their ingredients contained or had a risk of containing Heavy Metals;

    iv. whether Defendant failed to disclose the Omissions;

     v. whether the claims of the Plaintiffs and the Class serve a public benefit;

    vi. whether Defendant's packaging and label are false, deceptive, and misleading based on the Omissions;

vii. whether the Omissions are material to a reasonable consumer;

viii. whether the Omissions are likely to deceive a reasonable consumer;

ix. whether Defendant had knowledge that the Omissions were material and false, deceptive, and/or misleading;

x. whether Defendant breached its duty of care;

xi. whether Defendant breached its duty to disclose;

xii. whether Defendant violated the laws of the State of Minnesota;

xiii. whether Defendant breached its implied warranties;

xiv. whether Defendant engaged in unfair trade practices;

xv. whether Defendant engaged in false advertising;

xvi. whether Defendant made fraudulent omissions;

xvii. whether Plaintiffs and Class members' claims are tolled based on Defendant's fraudulent concealment;

xviii. whether Plaintiffs and members of the Class are entitled to actual and statutory damages; and

xix. whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief.

13.   Case Type / Category: _____Civil/Other_____ (NOTE:  select case type from Form 23, Subject Matter Index for Civil Cases, appended to the Minnesota Rules of Civil Procedure).

14.   Recommended Alternative Dispute Resolution (ADR) mechanism: __TBD_____
(See list of ADR processes set forth in Minn. Gen. R. Prac. 114.02(a))
Recommended ADR provider (known as a "neutral"): _TBD_____
Recommended ADR completion date: _TBD_____
       If applicable, reasons why ADR not appropriate for this case: _____

By signing below, the attorney or party submitting this form certifies that the above information is true and correct.

5

27-CV-24-7741

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

Dated:  May 3, 2024                          **GUSTAFSON GLUEK PLLC**

By: */s/ Catherine K. Smith*
CATHERINE SUNG-YUN K. SMITH
DANIEL E. GUSTAFSON
SHASHI K. GOWDA
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: csmith@gustafsongluek.com
  dgustafson@gustafsongluek.com
  sgowda@gustafsongluek.com


LOCKRIDGE GRINDAL NAUEN PLLP
ROBERT K. SHELQUIST
REBECCA A. PETERSON
KRISTA K. FREIER
CATHERINE A. PETERSON
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail:  rkshelquist@locklaw.com
  rapeterson@locklaw.com
  kkfreier@locklaw.com
  capeterson@locklaw.com


WEXLER BOLEY & ELGERSMA LLP
KENNETH A. WEXLER
KARA A. ELGERSMA
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
E-mail: kaw@wbe-llp.com
  kae@wbe-llp.com

GEORGE FELDMAN MCDONALD, PLLC
LORI G. FELDMAN
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
Facsimile: (888) 421-4173
E-mail: LFeldman@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
DAVID J. GEORGE
BRITTANY L. SACKRIN
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Telephone: (561) 232-6002
Facsimile: (888) 421-4173
E-mail: DGeorge@4-Justice.com
E-mail: bsackrin@4-Justice.com
E-service: eService@4-Justice.com

GEORGE FELDMAN MCDONALD, PLLC
JANINE L. POLLACK
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (917) 983-2707
E-mail: jpollack@4-Justice.com

LYNCH CARPENTER LLP
KATRINA CARROLL
KYLE A. SHAMBERG
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (312) 212-5919
E-mail: katrina@lcllp.com
        kyle@lcllp.com

Filed in District Court
State of Minnesota
5/3/2024 3:35 PM

SALTZ MONGELUZZI & BENDESKY, PC
SIMON B. PARIS, ESQ.
PATRICK HOWARD, ESQ.
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA  19103
Telephone: (215) 496-8282
Facsimile: (215) 754-4443
E-mail:  sparis@smbb.com
            phoward@smbb.com

THRONDSET MICHENFELDER, LLC
JASON GUSTAFSON
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (763) 515-6110
E-mail: jason@throndsetlaw.com

*Counsel for Plaintiffs*

State of Minnesota
Hennepin County

District Court
Fourth Judicial District

**Court File Number: 27-CV-24-7741**

Case Type: Civil Other/Misc.

## Notice of Judicial Assignment-
## General Civil Block Cases

FILE COPY

---

**Amanda Seutter and Brittany Yelle, individually and on behalf of a class of similarly situated individuals  vs  MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC.**

Date Case Filed: May 03, 2024

All future papers must include the above file number, name of assigned judge, attorney identification number, and must otherwise conform to format requirements or they will be returned.

This case is assigned the following judicial officer for all further proceedings:

> **District Court Judge Thomas J. Conley**
> 612-348-0732

**Mailing Address:** 300 South Sixth Street, MC 332, Minneapolis, MN 55487-0332

**Parties**:  If you receive this notice and have obtained an attorney, notify him/her of this assignment immediately.

**Attorneys**:  Only the first listed attorney for a party is being sent this notice.  If you are the attorney receiving this notice, contact all other attorneys representing your party of the judge assignment and requirements.

The filing attorney/party is responsible for notifying all attorneys/parties not listed on the Civil Cover Sheet of the judge assignment and requirements.

Per Supreme Court order, e-filing is mandatory in this case for all attorneys and government agencies. Unrepresented parties are excluded by this order.  Attorneys or government agencies must also e-serve all documents required or permitted to be served on other attorneys or government agencies.  Upon receipt of this notice, attorneys and government agencies shall immediately add their firm/agency's service contact(s) for this case to the e-filing system.  For further information on e-filing, go to: http://www.mncourts.gov/district/4/?page=3953.

All future hearings and trial dates will be scheduled by the courtroom staff.  Check with the Court Display Monitors on the Public Service Level for the location on the day of the hearing.

A notice to remove this judicial officer must comply with Minnesota Rules of Civil Procedure 63.03 and Minnesota Statute § 542.16.

Failure to timely file any required document or other failure to comply with the General Rules of Practice for the District Courts may result in the impositions of sanctions, including possible dismissal of the case or striking of the Answer.

The Minnesota Supreme Court has adopted time objectives for the disposition of civil cases. The Fourth Judicial District adheres to these objectives which are: 90% of the cases should be disposed of within 12 months, 97% within 18 months, and 99% within 24 months of filing.

Dated: May 6, 2024

Court Administrator
Hennepin County District Court

cc:   Mead Johnson Nutrition Company
      Mead Johnson & Company, LLC
      CATHERINE SUNG-YUN KIM SMITH

STATE OF MINNESOTA                                DISTRICT COURT

COUNTY OF HENNEPIN                        FOURTH JUDICIAL DISTRICT
                                                  Case Type:  Civil Other

| | |
|---|---|
| Amanda Seutter and Brittany Yelle**,** individually and on behalf of a class of similarly situated individuals,<br><br>            Plaintiffs,<br><br>v.<br><br>MEAD JOHNSON NUTRITION COMPANY and MEAD JOHNSON & COMPANY, LLC,<br><br>            Defendants. | Court File No. 27-CV-24-7741<br><br>Hon. Thomas J. Conley<br><br><br>**WAIVER OF SERVICE OF SUMMONS** |

TO:    CATHERINE K. SMITH, GUSTAFSON GLUEK PLLC

        I received your request that Defendants, Mead Johson Nutrition Company and Mead Johnson & Company, LLC, waive service of a summons in *Seutter, et al. v. Mead Johnson Nutrition Company, et al.*, District Court for the Fourth Judicial District of Minnesota, Hennepin County.

        I have received a copy of the Complaint in this lawsuit, a copy of this waiver, and a means for returning the signed waiver to you without cost to Defendants.  I agree to save the cost of service of the Summons and Complaint in this lawsuit.

        I understand that Defendants will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the Summons or in service of the Summons.  I understand that a judgment may be entered against Defendants if an answer or motion under Rule 12 is not served upon you with 60 days after May 7, 2024, or within 90 days after that date if the request was sent outside the United States.

Dated:    _____05/07/2024_____          _____
                                                               Signature

                                                               Jennifer L. Mesko
                                                               _____
                                                               Typed/Printed Name

Filed in District Court
State of Minnesota
5/10/2024 10:02 AM

**DUTY TO AVOID UNNECESSARY COSTS OF SERVICE OF SUMMONS**

Rule 4 of the Minnesota Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and complaint. A defendant/respondent located in the United States who, after being notified of an action and asked by a plaintiff/petitioner located in the United States to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver. It is not good cause for a failure to waive service that a party believes that the complaint/petition is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property.  A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the court or to the place where the action has been brought. A defendant/ respondent who waives service must within the time specified on the waiver form serve on the plaintiff/petitioner's attorney (or unrepresented plaintiff/petitioner) a response to the complaint/ petition. If the answer or motion is not served within this time, a default judgment may be taken against that defendant/respondent. By waiving service, a defendant/respondent is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received.

## CERTIFICATE OF SERVICE

The undersigned attorney hereby states that on June 6, 2024, a copy of the foregoing document was filed with the Hennepin County Court Administrator using the electronic filing system, and a copy was served on the following attorneys via U.S. Mail:

Catherine Sung-Yun K. Smith
Daniel E. Gustafson
Shashi K. Gowda
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402

Robert K. Shelquist
Rebecca A. Peterson
Krista K. Freier
Catherine A. Peterson
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

Kenneth A. Wexler
Kara A. Elgersma
**WEXLER BOLEY & ELGERSMA LLP**
55 West Monroe Street, Suite 3300
Chicago, IL 60603

Simon B. Paris
Patrick Howard
**SALTZ MONGELUZZI & BENDESKY, PC**
1650 Market Street, 52nd Floor
One Liberty Place
Philadelphia, PA 19103

Lori G. Feldman
**GEORGE FELDMAN McDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520

David J. George
Brittany L. Sakrin
**GEORGE FELDMAN McDONALD, PLLC**
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467

Janine L. Pollack
**GEORGE FELDMAN McDONALD, PLLC**
745 Fifth Avenue, Suite 500
New York, NY 10151

Katrina Carroll
Kyle A. Shamberg
**LYNCH CARPENTER LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602

Jason Gustafson
**THRONDSET MICHENFELDER, LLC**
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402

*/s/George W. Soule*